UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC., a New York corporation,<br><br>       Plaintiff,<br><br>  v.<br><br>D&A CORPORATION d/b/a BAKERSFIELD WHOLESALE FOODS, a California Corporation, ABDO AEZAH, an individual, MALAKA M. AEZAH, an individual, FAHD AIZAH, an individual, DAVID AEZAH, an individual, and DOES 1 THROUGH 100, inclusive,<br><br>       Defendants.<br>_____ | 1:04-cv-6737 OWW TAG<br><br>MEMORANDUM DECISION IN SUPPORT OF DOC. 72 (ORDER GRANTING PLAINTIFF'S MOTION FOR AN ORDER OF CONTEMPT). |

I.   **INTRODUCTION**

Plaintiff, American Express Travel Related Services Company, Inc. ("Plaintiff" or "American Express") moved for an order of contempt against Defendant Abdo Aezah ("Defendant Abdo"), for violation of a temporary restraining order.  (Doc. 30, Pl.'s Mem. 6-7, filed Feb. 23, 2005).  Defendant Abdo opposed the motion. (Doc. 34, Def.'s Response).  Oral argument was heard and an

1

evidentiary hearing took place on April 4, 2005.  Plaintiff's
motion was granted on April 13, 2005.  (Doc. 72).  This is a
Memorandum Decision in support of the Order Granting Plaintiff's
Motion for an Order of Contempt (Doc. 72).

## II.  **PROCEDURAL HISTORY**

This cause of action arises out of the non-payment of
approximately $3.68 million in credit card charges made to
Defendants' American Express charge cards.  American Express
filed its original complaint on December 21, 2004, against
D&A Corporation, d/b/a Bakersfield Wholesale Foods
("Bakersfield Wholesale"); Defendant Abdo; Malaka M. Aezah
("Defendant Malaka"); and Fahd Aizah (Defendant Fahd).[1]  (Doc. 1,
Compl.).  Defendant Malaka is Defendant Abdo's common law wife.
(*See* Doc. 24, Def. Abdo's Answer ¶ 7).  Defendant Fahd was
dismissed as a defendant, without prejudice, on March 9, 2005.
(Doc. 39, Order).  Plaintiff filed the operative First Amended
Complaint ("FAC") on March 22, 2005.  (Doc. 44).  Plaintiff added
David Aezah ("Defendant David"), who is either Defendant Abdo's
brother or brother-in-law, as a defendant and amended its
claims.[2]

---

[1] The original complaint contained claims for Breach of
Contract against Bakersfield Wholesale, Account Stated against
Bakersfield Wholesale, Book Account against all defendants,
Unjust Enrichment against all defendants, Common Law Fraud
against all defendants, and Piercing the Corporate Veil.

[2] Plaintiff amended its claims as follows: Breach of
Contract against Bakersfield Wholesale, Account Stated Against

On the same day that Plaintiff filed its original Complaint, December 12, 2004, Plaintiff also filed a Motion for Writ of Attachment, pursuant to Cal. Civ. Proc. § 482.010 *et seq.*, against property located at 402 California Avenue, Bakersfield, California ("the Warehouse Property") and against approximately $700,000.00 worth of checks from retail outlets to whom Bakersfield Wholesale sells cigarettes and groceries.  (Doc. 3, Declaration of Michael Samuelson in support of Motion for Writ of Attachment ("M. Samuelson Decl.") at 7; *see also* Doc. 2, 12/21/04 Motion for Writ of Attachment ("First Attachment Motion") at 2).

In response to the First Attachment Motion, on January 4, 2005, the Court issued an order for Defendants Bakersfield Wholesale, Abdo, Malaka, and Fahd to show cause why a writ of attachment should not issue.  (Doc. 6, 01/04/05 Order to Show Cause at 2-3).  The 01/04/05 Order to Show Cause also contained a Temporary Restraining Order ("01/04/05 TRO") against all Defendants.  (*Id.* at 2).  The 01/04/05 TRO is the subject of this motion.  The 01/04/05 TRO stated:

> [I]t is further ORDERED that pending the hearing and determination of this motion, defendants, all persons owing any debt to defendants, and all other persons and garnishees, be and hereby are restrained and prohibited from transferring or paying any assets of the defendants or any personal or real property in which the defendants have an interest, or any debt owed to defendants to the following extent:  i) as to defendant Bakersfield Wholesale, to the extent of $3,683,320.97; ii) as to defendant Abdo Aezah, to

Bakersfield Wholesale, Breach of Contract against the individual defendants, Breach of Contract on Book Account against all defendants except Defendant David, Unjust enrichment against all defendants except Defendant David, common law fraud against all defendants except Defendant David, Piercing the Corporate Veil, and Fraudulent Conveyance against Bakersfield Wholesale, Defendants Abdo and David.  (*Id.*).

**3**

the extent of $351,384.38; iii) as to defendants Malaka
Aezah to the extent of $144,044.87; and iv) as to defendant
Fahd Aizah to the extent of $3,187,891.72....

(*Id.*).   The amounts were based on amounts detailed in
American Express' First Attachment Motion with respect to the
respective charge accounts of each Defendant.  (Doc. 3, M.
Samuelson Decl. ¶¶ 10, 29).

Defendants Abdo, Malaka, Bakersfield Wholesale, and Fahd
were served with the 01/04/05 TRO.  (Docs. 16-18, 23 Certificates
of Service).   The Certificate of Service for Defendant Abdo
states that he was served with the 01/04/05 TRO on
January 4, 2005, at 402 California Avenue, Bakersfield,
California (i.e., the Warehouse Property) by personal delivery to
Joseph Aezah, who is listed as "authorized to accept" service.
(Doc. 17).   At the contempt hearing, Defendant Abdo testified
that Joseph Aezah is his sixteen-year-old nephew.  Defendant Abdo
also testified that he did not remember when his nephew Joseph
gave him the 01/04/05 TRO.  Defendant contends that the
January 4, 2005, certificate of service shows only that the
01/04/05 TRO was served on someone other than Defendant Abdo.
(Doc. 34, Defs.' Response 4).

Plaintiff also asserts that it served Defendant Abdo with
the 01/04/05 TRO via facsimile and Federal Express on
January 5, 2005.   (*Id.*).   Defendant contends that there is no
foundational evidence in Plaintiff's papers regarding the
facsimile number of D&A Corporation and that Plaintiff failed to
produce the Federal Express receipt.  (*Id.*).   Defendant Abdo
testified that he did not remember whether he received the
facsimile or the Federal Express of the 01/04/05 TRO.  Abdo

**4**

testified that he received "a lot of papers."  Defendant Abdo acknowledged that he was present at the January 11, 2005, hearing (which the 01/04/05 Order to Show Cause noticed) and that he was present at the hearing because his attorney told him to be there.

Oral argument regarding the 01/04/05 Order to Show Cause was heard on January 11, 2005, in Courtroom 2.  Defendant Abdo was present at the hearing.  Steven Koch and M. Monack appeared for Plaintiff.  Russell VanRozeboom appeared for Defendants D&A Corporation, Abdo, and Malaka.  (Doc. 12, Minutes; *see also* 01/11/05 Order Granting Writs of Attachment 1-2).  Defendants Malaka and Fahd did not appear.[3]  The parties reached agreement as to the issuance of the writs of attachment, which were subsequently issued on the same day.[4]   (Docs. 14, 15 ("First Writs of Attachment")).

On February 23, 2005, American Express moved for the following relief: (1) Expedited Discovery; (2) Order of Contempt against Defendant Abdo; (3) Leave to Amend the Summons and Complaint pursuant to Fed. R. Civ. P. 15; (4) Order of Attachment

---

[3] Defendant Fahd had not yet been dismissed from the case on January 11, 2005.

[4] One of the First Writs of Attachment was issued against Defendant Abdo (Doc. 14) and the other was issued against Defendant Bakersfield Wholesale (Doc. 15).  Both of the First Writs of Attachment were phrased generally, and ordered attachment of "[a]ny asset of the defendant or any personal or real property in which the defendant has an interest, or any debt owed to defendant."  (*Id.*).  The writ as to Defendant Abdo was issued in the amount of $351,384.38, and the First Writ for Defendant Bakersfield Wholesale was issued in the amount of $3,683,320.97.  (*Id.*; *see also* Doc. 13, Order Granting Writs of Attachment 2).  No writs of attachment were issued as to Defendants Malaka and Fahd.  (*See id.*).

against the properties located at 11102 Coachlight Court, Bakersfield, California ("Coachlight Property"), and 402 California Avenue, Bakersfield, California ("Warehouse Property"), pursuant to Fed. R. Civ. P. 64 and Cal. Civ. Proc. § 482.010; (5) Preliminary Injunction against Defendant Abdo and against Defendant David pursuant to Cal. Civ. Proc. § 3439.07(a)(3)(A).  (Doc. 30, Pl.'s Mem.).

The hearing on these motions was originally noticed for April 4, 2005.  (*Id*. at 1).  On February 28, 2005, the Court issued an Order to Show Cause and the hearing was rescheduled for March 3, 2005.[5]  (Doc. 31, 02/28/05 Order to Show Cause).

---

[5]    The 02/28/05 Order ordered Defendants Bakersfield Wholesale, Abdo, Malaka, and Fahd, and proposed Defendant David Aezah, were ordered to show cause on March 3, 2005:

i) why an order of contempt against Defendant Abdo should not issue for violation of the temporary restraining order signed January 4, 2005;

ii) why American Express should not be granted leave to amend the summons and complaint to assert attidional causes of action against Defendants Abdo and Bakersfield Wholesale and to name David as an additional defendant to the action on a claim for fraudulent conveyance;

iii) why an order of attachment should not be issued as to the Warehouse Property and a property located at 11102 Coachlight Court, Bakersfield, California ("Coachlight Property");

iv) why a preliminary injunction should not issue preventing David from transferring the Coachlight Property and the Warehouse Property pending further order of the Court, and preventing Defendant Abdo from transferring, conveying, or otherwise encumbering any assets in his possession; and

v) why expedited discovery should not be ordered.

Defendants were ordered to respond to the Order to Show Cause by March 2, 2005, at 4:30 p.m. (*Id.* at 3). Defendants Bakersfield Wholesale, Abdo, and Malaka responded by the deadline. (Doc. 34, Defs.' Response).

On March 3, 2005, in Courtroom 2, oral argument was heard on Plaintiff's February 23, 2005, motion, with appearances by Plaintiff's and Defendants' counsel. (Doc. 43, Minutes). Plaintiff's motions for (1) Expedited Discovery; (2) Leave to Amend; and (3) Writs of Attachment were granted.[6] (Doc. 41, 03/15/05 Order Granting Expedited Discovery and Other Relief; Doc. 42, 03/16/05 Order Granting Writs of Attachment and Other Relief).

---

(Doc. 31, 02/28/05 Order to Show Cause 2).

The 02/28/05 Order to Show Cause also contained a temporary protective order against proposed defendant David and against Defendant Abdo:

> [I]t is further ORDERED that pending the hearing and determination of this motion or pending further order of the Court, David, be and hereby is restrained and prohibited from transferring, conveying or otherwise encumbering the Coachlight Property and the Warehouse Property; and Abdo is restrained and prohibited from transferring, conveying or otherwise encumbering any assets in his possession, whether real property or chattels, except in the ordinary course of business....

(*Id.* at 2). The February 28, 2005, temporary restraining order is not the subject of this motion.

[6] Writs of Attachment issued as to Defendant Bakersfield Wholesale only. (Docs. 47, 48). One Writ was issued as to the Coachlight Property and the other issued as to the Warehouse Property. (Docs. 47, 48; *see also* Doc. 42, 03/16/05 Order Granting Writs of Attachment and Other Relief 3). The writs were not signed by the clerk of court. (See also Docs. 52 & 53).

7

1  The motions for preliminary injunction and contempt were not
2  heard at the hearing on March 3, 2005.  Further oral argument was
3  continued until April 4, 2005.  (Doc. 41, Order Granting
4  Expedited Discovery and Other Relief 3).  Defendant Abdo was
5  directed to personally appear at the hearing to give testimony if
6  so required.  (*Id*.).  Neither party filed any further documents
7  or papers relating to the Plaintiff's motions for contempt and
8  preliminary injunction.
9  On April 4, 2005, oral argument was heard regarding
10  Plaintiff's motion for contempt.  The motion for preliminary
11  injunction was not discussed by the parties.[7]  Ira N. Glauber and
12  Steven M. Koch appeared on behalf of Plaintiff, and
13  Russell VanRozeboom and Gary L. Huss appeared on behalf of
14  Defendant.  (Doc. 65, Minutes).  An evidentiary hearing was held
15  and Defendant Abdo Azeh testified.

16
17  III.   **STATEMENT OF FACTS**
18

19  This is an action for non-payment of approximately $3.68
20  million in credit card charges made to Defendants' American
21  Express charge cards.  Plaintiff alleges that Defendants
22  Bakersfield Wholesale, Abdo, and Malaka purchased from Costco
23  approximately $3.68 million worth of cigarettes using their
24  American Express corporate charge cards and that Defendants have

25
26  _____
27  [7] On April 20, 2005, an order issued informing the parties
that "[i]f injunctive relief is still sought, this subject needs
to be addressed."  (Doc. 76).  No action by either party has been
28  taken to date.

failed to make payment on this amount.  The subject of

Plaintiff's motion for contempt is the allegation that Defendant

Abdo has transferred property he owned to his brother-in-law,

Defendant David, in violation of the TRO.

### A.   Credit Card Charges.

In May 2004, Defendant Abdo applied for and was granted a

corporate credit card account (but no purchase card) on behalf of

"Bakersfield Wholesale."  (Doc. 30, Glauber Decl. ¶ 8a; Doc. 30,

Pl.'s Mem. 4).  In September 2004, Abdo applied for and was

granted a corporate purchase card account on behalf of "D&A

Corporation."  (*Id.*).  American Express then issued three

additional American Express corporate credit cards in the names

of Defendants Abdo, Malaka, and Fahd.  (*Id.*).

As of the end of October 2004, Plaintiff alleges there was a

balance of $109,762 owed with respect to the American Express

credit card account of Abdo Aezah/Bakersfield Wholesale (3794-

793179-41002).  Plaintiff further alleges that, as of the end of

October 2004, there was a balance of $109,762 owed with respect

to the card issued in the name of Defendant Abdo; $46,834.26 owed

with respect to the card of Defendant Malaka; and $35,033.75 owed

with respect to the card of Defendant Fahd.  (*Id.* at ¶ 8(b-c)).

On November 5 and 7, 2004, American Express received electronic

payments by computer of those amounts for each account.  (*Id.*).

However, approximately one month later, on December 4, 2004, the

bank that issued these payments to American Express reversed the

payments due to insufficient funds.  (*Id.*).  American Express

**9**

closed the accounts on December 2, 2004.[8]  (*Id.* at ¶ 8(e)).

As of December 15, 2004, the total unpaid balance on the four American Express cards issued to defendants was $3,683,320.97.  (*Id.* at ¶ 8(f)).  Plaintiff asserts that neither Defendant Abdo nor Bakersfield Wholesale has disclosed the location of the cigarettes they purchased using the credit. American Express suspects (but is unable to prove) that Bakersfield Wholesale and Abdo have either secreted the cigarettes or the proceeds from the sale of the cigarettes, or have fraudulently transferred the cigarettes to parties unknown to American Express at the time the brief was filed.  (*Id.*).  At the hearing Defendant Abdo invoked his Fifth Amendment privilege in response to questions about the whereabouts of the cigarettes and his assets.

### B.   Defendant Abdo's Alleged Conveyances of Property.

In its moving papers, American Express initially asserted that Defendant Abdo violated the January 4, 2005, TRO by transferring the Coachlight Property to his brother David.  At the April 4, 2005, contempt hearing, however, Plaintiff acknowledged that there is no admissible evidence of the transfer of the Coachlight Property, and that it does not believe that Defendant Abdo transferred the Coachlight Property.  Instead, Plaintiff argues that Defendant Abdo violated the 01/04/05 TRO by transferring his home residence.  Plaintiff produced a certified

---

[8] American Express does not explain why the accounts were closed on December 2, 2004, even though the bank did not inform it of the reversal until two days later, on December 4, 2004.

copy of a Grant Deed (dated January 6, 2005, and signed January 7, 2005), whereby Defendant Abdo transferred to Defendant David a property located at 2516 El Portal, Bakersfield, California ("El Portal Property").[9]  (Pl.'s Ex. 2).  During his testimony on April 4, 2005, Defendant Abdo admitted that he granted the El Portal Property, which is his home residence, to David and that he "tried to transfer it for his kids."[10]

Plaintiff also asserts that in August 2004, long before the 01/04/05 TRO was in effect, Defendant Abdo transferred the Warehouse Property to his brother-in-law, Defendant David.  (*Id.* at ¶ 12).  Plaintiff attaches a printout from Westlaw that purports to document the transfer of property and that Defendant Abdo conveyed the property to Defendant David without any consideration.  (*See id.* at Ex. F).  During the April 4, 2005, contempt hearing, Plaintiff produced a Grant Deed that was dated and signed August 27, 2004, establishing the transfer of the Warehouse Property from Defendant Abdo to Defendant David.  (Pl.'s Ex. 4).  Defendant Abdo did not deny that this Grant Deed (i.e., Pl.'s Ex. 4) documented transfer of the Warehouse Property.

At the contempt hearing, Plaintiff also produced a certified

---

[9] The Grant Deed contains a technical description of the property and omits the street address.  Defendant Abdo did not deny during his testimony that, through the Grant Deed (Pl.'s Ex. 2), he granted his residence located at 2516 El Portal to his brother David on January 6, 2005.

[10] Plaintiff also produced a Grant Deed dated March 21, 2005, whereby David granted the El Portal Property back to Abdo. (Pl.'s Ex. 3).

copy of a Notice to Creditors of Bulk Sale, dated January 3, 2005.  (Pl.'s Ex. 1).  The notice stated that "a bulk sale is about to be made," and listed Bakersfield Wholesale as the seller and David Aezah as the buyer.  The notice described the assets being sold as "inventory."  Plaintiff produced no evidence that the bulk sale had actually been consummated.  In response to questions about this bulk sale at the April 4, 2005, hearing (including but not limited to questions regarding the content of the inventory, whether the bulk sale took place, whether the inventory included the $3.68 million worth of cigarettes charged to the American Express charge cards), Defendant Abdo invoked the Fifth Amendment.

## IV.   LEGAL ANALYSIS

### A.   Legal Standard for Contempt.

Contempt may be civil or criminal.  The punishment for a civil contempt is remedial (for the benefit of the complainant), while the punishment for a criminal contempt is punitive (to vindicate the Court's authority).[11]  *Hicks ex rel. Feiock v.*

---

[11] The Supreme Court has noted the distinction between civil and criminal contempt is blurred.  *Int'l Union, United Mine Workers of Amer. v. Bagwell*, 512 U.S. 821, 827 n. 3 (1994).  An issue in contempt cases often addressed on appeal is whether the sanctions for contempt issued by a district court are "civil" or "criminal."  *See, e.g., Bagwell*, 512 U.S. at 826-30; *United States v. Ayres*, 166 F.3d 991, 995 (9th Cir. 1999); *Kirkland v. Legion Ins. Co.*, 343 F.3d 1135, 1140 (9th Cir. 2003); *Portland Feminist Women's Health Ctr. v. Advocates for Live, Inc.*, 877 F.2d 787, 790 (9th Cir. 1989).  Courts look to the nature of the sanctions on appeal (i.e., after they have been imposed by the

*Feiock*, 485 U.S. 624, 631 (1988); *Portland Feminist Women's Health Ctr. v. Advocates for Life*, 877 F.2d 787, 790 (9th Cir. 1989); *Int'l Union, United Mine Workers of Amer. v. Bagwell*, 512 U.S. 821, 827 (1994) ("whether a contempt is civil or criminal turns on the 'character and purpose' of the sanction involved").

Failure to comply with a court order is grounds for civil contempt to induce compliance and to compensate the complainant for the cost of the contempt proceeding, including attorney's fees. *Perry v. O'Donnell*, 759 F.2d 702, 704-05 (9th Cir. 1985). An order must be specific and definite to be enforceable through contempt proceedings. *United States v. Grant*, 852 F.2d 1203, 1204 (9th Cir. 1988); *Gifford v. Heckler*, 741 F.2d 263, 265 (9th Cir. 1984); *Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.*, 689 F.2d 885, 889 (9th Cir. 1981).

Although a criminal contempt requires willful disobedience, it is unclear whether willfulness is a requirement for civil contempt. *Compare Grant*, 852 F.2d at 1204; *Gifford*, 741 F.2d at 265; *Shuffler v. Heritage Bank*, 720 F.2d 1146 (9th Cir. 1983) (willfulness required), *with In re Dual-Deck Video Cassette Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993); *General Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1379 (9th Cir. 1986); *Perry*, 759 F.2d at 705 (willfulness not required).

The party moving for contempt has the burden to show by clear and convincing evidence that a specific court order was

---

trial judge) to determine whether the purpose of the sanctions was remedial or punitive, and whether the contemnor should have been afforded the constitutional protections of a criminal defendant.

1  violated.  *Dual-Deck*, 10 F.3d at 695; *Balla v. Idaho State Bd. of*
2  *Corrections*, 869 F.2d 461, 466 (9th Cir. 1989); *Vertex*, 689 F.2d
3  at 889.  "The burden then shifts to the contemnors to demonstrate
4  why they were unable to comply."  *Fed. Trade Comm'n v. Affordable*
5  *Media, LLC*, 179 F.3d 1228, 1239 (9th Cir. 1999).  There is no
6  good faith exception to compliance with a court order.  *Peterson*
7  *v. Highland Music*, 140 F.3d 1313, 1323 (9th Cir. 1998).  "The
8  decision to hold a party in contempt of a court order rests with
9  the sound discretion of the trial court."  *Transgro, Inc. v. Ajac*
10 *Transmission Parts Corp.*, 768 F.2d 1001, 1023 (9th Cir. 1985).

11 "[C]ivil contempt sanctions, or those penalties designed to
12 compel future compliance with a court order, are considered to be
13 coercive and avoidable through obedience, and thus may be imposed
14 in an ordinary civil proceeding upon notice and an opportunity to
15 be heard."  *Bagwell*, 512 U.S. at 827.

16

17 **B.   Whether Plaintiff Was Required to Specify the Type of**
18 **Contempt it Seeks.**

19 Defendants argue it cannot be ascertained from Plaintiff's
20 brief and motion whether the contempt it seeks is civil or
21 criminal.  Plaintiff did not state in its motion what relief it
22 is seeking.  It stated that a number of different remedies are
23 allowed in contempt proceedings, without specifying which remedy
24 it believes is appropriate here.  Plaintiff cites the following
25 cases to illustrate various remedies that can be awarded in
26 contempt cases: *In re Crystal Palace Gambling Hall, Inc.*, 817
27 F.2d 1361, 1367-8 (9th Cir. 1987) (costs & fees); *In re 2218*
28 *Bluebird Ltd. Partnership*, 41 B.R. 540, 545-6 (S.D. Cal. 1984)

**14**

1   (dismissal of pleadings); *Hook v. Ariz. Dept. of Corrections*,
2   107 F.3d 1397, 1404 (9th Cir. 1997); (coercive sanctions); *Uphaus*
3   *v. Wyman*, 360 U.S. 72, 1046-7 (1959) (imprisonment to induce
4   compliance).  All of the cases cited involve civil contempt.

5       Defendants did not cite, and the Court has not found, cases
6   requiring that a party seeking contempt specify that it is
7   seeking civil contempt.  Where the contempt is criminal, the
8   contemnor must have actual notice of the criminal nature of the
9   proceedings.  *United States v. Rylander*, 714 F.2d 996, 1004
10  (9th Cir. 1983) (contemnor held to have actual notice of criminal
11  contempt hearing despite that repeated attempts at personal
12  service failed; contemnor's son appeared at hearing and read
13  statement that contemnor had dictated to him over the telephone);
14  *see also* Fed. R. Crim. P. 42(a)(1)(A) (2005) (setting forth
15  notice requirements for criminal contempt proceedings).  Criminal
16  contempt proceedings require procedural protections afforded
17  criminal defendants.  *Young v. United States ex rel. Vuitton et*
18  *Fils S.A.*, 481 U.S. 787, 800-1 (1987); *Bagwell*, 512 U.S. at 826.
19  It is not necessary for the party seeking contempt to request
20  punitive relief, and is often not even appropriate for the party
21  to do so.  *See Nat'l Labor Relations Bd. v. Ironworkers Local*
22  *433*, 169 F.3d 1217, 1219 n. 2 (9th Cir. 1999) ("In exceptional
23  circumstances, the NLRB may request that the court initiate
24  criminal contempt proceedings." citing *Nat'l Labor Relations Bd.*
25  *v. A-Plus Roofing, Inc.*, 39 F.3d 1410, 1417 (9th Cir. 1994)).

26      Here, it is irrelevant that Plaintiff did not explicitly
27  state which type of contempt it seeks.  All cases Plaintiff cited
28  in support of its motion deal with civil contempt.  The decision

**15**

1  whether to initiate criminal proceedings in a contempt case rests
2  solely with judges and grand juries.  *A-Plus Roofing, Inc.*,
3  39 F.3d at 1417; *see also Young*, 481 U.S. at 800-1.  It is not
4  within the discretion of a plaintiff to initiate criminal
5  contempt proceedings.  Defendant Abdo did not receive notice that
6  the proceeding would be anything other than a civil one.  This is
7  a civil contempt proceeding.

8

9        **C.    Defendants Argue that the Language of the TRO is Vague**
10            **and Ambiguous.**

11       Defendants argue that it "is not entirely clear" how the
12  following language of the TRO is to be interpreted: "restrained
13  and prohibited from transferring or paying any assets of the
14  defendants or any personal or real property in which the
15  defendants have an interest...to the following extent: ... ii) as
16  to defendant Abdo Aezah, to the extent of $351,384.38...."
17  Defendants argue that the following language in one of
18  Plaintiff's submissions is somehow more clear: "restrained and
19  prohibited from transferring, conveying or otherwise encumbering
20  any assets in his possession...."  (*Id.* at 3).

21       Contrary to Defendants' conclusory assertion, the TRO
22  language is not vague and ambiguous.  The language makes it very
23  clear that the defendants (including Abdo) are not to transfer
24  any "assets" or any "personal or real property in which [they]
25  have an interest" that is valued at certain specified amounts.
26  As to Defendant Abdo, this amount is $351,384.38.

27

28       **D.    Whether Defendant Abdo Violated the 01/04/05 Temporary**

                                 **16**

**Restraining Order.**

A civil contempt "may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard." *Bagwell*, 512 U.S. at 827.  Fed. R. Civ. P. 65(d) provides that TROs are "binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them *who receive actual notice of the order by personal service or otherwise*." (emphasis added).  Defendant Abdo does not admit nor deny that he received actual notice of the January 4, 2005, TRO before January 6, 2005, (the date on the El Portal Grant Deed), or January 7, 2005 (the date the El Portal Grant Deed was signed).

The certificate of service states that the 01/04/05 TRO was served on Defendant Abdo on January 5, 2005, by personal delivery to his sixteen year old nephew Joseph Aezah at 402 California Avenue, Bakersfield, California.  (Doc. 30, Glauber Decl., Ex. D).  Defendant Abdo testified at the hearing on April 4, 2005, that he "did not remember" when Joseph gave him the 01/04/05 TRO and that he received "a lot of papers." Defendant Abdo, however, was present at the January 11, 2005, hearing and does not deny having received notice of the 01/04/05 TRO at some time before January 11, 2005.

American Express also asserts it faxed a copy of the 01/04/05 TRO to Defendant Abdo on January 5, 2005.  (*Id*. at ¶ 10, Ex. E).  Defendant argues that the fax is not proper service because there is no foundation that the fax number used is the correct fax number for Defendant Abdo.  (Doc. 34, Def.'s Opp. 4).

17

1  Defendant Abdo does not deny having received the fax.

2      Furthermore, American Express asserts it sent a copy of the
3  01/04/05 TRO to Defendant Abdo overnight via Federal Express and
4  that Defendant Abdo received the package on January 6, 2005.
5  (Doc. 30, Glauber Decl. ¶ 10).  Defendant Abdo argues that
6  Plaintiffs failed to attach a Federal Express receipt, but does
7  not deny having received the Federal Express.  He testified only
8  that he "didn't remember" receiving the papers.

9      Plaintiff has established by clear and convincing evidence
10  that it attempted service of the TRO on Defendant Abdo by three
11  means-personal delivery, facsimile, and Federal Express.

12      The TRO prohibiting Defendant Abdo from transferring any of
13  his property up to an amount of $351,348.38 issued on
14  January 4, 2005.  Defendant Abdo transferred his home residence
15  on January 7, 2005.  He admitted at the April 4, 2005, hearing
16  that he transferred the property to his brother "for his kids,"
17  which establishes that it was a knowing transfer with the intent
18  to avoid creditors.

19      Plaintiff has established by clear and convincing evidence
20  that Defendant Abdo violated the 01/04/05 TRO by transferring the
21  El Portal property to Defendant David via the El Portal Grant
22  Deed (Pl.'s Ex. 2).[12]

23  ─────────────────

24      [12] Plaintiffs also produced a notice of bulk sale dated
    January 3, 2005, as evidence of a violation of the TRO.  This
25  document fails to establish by clear and convincing evidence that
    Defendant Abdo violated the TRO by a bulk sale.  The notice
26  establishes only that a bulk sale was about to be made --
    Plaintiffs produced no evidence that the sale actually occurred.
27  Plaintiff's Motion for Contempt on the grounds of a bulk sale is
    **DENIED.**  The transfer of the Warehouse Property occurred months
28

18

1

**V.    CONCLUSION**

2

3       For all the foregoing reasons, Plaintiff's Motion for

4       contempt against Defendant Abdo is **GRANTED.**  Plaintiffs are

5       awarded attorneys' fees and costs in an amount to be

6       determined.

7

8  **SO ORDERED.**

9  **DATED: May _13__ , 2005.**

10

11                                   **/s/ OLIVER W. WANGER**

12                           _____

13                                   **Oliver W. Wanger**
                              **UNITED STATES DISTRICT JUDGE**

14

15

16

17

18

19

20

21

22

23

24

25

26

27  _____

28  before the TRO issued and Plaintiff does not (nor cannot) argue
    that this transfer could be the basis for a contempt order.

**19**