1

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7                    EASTERN DISTRICT OF CALIFORNIA

8

9   AMERICAN EXPRESS TRAVEL RELATED  )   1:04-cv-6737 OWW TAG
    SERVICES COMPANY, INC., a New    )
10  York Corporation,                )   SCHEDULING CONFERENCE ORDER
                                     )
11               Plaintiff,          )   Discovery Cut-Off: 6/29/07
                                     )
12       v.                          )   Non-Dispositive Motion
                                     )   Filing Deadline: 7/10/07
13  D&A CORPORATION d/b/a            )
    BAKERSFIELD WHOLESALE FOODS, a   )   Dispositive Motion Filing
14  California corporation, ABDO     )   Deadline: 7/16/07
    AEZAH, an Individual, MALAKAH M. )
15  AEZAH, an Individual, DAVID      )   Settlement Conference Date:
    AEZAH, an Individual,            )   7/11/07 10:00 Bakersfield
16  BAKERSFIELD GROCERY WHOLESALE,   )
    an unincorporated business       )   Pre-Trial Conference
17  entity; DAVID AEZAH INVESTMENT,  )   Date: 9/24/07 11:00 Ctrm. 3
    INC., a California Corporation,  )
18  and DOES 1 through 100,          )   Trial Date:  11/14/07 9:00
    Inclusive,                       )   Ctrm. 3 (JT-10 days)
19                                   )
                 Defendants.         )
20                                   )
    _____)
21

22

23  I.   Date of Scheduling Conference.

24       March 2, 2007.

25  II.  Appearances Of Counsel.

26       Jaffe & Asher LLP by Ira N. Glauber, Esq., and Gubler & Ide

27  by Steven Koch, Esq., appeared on behalf of Plaintiff.

28       Wild, Carter & Tipton by Gary L. Huss, Esq., appeared on

                                  1

1  behalf of Defendants David Aezah, Bakersfield Wholesale Foods and
2  David Aezah Investments, Inc.

3  **III.   Summary of Pleadings.**

4      1.   In August 2005, a $3,683,320 default judgment (the
5  "Judgment") was entered in this Court against Defendants D&A
6  Corporation d/b/a Bakersfield Wholesale Foods ("Bakersfield
7  Wholesale") and Defendant Abdo Aezah ("Abdo") in favor of
8  American Express.  The judgment remains unsatisfied because both
9  Abdo and Bakersfield Wholesale have rendered themselves judgment-
10 proof by transferring their assets to Abdo's brother, Defendant
11 David Aezah ("David").

12     2.   The Judgment at issue arose from the non-payment of
13 approximately $3.6 million in American Express credit card
14 charges.  In November and December 2004, Bakersfield Wholesale
15 used its corporate American Express credit card accounts to
16 purchase more than $3 million worth of cigarettes from Costco
17 stores (the "Costco Cigarettes").  Abdo, who made the purchases
18 on behalf of Bakersfield Wholesale, has testified that he resold
19 the cigarettes for cash, but he has refused to turn over the
20 proceeds to American Express or reveal what he did with the
21 proceeds.  Initially, American Express was frustrated in its
22 attempts to locate the proceeds by Abdo's invocation of the Fifth
23 Amendment before this Court at an April 2005 contempt hearing and
24 his otherwise evasive testimony.

25     3.   However, in the last six months, American Express has
26 untangled much of what has transpired, largely through document
27 productions and testimony by third parties:

28     •   In August, 2004, David "purchased" Bakersfield

2

1    Wholesale from Abdo in exchange for the forgiveness of
2    a $150,000 loan and for assuming a $300,000 mortgage,
3    and acquired title to Bakersfield Wholesale's real
4    property.  At no time did David disclose to American
5    Express that he had obtained this ownership interest in
6    the business.

7  •  In November and December 2004, Abdo – who had the
8    authority to use Bakersfield Wholesale's American
9    Express credit cards – used them to purchase some $3.6
10   million in cigarettes on behalf of the business at
11   Costco stores (the "Costco Cigarettes").

12 •  Immediately thereafter, Bakersfield Wholesale defaulted
13   on its American Express credit card accounts because of
14   a series of "bounced" checks.  Bakersfield refused to
15   pay the $3.6 million which it owed to American Express,
16   despite due demand.  At this point, the brothers set
17   upon a scheme to keep that money for themselves.

18 •  In December 2004, David – who has perjuriously
19   testified during discovery in this lawsuit that he had
20   nothing to do with the cigarettes bought on the
21   American Express card – rented a unit at a storage
22   facility in Bakersfield, Fortress Self-Storage
23   ("Fortress"), where the brothers hid millions of
24   dollars worth of the Costco Cigarettes transported from
25   Bakersfield Wholesale's warehouse.  David's rental of
26   the unit came just days after Bakersfield Wholesale had
27   finished its massive cigarette purchases.

28 •  The brothers then immediately shut Bakersfield

3

1    Wholesale down as a corporate entity, and in January

2    2005, David opened a cookie cutter successor business,

3    in the same location, with the same customers and

4    suppliers, but with a slightly different name,

5    "Bakersfield Grocery Wholesale."  It has continued to

6    do a landmark business, with Abdo frequently running

7    the store in David's absence.  In a police report dated

8    December 2005, Abdo stated that he and David were the

9    "co-owners" of the new business.

10  • After the Costco Cigarettes were hidden away at the

11    Fortress storage unit, David drew down on the

12    cigarettes for sale at the successor business on an "as

13    needed" basis, in an attempt to launder the proceeds

14    and to cheat American Express out of monies due to it.

15  • In July 2005, a fire at the storage facility damaged or

16    destroyed the remaining Costco Cigarettes, valued at

17    $340,000 - an amount which properly belonged to

18    American Express, but which was paid to David

19    personally by the insurance carrier and which David

20    deposited into the account of his successor business,

21    Bakersfield Grocery Wholesale.

22  • American Express has succeeded in tracking down at

23    least some of the other cash proceeds from the sale of

24    the Costco Cigarettes.  Documents subpoenaed by

25    American Express from Citibank (where David and the

26    successor business had checking accounts) demonstrate

27    that David sent more than $350,000 into his home

28    country of Yemen to various individuals (all of which

**4**

1  he claims were "cash-checking" services).

2  • In December 2005, Abdo tried to throw American Express
3  off his track by making a false report to the police
4  that $2.3 million of the proceeds of the Costco
5  Cigarettes had been stolen from under his kitchen sink.
6  The police never believed a word of his story, and Abdo
7  now claims his report was an "honest mistake."

8  • Following this ruse, David and Abdo deposited $1.3
9  million in $100 dollar bills into the account of the
10  successor business, Bakersfield Grocery Wholesale, over
11  the course of two days in May 2006.

12  • On May 10, 2006, just one day after they deposited the
13  cash into Bakersfield Grocery Wholesale's account at
14  Citibank, the brothers used the money to purchase a low
15  income apartment complex in Pascagoula, Mississippi
16  (the "Mississippi Property").  Only American Express'
17  prompt action in filing a lis pendens in the State of
18  Mississippi prevented a quick resale of the property
19  and further laundering of the cash proceeds of the
20  Costco Cigarettes.  The value of this property is being
21  held in escrow pending the disposition of this lawsuit,
22  but it is not nearly enough to satisfy the Judgment of
23  $3.6 million.

24  • During his deposition in October 2006, David was unable
25  to document or explain how he obtained the massive sums
26  of cash transferred to Yemen or used to purchase the
27  Mississippi apartment complex.  It is evidence that
28  these monies were the proceeds from the sale of the

1   Costco Cigarettes and that David and Abdo have been

2   assiduously working to keep out of the reach of

3   American Express.

4   4.   Based on the above facts - none of which can be

5   disputed - American Express has valid claims against David and

6   the company he now operates as the successor to Bakersfield

7   Wholesale (Bakersfield Grocery Wholesale, an unincorporated

8   entity) for fraudulent conveyance, alter ego liability (piercing

9   the corporate veil), successor liability, and conspiring to

10  defraud, among other claims.   At trial, American Express intends

11  to prove that David and his company are equally as liable as his

12  brother Abdo for the $3,688,320 (plus interest) owed to American

13  Express.

14  **Defendants' Statement**

15  1.   This action was originally filed on December 21, 2004,

16  against Defendants D&A Corporation, doing business as Bakersfield

17  Wholesale Foods, Abdo Aezah, Fahd Aizah (Abdo Aezah's father-in-

18  law), and Malakah Aezah (Abdo Aezah's wife) by Plaintiff American

19  Express.   Plaintiff then filed a First Amended Complaint on March

20  22, 2005 (Docket No. 44), and a Second Amended Complaint shortly

21  thereafter on June 8, 2005 (Docket No. 96).   Defendant David

22  Aezah, Bakersfield Grocery Wholesale (an unincorporated business

23  owned and operated by David Aezah), and Dave Aezah Investments,

24  Inc., a California Corporation were named as Defendants in these

25  subsequent lawsuits.   In its Second Amended Complaint, the

26  Plaintiff pled causes of action including breach of contract

27  (Bakersfield Wholesale), account stated (same), breach of

28  contract (all individual Defendants except David Aezah), book

**6**

account (all Defendants except David Aezah), unjust enrichment
(all Defendants), common law fraud (Bakersfield Wholesale and
Abdo Aezah), piercing the corporate veil, and fraudulent
conveyance (Bakersfield Wholesale, David and Abdo Aezah.)

2.    Bakersfield Wholesale Foods was a California
corporation that engaged in the wholesale grocery business, and
was owned and operated by Abdo Aezah.  It sold candy, soda,
cigarettes, foodstuffs, and other products to mini marts, gas
stations, and other retail markets.  In approximately May, 2004,
Abdo Aezah applied for, and was authorized and issued a corporate
credit card from American Express in the name of "Bakersfield
Wholesale" - the abbreviated name of his business (Bakersfield
Wholesale Foods).  Several months later, Abdo applied for a
corporate purchase card account with Plaintiff American Express
on behalf of D&A Corporation, another of his businesses.  Upon
his request, and with the full knowledge and approval of
Plaintiff American Express, he was issued three separate American
Express corporate credit cards - one in the name of Abdo
Aezah/Bakersfield Wholesale, one in the name of Malakah
Aezah/Bakersfield Wholesale; and one in the name of Fahd
Aizah/Bakersfield Wholesale.  Upon Abdo's request, Plaintiff also
issued a corporate purchase card in the name of D&A Corporation.

3.    Defendant Abdo Aezah subsequently used these purchase
cards to purchase cigarettes from the Bakersfield Costco
wholesale.  Abdo charged $351,384.38 in cigarettes to the account
in his name; $144,044.87 were charged to the account in the name
of Malakah Aezah; and $3,187,891.72 were charged to the account
in the name of Fahd Aizah.  As part of the normal operation of

1   Bakersfield Wholesale, Abdo then resold the cigarettes to other

2   businesses, and deposited the payments he received to his

3   business account.  At the end of October 2004, American Express

4   informed Abdo there was a balance due of $46,834.26 for the

5   account in the name of Malakah, and a balance due of $35,033.75

6   for the account in the name of Fahd Aizah.  On November 5, 2004,

7   American Express received a wire transfer payment for $46,834.26

8   – the full amount due on the Malakah account.  Two days later,

9   American Express received another wire transfer payment in the

10  amount of $35,033.75 – the full amount due for the account in the

11  name of Fahd Aizah.

12        4.    During the month of November, Defendant Abdo continued

13  to use the American Express card, and in fact was encouraged to

14  expand his use and indebtedness by the Plaintiff itself.   In

15  response to Plaintiff's encouragement to utilize the cards more,

16  Abdo purchased an additional $3,683.320.97 in cigarettes on the

17  American Express cards.  On December 2, 2004, Plaintiff cancelled

18  the accounts.  Two days later, on December 4, 2004, the bank that

19  had handled the wire transfer reversed the charges, due to the

20  fact that the checks that Abdo had deposited from other retailers

21  – for the purchase of the cigarettes at issue – had been returned

22  by their bank.  Despite Plaintiff's assertion that it cancelled

23  the account after it received notice that the wire transfers had

24  been reversed, Plaintiff's own pleadings reveal that it cancelled

25  the account before it had received any notice of the reversal of

26  charges, or that Plaintiff would not be paid by Defendant.

27        5.    During the same general time frame, Abdo desired to be

28  relieved of some of his other debt obligations.  Towards that

**8**

1  end, he entered into an agreement with Defendant David Aezah

2  wherein Abdo would turn over ownership of the premises located at

3  402 California Avenue, Bakersfield, California, in exchange for

4  David's forgiveness of a $150,000 loan to Abdo and the assumption

5  by David of a $300,000 mortgage obligation.  While Plaintiff

6  appears to feel this demonstrates some evil intent or motive on

7  David's part, and points out that David never disclosed to

8  American Express that he had acquired the ownership of the

9  building, this is simply irrelevant and misleading.  First, this

10  transfer took place BEFORE the cigarettes at issue were

11  purchased, and well before Plaintiff commenced this litigation.

12  Further, the transfer document was a matter of public record, and

13  could have been easily discovered by Plaintiff during a title

14  check.  Finally, there simply was no obligation on the part of

15  David to notify Plaintiff of his ownership - he had no connection

16  or relationship with Plaintiff.  In December 2004, following

17  threats to seize all of his merchandise, the litigation filed by

18  Plaintiff, and the incurrence of significant amounts of

19  unrecoverable debt from clients, Abdo closed his business.

20      6.   At some point, David began developing an interest in

21  creating a business to supply mini marts and gas stations.  As he

22  had previously owned mini marts and gas stations, this was a

23  natural extension for him.  He had also made significant sums of

24  money over the years buying and selling real estate investments.

25  In January, 2005, he formed an unincorporated business,

26  Bakersfield Grocery Wholesale, and began to sell various

27  merchandise to mini marts, gas stations, and other businesses.

28  As he owned the property at 402 California, having previously

**9**

1   assumed the mortgage liability and forgiven Abdo's debt, he
2   located his new business there.  He installed signage in the name
3   of Bakersfield Grocery Wholesale, and commenced business under
4   that name.

5       7.     While operating this business, he retained significant
6   amounts of cash in a safe located on the premises.  Many of his
7   suppliers preferred to be paid in cash, and his faith also
8   prohibits *riba* - the acceptance of interest on a debt.  In 2005,
9   David traveled to the country of Yemen for his son's marriage.
10  Before traveling to Yemen, he arranged for his brother to handle
11  any day-to-day business needs for Bakersfield Grocery Wholesale,
12  including the paying of invoices, the receipt and depositing of
13  money, the general supervision of the business activities, and
14  accepting freight deliveries.  At no time did Abdo have any
15  management or ownership duties, nor was he a co-owner of
16  Bakersfield Grocery Wholesale - a fact that Abdo made clear in
17  the police report dated October 2005.  While in Yemen, David
18  wrote checks on Bakersfield Grocery Wholesale's - his business' -
19  account.  These checks were used to pay for his son's wedding,
20  marriage and wedding gifts for his son and daughter-in-law, and
21  other purchases and gifts to family members in Yemen.

22      8.     As part of David's long established practice of buying
23  and selling properties, he located a property for sale in
24  Mississippi.  David asked Abdo to look over the property and
25  provide his opinion - something Abdo had done on David's other
26  purchases.  Because David was out of the country (in Yemen)
27  during much of the time period associated with the purchase
28  negotiations, he directed his brother to perform certain duties

1   on his behalf.  The purchase of this property was subsequently

2   completed, and title transferred to David.

3       9.    In the fall and early winter of 2005, while David was

4   out of the country, and due to a string of burglaries at the

5   business location, Abdo took several hundred thousands of dollars

6   in cash home with him for safekeeping.  Upon returning home from

7   a day spent with his family, he and his family discovered that

8   their house had been burglarized, and the money stolen.  He

9   reported this to the Bakersfield Police Department, and reported

10  that a significant portion of the money stolen belonged to his

11  brother.  Upon receipt of the initial officer's report, Abdo

12  identified several errors, including the statement that he was an

13  owner of Bakersfield Grocery Wholesale.  Although the initial

14  officer was unable to explain these errors, and he admits that he

15  cannot remember whether Abdo even made the statement, Abdo

16  attempted to promptly correct this error and informed the

17  investigating detective that he was not, in fact the owner or

18  even a co-owner.  Further, the investigation into this burglary

19  was terminated only after the detective had found no conclusive

20  evidence regarding a burglary either way, and Plaintiff, through

21  its attorneys, had willfully injected itself into the police

22  investigation and sought to sway and persuade the detective that

23  it was a false report.  Plaintiff's own actions render the police

24  report meaningless, as they intentionally sought to taint and

25  prejudice the investigating officer.

26      10.   Following the filing of the Plaintiff's First Amended

27  Complaint, they were informed that Abdo Aezah and Bakersfield

28  Wholesale did not intend to file an answer, and instead intended

1  to allow the Plaintiff to take a default judgment against them.
2  During oral argument, and in their pleadings, Plaintiff waived
3  any claim for attorney's fees, and they subsequently were awarded
4  a default judgment against Abdo and Bakersfield Wholesale.
5  Plaintiff then filed a Second Amended Complaint against David,
6  which included a claim to pierce the corporate veil/alter ego as
7  to David and Abdo and their associated businesses.  David filed a
8  motion to dismiss pursuant to Federal Rules of Civil Procedure
9  12(b), and this motion was granted by the Court.  Plaintiff chose
10 not to file a motion for reconsideration or to appeal this
11 decision, and subsequently chose not to file any amended
12 complaint within the time specified by the Court, and thus the
13 order became final and binding.

14      11.  Plaintiff then chose to essentially abandon the case
15 for nearly a year and a half while they pursued essentially a
16 collection action against Abdo.  They deposed Abdo on numerous
17 occasions, from which they learned that Abdo was, for all
18 purposes, essentially judgment proof.  They then deposed David,
19 and learned that David has resources - including resources from
20 the purchase and sale of properties unrelated to the grocery
21 business, as well as the operation of Bakersfield Grocery
22 Wholesale.  As such, Plaintiffs now seek to essentially go after
23 a different individual simply because this individual has money,
24 and has a business similar to that of Abdo's.  Further, the
25 Plaintiff attempts to elevate and transform normal family and
26 cultural beliefs, practices, and customs into a scheme to
27 defraud.
28 ///

1 | **IV.   Orders Re Amendments To Pleadings.**

2 |       **1.   American Express recently filed its Third Amended**
3 | **Complaint.   It does not anticipate any further amendments of the**
4 | **Complaint.   The Third Amended Complaint names two additional**
5 | **Defendants: Bakersfield Grocery Wholesale, an unincorporated**
6 | **business entity (which is the successor to judgment debtor**
7 | **Bakersfield Wholesale), and David Aezah Investment, Inc.**
8 | **("DAI"), a corporation wholly owned by Defendant David Aezah.**
9 | **American Express has requested that counsel for David Aezah**
10 | **accept service of process on behalf of these two additional**
11 | **Defendants, without prejudice to Defendants' substantive rights.**
12 | **Mr. Huss has not yet responded to this request.**

13 |       **2.   The Third Amended Complaint adds a claim for piercing**
14 | **the corporate veil against David based upon documentary evidence**
15 | **demonstrating his ownership interest in judgment debtor**
16 | **Bakersfield Wholesale, and the fact that they act as alter-egos**
17 | **of each other.   It also adds new causes of action against David**
18 | **and his companies for conspiracy to engage in fraudulent**
19 | **transfers, and successor liability.   There also is a new claim**
20 | **for a declaratory judgment seeking a determination as to which**
21 | **party is entitled to the proceeds from the sale of the property**
22 | **in Mississippi which American Express claims was purchased as**
23 | **part of Defendants' fraudulent conveyance conspiracy.**

24 |       **3.   Mr. Huss has been authorized by Mr. Aezah to accept**
25 | **service of the Third Amended Complaint on behalf of Bakersfield**
26 | **Grocery Wholesale, an unincorporated business entity, and David**
27 | **Aezah Investment, Inc., a corporation.**

28 | *///*

1  **V.    Factual Summary.**

2       **A.    Admitted Facts Which Are Deemed Proven Without Further**
3  **Proceedings.**

4            **1.    Defendant Bakersfield Wholesale was a corporation**
5  organized and existing under the laws of the State of California
6  with its principal place of business located at 402 California
7  Avenue, Bakersfield, California.

8            **2.    Bakersfield Wholesale was operated as a wholesale**
9  grocery company that sold candy, soda, cigarettes, and other
10  products to mini marts and other retail grocery outlets.

11            **3.    Defendant Bakersfield Grocery Wholesale is an**
12  unincorporated business entity which is owned and operated by
13  David Aezah and began operations on or about January 3, 2005.

14            **4.    Prior to August 2004, Abdo Aezah owned Bakersfield**
15  Wholesale and the warehouse where it operated at 402 California
16  Avenue, Bakersfield, California (the "Warehouse").

17            **5.    On August 27, 2004, Abdo Aezah delivered a grant**
18  deed to David Aezah transferring title to the warehouse to David
19  Aezah.  The transfer was recorded with the Clerk of Kern County,
20  California, on September 14, 2004.

21            **6.    David Aezah and Abdo Aezah executed a written**
22  declaration dated September 19, 2004, which stated among other
23  things: (1) that in exchange for the satisfaction of the $150,000
24  loan from David to Abdo, Abdo transferred the Warehouse located
25  at 402 California Avenue to David; and (2) the borrower Abdo, no
26  longer has an interest of any kind in this property or any
27  business within it.

28            **7.    On August 31, 2004, Bakersfield Wholesale opened a**

**14**

1  new checking account on which David was made a signatory.   The

2  account statements were sent to David Aezah's mailing address

3  rather than his brother's.

4          8.   Bakersfield Wholesale purchased approximately $3.6

5  million worth of Costco Cigarettes in November and December,

6  2004, using American Express corporate accounts.   Abdo has

7  admitted to making all such purchases on behalf of Bakersfield

8  Wholesale.

9          9.   On December 4, 2004, Bakersfield Wholesale had

10 three payments to American Express returned for lack of funds.

11 At a time thereafter, American Express terminated Bakersfield

12 Wholesale's American Express accounts and demanded payment in

13 full of the $3,683,320.97 total outstanding balance that is

14 claimed to be unpaid.

15          10.   No payments of the outstanding debt have been

16 made.

17          11.   In January 2005, David commenced applying for

18 licenses to do business in the name of Bakersfield Grocery

19 Wholesale rather than Bakersfield Wholesale Foods.

20          12.   In January 2005, David took checks which had been

21 made payable to Bakersfield Wholesale Foods for goods purchased

22 in 2004, many of which were issued in 2004 before Bakersfield

23 Grocery Wholesale was formed or licensed, and deposited them

24 directly into the account of Bakersfield Grocery Wholesale.

25          13.   On January 3, 2005, David filed a Notice to

26 Creditors of Bulk Sale with the Kern County Assessor on January

27 4, 2005.   The Notice advised that on January 21, 2005,

28 Bakersfield Wholesale intended to transfer its entire inventory

1    to David Aezah for $180,000.

2         14.   On January 15, 2005, David cancelled the bulk sale

3    because a TRO obtained by American Express was in effect in this

4    case.  Abdo owns a residence at 2516 El Portal Drive,

5    Bakersfield, California.  In early January 2005, following the

6    filing of this action in California, Abdo deeded title to the

7    home to David for no consideration.  Abdo admitted under oath

8    that he put title in his house in his brother's name in order to

9    attempt to prevent American Express from levying on the house.

10   After American Express moved to hold Abdo in contempt for an

11   alleged fraudulent conveyance, the residence was deeded back to

12   Abdo by David.

13        15.   On December 6, 2004, one month before David claims

14   he commenced involvement with the business, David Aezah rented a

15   large unit at a storage facility in Bakersfield, California,

16   called Fortress Self-Storage.

17        16.   A fire broke out on July 4, 2005, at the Fortress

18   Self-Storage which damaged several storage units, including

19   David's rental unit.  As part of an insurance claim, David Aezah

20   submitted receipts showing the cost of the cigarettes.  The

21   receipts submitted include November - December 2004 receipts for

22   the purchase of cigarettes by Bakersfield Wholesale at Costco,

23   using the American Express credit card.  Based on these receipts,

24   the insurance carrier (Travelers) issued a check to David, in his

25   individual capacity, in the amount of $341,197.28.  On or about

26   January 11, 2006, David deposited the insurance check into

27   Bakersfield Grocery Wholesale's account at Citibank.

28        17.   Documents produced by Citibank pursuant to

subpoena show that David wrote approximately $350,000.00 in checks on his personal account and on the account of Bakersfield Grocery Wholesale in the fall of 2005 through the spring of 2006 to various individuals who cashed checks in Yemen.  David alleges that the payees on the checks were people who provide "check cashing" services and he spent the entire amount on his son's wedding in Yemen as well as the purchase of a car and furniture. American Express disputes this based on David's lack of specification how the entire amount of funds transferred to Yemen had been spent.

18.  In or about April 2006, David commenced negotiations for purchase of the Carver Village Apartments, a large apartment complex located at 1912 Live Oak Street, Pascagoula, Mississippi (the "Mississippi Property").  In order to pay for the property on May 9, 2006, Abdo and an employee of Bakersfield Grocery, took $600,000.00 in $100.00 bills from a safe at 402 California, and deposited the cash into a bank account of Bakersfield Grocery Wholesale at Citibank.  On May 10, 2006, Abdo and the employee deposited another $707,500 in $100.00 bills into this bank account.

19.  On or about May 17, 2006, David closed on the purchase of the Mississippi Property, using the cash Abdo had deposited into the Bakersfield Grocery account.

20.  In August 2006, David learned that it would be difficult to develop the Mississippi Property because the buildings in question had been condemned or were in the process of being condemned for violations of building codes.  Therefore, David began negotiations to sell the Mississippi Property to the

1  Low Income Family Enrichment Foundation (the "Life Foundation")
2  which had previously been interested in the property.   The
3  parties negotiated a sale price of $1,450,000 and entered into a
4  contract of sale dated July 17, 2006.   However, the sale
5  transaction did not close.

6          21.   On September 19, 2006, American Express, having
7  learned about the proposed transaction from bank records produced
8  by Citibank, brought an action in the United States District
9  Court for the Southern District of Mississippi (the "Mississippi
10 Action") in order to enjoin its sale and prevent the loss of the
11 proceeds of the proposed sale.   American Express also filed a lis
12 pendens with the Clerk of the Chancery Court of Jackson County,
13 Mississippi, which gave notice of American Express's claims to
14 the Life Foundation and other potential purchasers of the Carver
15 Village Apartments.

16         22.   On November 13, 2006, American Express agreed to
17 lift its lis pendens and permit the sale of the Mississippi
18 Property to proceed, subject to the Agreement and Escrow
19 Instructions dated November 13, 2006, executed by American
20 Express, David and the Life Foundation ("Mississippi Property
21 Agreement").

22         23.   Under the Mississippi Property Agreement, American
23 Express obtained a deed of trust securing Life's obligation to
24 pay $1.4 million to the party entitled to receive payment of such
25 funds.   Pursuant to that agreement, when this Court makes a
26 determination as to whether American Express or David is entitled
27 to the funds, they will be paid over to the prevailing party.
28 ///

1   **B.   Contested Facts.**

2       **Plaintiff's**

3       1.   Plaintiff contends that it is a successor-in-

4   interest to Defendant Bakersfield Wholesale, and that it is owned

5   and operated jointly by David and Abdo.

6       2.   Plaintiff contends that in or about August 2004,

7   Abdo transferred 100% of the ownership of Bakersfield Wholesale

8   to David.

9       3.   Plaintiff will prove that the only thing that

10  changed about the business was the name, and that it operated at

11  the same address (402 California Avenue in Bakersfield) with the

12  same telephone and fax numbers, selling the same goods to the

13  same customers.

14      4.   American Express contends that thereafter, David

15  drew upon Costco Cigarettes stored at Fortress in order to stock

16  the inventory of the successor business, Bakersfield Grocery

17  Wholesale.

18      **Defendants' Contested Facts**

19      1.   Defendant David Aezah disputes any allegation that

20  he is responsible for the debt incurred by Abdo Aezah and/or D&A

21  Corporation.  Defendant further disputes any allegation that he

22  was involved in any scheme, conspiracy, plan, or effort to

23  defraud Plaintiff and/or to conceal, hide, secret, or otherwise

24  make unavailable any funds or items belonging to Plaintiff.

25  Defendant further disputes any allegation or claim that he

26  received and retained any sums of money from Abdo and/or D&A that

27  he knew was due, or legally belonged to Plaintiff.  Defendant

28  further disputes any allegation that the sums of money used to

1   purchase the Mississippi property derived from the proceeds of

2   the sale of the cigarettes purchased by Abdo and D&A using the

3   American Express cards issued to them.  Defendant disputes any

4   allegations that he actively assisted Abdo in unlawfully

5   concealing assets from American Express.  Defendant further

6   disputes any allegations that he fraudulently concealed any

7   assets belonging to American Express, or that he engaged in any

8   conspiracy with Abdo or any other Defendant to conceal any

9   assets.

10  VI.  Legal Issues.

11       A.   Uncontested.

12            1.   Jurisdiction exists under 28 U.S.C. § 1332.

13            2.   Venue is proper under 28 U.S.C. § 1391.

14            3.   As to supplemental claims, the parties agree that

15  the substantive law of the State of California provides the rule

16  of decision in this diversity action.

17       B.   Contested.

18            1.   American Express has asserted meritorious claims

19  for fraudulent transfer against David, Abdo, Bakersfield

20  Wholesale, and Bakersfield Grocery.  American Express also has a

21  claim against David for being a co-conspirator to Abdo's

22  fraudulent transfers.  David actively participated in Abdo's

23  attempt to put Bakersfield Wholesale's assets outside the reach

24  of American Express and this Court.  Accordingly, David is liable

25  not only for the damage to American Express that he directly

26  caused, but for any fraudulent transfer which Abdo undertook in

27  connection with this conspiracy.

28            2.   American Express also has a claim against

20

1  Defendants for successor liability.  Neither David nor Abdo makes
2  any pretense that Bakersfield Grocery Wholesale's business
3  differs in any way from that of its predecessor business,
4  Bakersfield Wholesale.  Their attempts to claim that the
5  businesses were independent of each other failed completely when
6  American Express learned that David had deposited checks from
7  Bakersfield Wholesale's customers into the successor business's
8  account; when it learned that David sold Costco Cigarettes
9  purchased by Bakersfield Wholesale through his new business, and
10 when it learned that the successor business's accounts had been
11 used to launder money for the purchase of Mississippi property.

12       3.    In addition, American Express has asserted claims
13 against Defendants for alter ego liability.  The evidentiary
14 facts clearly show that David was 100% owner of Bakersfield
15 Wholesale at the time that the American Express debt at issue in
16 this lawsuit was incurred; that Abdo, David and Bakersfield
17 Wholesale were alter egos of each other; and that Bakersfield
18 Wholesale and its successor entity, Bakersfield Grocery
19 Wholesale, are shell entities that are insufficiently
20 capitalized, fail to observe corporate formalities, are used for
21 fraudulent purposes, and are so totally dominated and controlled
22 by Abdo and David as to have no separate and independent
23 existence of their own.

24       **Defendants' Statement**

25       1.    Defendant disputes Plaintiff's claim of fraudulent
26 transfer, and Plaintiff's claim that David was a "co-conspirator
27 to Abdo's fraudulent transfers."

28       2.    Defendant disputes any successor liability.  The

21

1   company owned and operated by David, Bakersfield Grocery

2   Wholesale, was created after the events at issue here (to wit,

3   the purchase of the cigarettes.)  It engages in the sale of

4   merchandise to convenience stores - a business with a very

5   finite, discrete set of customers.  As such, Defendant contends

6   that the fact that it services customers who were also customers

7   of Abdo's business is irrelevant - there are only so many

8   potential customers in the area served by Bakersfield Grocery

9   Wholesale.

10          3.   Defendant disputes any alter ego liability.

11   Defendant further notes that this issue has previously been

12   addressed by the Court, which granted Defendants' FRCP 12(b)(6)

13   motion to dismiss Plaintiff's prior alter ego theory and piercing

14   the corporate veil claim.  As part of the Court's Order,

15   Plaintiff was afforded an opportunity to amend its Complaint, but

16   Plaintiff chose not to amend the Complaint.  Plaintiff further

17   elected not to file a motion for reconsideration of this Court's

18   decision, and it also chose not to appeal the Order to a higher

19   court.  As such, the decision became final ten days after it was

20   entered.

21          4.   Defendant disputes the existence or right to any

22   attorneys' fees.  Plaintiff has previously waived its rights to

23   attorneys' fees, and this waiver was affirmed when Plaintiff

24   itself drafted and filed the Default Judgment.  Furthermore, this

25   is a case governed by California law, which provides that

26   attorneys' fees are not recoverable unless an exception applies.

27   Here, no exceptions apply, as there is no contract providing for

28   the award of attorneys' fees, and Plaintiff is not acting as a

1  private attorney general for the benefit of the public at large.

2  VII. Consent to Magistrate Judge Jurisdiction.

3      1.    The parties have not consented to transfer the

4  case to the Magistrate Judge for all purposes, including trial.

5  VIII.      Corporate Identification Statement.

6      1.    Any nongovernmental corporate party to any action in

7  this court shall file a statement identifying all its parent

8  corporations and listing any entity that owns 10% or more of the

9  party's equity securities.  A party shall file the statement with

10  its initial pleading filed in this court and shall supplement the

11  statement within a reasonable time of any change in the

12  information.

13  IX.  Discovery Plan and Cut-Off Date.

14      Plaintiff's Discovery Plan

15      1.    Document production by Defendants and third-parties has

16  taken place and is virtually complete.  American Express recently

17  served counsel for David with a supplemental set of

18  interrogatories and a supplemental document request.  American

19  Express requests that counsel for David respond to these requests

20  within 30 days.

21      2.    Defendant recently served American Express with a

22  document request that American Express will respond to within 30

23  days.

24      3.    American Express has taken approximately one dozen

25  depositions.  The following depositions remain:

26          a.    American Express wishes to depose Defendant David

27  Aezah for one additional day with respect to documents and facts

28  uncovered after David was deposed in October 2006.

23

1    b.    American Express wishes to depose several people
2  in Mississippi with respect to their dealings with David and Abdo
3  about the purchase and sale of property there using the proceeds
4  from the sale of the cigarettes at issue in this action.

5    c.    American Express proposes that all discovery be
6  concluded by May 31, 2007.

7  **Defendants' Discovery Plan**

8    1.    This Court has previously issued a Scheduling Order
9  which required that all discovery be conducted by August 31, 2005
10 (Scheduling Conference Order, filed April 6, 2005).  After the
11 specified discovery cutoff date had passed, Plaintiff twice
12 obtained an order regarding discovery.  More than a year after
13 the discovery cutoff period had passed, Plaintiff deposed David
14 Aezah on two separate occasions.  Approximately 20 months after
15 the discovery cutoff period had passed, Plaintiff deposed
16 approximately 6 individuals in January, 2007.  Following these
17 depositions, Plaintiff indicated that they wanted to depose David
18 Aezah yet again, despite the fact he had been deposed three
19 separate times in these proceedings.

20   2.    All pre-trial disclosures are believed to have already
21 been made.

22   3.    There are no contemplated or proposed changes on the
23 limits of discovery as imposed by FRCP Rules 26(b); 30(a), 2a, b,
24 or c; 30(d) or 33(a).

25   4.    Protective Orders:

26   a.    Plaintiff has previously subpoenaed Defendant's
27 corporate and personal income tax statements for various years.
28 These statements were introduced as deposition exhibits during

1  the depositions of various witnesses.  In the event that

2  Plaintiff seeks to introduce or utilize these at trial, Defendant

3  reserves the right to seek an appropriate protective order.

4       b.   In the event that Plaintiff seeks to discover

5  and/or introduce any information pertaining to any trade secret

6  or other protectable interest, Defendant reserves the right to

7  seek an appropriate protective order.

8       c.   Plaintiff has indicated it intends to seek to

9  depose Defendant David Aezah yet again.  Plaintiff has previously

10  deposed Defendant David Aezah on three separate occasions.

11  During at least one of these occasions, Plaintiff conducted

12  additional discovery, and proceeded to depose Defendant upon this

13  newly discovered information at the succeeding deposition.

14  Plaintiff now wishes to repeat this procedure of deposing the

15  Defendant, going out and discovering additional information, and

16  then returning and deposing the Defendant upon any new

17  information discovered.  Defendants contend that Plaintiff made a

18  strategic decision to depose Defendant early in the discovery

19  process, and Defendant has been more than cooperative in agreeing

20  to two additional depositions.  Plaintiff's request to depose

21  Defendant yet again is burdensome, excessive, and demonstrative

22  of Plaintiff's abuse of the discovery process.  Should Plaintiff

23  seek to depose Defendant, Defendant intends to seek an

24  appropriate protective order.

25       d.   No issues are currently anticipated related to the

26  timing, sequencing, phasing or scheduling of discovery.

27       e.   As previously noted, the Plaintiff has previously

28  deposed both Abdo and David Aezah on numerous occasions.

1  Plaintiff has recently indicated they intend to depose David

2  Aezah yet again.  As this would constitute the fourth deposition

3  of David Aezah, Defendant David Aezah intends to resist this

4  further, unwarranted deposition by seeking a protective order,

5  and the Plaintiff will be required to obtain a court order to

6  take this deposition.

7          f.   Defendant does not anticipate any discovery taking

8  place outside of the United States.

9          g.   Defendant anticipates there is a strong likelihood

10 of discovery involving electronic, digital, magnetic and/or

11 optical data, and Defendant has requested the production of

12 documents from Plaintiff and third-party witnesses that could

13 include the production of electronic, digital, magnetic and/or

14 optical data.

15     5.   The parties are ordered to complete all discovery on

16 or before June 29, 2007.

17     6.   The parties are directed to disclose all expert

18 witnesses, in writing, on or before May 1, 2007.  Any

19 supplemental or rebuttal expert disclosures will be made on or

20 before June 1, 2007.  The parties will comply with the provisions

21 of Federal Rule of Civil Procedure 26(a)(2) regarding their

22 expert designations.  Local Rule 16-240(a) notwithstanding, the

23 written designation of experts shall be made pursuant to F. R.

24 Civ. P. Rule 26(a)(2), (A) and (B) and shall include all

25 information required thereunder.  Failure to designate experts in

26 compliance with this order may result in the Court excluding the

27 testimony or other evidence offered through such experts that are

28 not disclosed pursuant to this order.

1      7.    The provisions of F. R. Civ. P. 26(b)(4) shall

2  apply to all discovery relating to experts and their opinions.

3  Experts may be fully prepared to be examined on all subjects and

4  opinions included in the designation.  Failure to comply will

5  result in the imposition of sanctions.

6  X.    Pre-Trial Motion Schedule.

7      1.    All Non-Dispositive Pre-Trial Motions, including any

8  discovery motions, will be filed on or before July 10, 2007, and

9  heard on August 17, 2007, at 9:00 a.m. before Magistrate Judge

10  Theresa A. Goldner in Bakersfield.

11      2.    In scheduling such motions, the Magistrate

12  Judge may grant applications for an order shortening time

13  pursuant to Local Rule 142(d).  However, if counsel does not

14  obtain an order shortening time, the notice of motion must comply

15  with Local Rule 251.

16      3.    All Dispositive Pre-Trial Motions are to be

17  filed no later than July 16, 2007, and will be heard on August

18  20, 2007, at 10:00 a.m. before the Honorable Oliver W. Wanger,

19  United States District Judge, in Courtroom 3, 7th Floor.  In

20  scheduling such motions, counsel shall comply with Local Rule

21  230.

22  XI.   Pre-Trial Conference Date.

23      1.    September 24, 2007, at 11:00 a.m. in Courtroom 3, 7th

24  Floor, before the Honorable Oliver W. Wanger, United States

25  District Judge.

26      2.    The parties are ordered to file a Joint Pre-

27  Trial Statement pursuant to Local Rule 281(a)(2).

28      3.    Counsel's attention is directed to Rules 281

27

1   and 282 of the Local Rules of Practice for the Eastern District

2   of California, as to the obligations of counsel in preparing for

3   the pre-trial conference.  The Court will insist upon strict

4   compliance with those rules.

5   XII. Trial Date.

6       1.   November 14, 2007, at the hour of 9:00 a.m. in

7   Courtroom 3, 7th Floor, before the Honorable Oliver W. Wanger,

8   United States District Judge.

9       2.   This is a jury trial.

10      3.   Counsels' Estimate Of Trial Time:

11           a.   10 days.

12      4.   Counsels' attention is directed to Local Rules

13  of Practice for the Eastern District of California, Rule 285.

14  XIII.     Settlement Conference.

15      1.   A Settlement Conference is scheduled for July 11, 2007,

16  at 10:00 a.m. in Bakersfield before the Honorable Theresa A.

17  Goldner, United States Magistrate Judge.

18      2.   Unless otherwise permitted in advance by the

19  Court, the attorneys who will try the case shall appear at the

20  Settlement Conference with the parties and the person or persons

21  having full authority to negotiate and settle the case on any

22  terms at the conference.

23      3.   Permission for a party [not attorney] to attend

24  by telephone may be granted upon request, by letter, with a copy

25  to the other parties, if the party [not attorney] lives and works

26  outside the Eastern District of California, and attendance in

27  person would constitute a hardship.  If telephone attendance is

28  allowed, the party must be immediately available throughout the

1  conference until excused regardless of time zone differences.
2  Any other special arrangements desired in cases where settlement
3  authority rests with a governing body, shall also be proposed in
4  advance by letter copied to all other parties.

5       4.   Confidential Settlement Conference Statement.
6  At least five (5) days prior to the Settlement Conference the
7  parties shall submit, directly to the Magistrate Judge's
8  chambers, a confidential settlement conference statement.  The
9  statement should not be filed with the Clerk of the Court nor
10  served on any other party.  Each statement shall be clearly
11  marked "confidential" with the date and time of the Settlement
12  Conference indicated prominently thereon.  Counsel are urged to
13  request the return of their statements if settlement is not
14  achieved and if such a request is not made the Court will dispose
15  of the statement.

16       5.   The Confidential Settlement Conference
17  Statement shall include the following:

18            a.   A brief statement of the facts of the
19  case.

20            b.   A brief statement of the claims and
21  defenses, i.e., statutory or other grounds upon which the claims
22  are founded; a forthright evaluation of the parties' likelihood
23  of prevailing on the claims and defenses; and a description of
24  the major issues in dispute.

25            c.   A summary of the proceedings to date.

26            d.   An estimate of the cost and time to be
27  expended for further discovery, pre-trial and trial.

28            e.   The relief sought.

1              f.   The parties' position on settlement,

2  including present demands and offers and a history of past

3  settlement discussions, offers and demands.

4  XIV. Request For Bifurcation, Appointment Of Special Master,

5  Or Other Techniques To Shorten Trial.

6       1.   None.

7  XV.  Related Matters Pending.

8       1.   There is a related case in Mississippi that has been

9  filed by American Express that has been withdrawn and the parties

10 have stipulated that the trial in this District will resolve

11 which party is entitled to the proceeds from the sale of the

12 Mississippi property.

13 XVI. Compliance With Federal Procedure.

14      1.   The Court requires compliance with the Federal

15 Rules of Civil Procedure and the Local Rules of Practice for the

16 Eastern District of California.  To aid the court in the

17 efficient administration of this case, all counsel are directed

18 to familiarize themselves with the Federal Rules of Civil

19 Procedure and the Local Rules of Practice of the Eastern District

20 of California, and keep abreast of any amendments thereto.

21 XVII.     Effect Of This Order.

22      1.   The foregoing order represents the best

23 estimate of the court and counsel as to the agenda most suitable

24 to bring this case to resolution.  The trial date reserved is

25 specifically reserved for this case.  If the parties determine at

26 any time that the schedule outlined in this order cannot be met,

27 counsel are ordered to notify the court immediately of that fact

28 so that adjustments may be made, either by stipulation or by

1   subsequent scheduling conference.

2       2.   Stipulations extending the deadlines contained

3   herein will not be considered unless they are accompanied by

4   affidavits or declarations, and where appropriate attached

5   exhibits, which establish good cause for granting the relief

6   requested.

7       3.   Failure to comply with this order may result in

8   the imposition of sanctions.

9

10   IT IS SO ORDERED.

11   **Dated:    March 6, 2007**                    **/s/ Oliver W. Wanger**
     emm0d6                              UNITED STATES DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28