IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC., | No. CV-F-04-6737 OWW/TAG |
| | MEMORANDUM DECISION GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Doc. 362) |
| Plaintiff, | |
| vs. | |
| D&A CORPORATION dba BAKERSFIELD WHOLESALE FOODS, et al., | |
| Defendants. | |

American Express Travel Related Services Company, Inc. (hereinafter referred to as American Express) has sued Defendants D&A Corporation dba Bakersfield Wholesale Foods ("Bakersfield Wholesale"), Abdo Aezah ("Abdo"), Malaka M. Aezah, David Aezah ("David"), Bakersfield Grocery Wholesale ("Bakersfield Grocery"), David Aezah Investment, Inc. ("DAI"), and Does 1 - 100, inclusive, by the Third Amended Complaint (TAC) filed on February 23, 2007 (Doc. 158).  David, Bakersfield Grocery and DAI are

1

sometimes referred to collectively as the "David Defendants."

American Express moves for an order (1) granting summary judgment against David, Bakersfield Grocery, and DAI on its claims for fraudulent transfer, conspiracy to commit fraudulent transfer, alter ego and successor liability; (2) directing the payment of $1.4 million, representing the proceeds of David's sale of certain property in Mississippi maintained in escrow pending the outcome of this lawsuit; and (3) dismissing all the David Defendants' affirmative defenses alleged in their Answer as a matter of law.

A.  GOVERNING STANDARDS.

Summary judgment is proper when it is shown that there exists "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56.  A fact is "material" if it is relevant to an element of a claim or a defense, the existence of which may affect the outcome of the suit.  *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987).  Materiality is determined by the substantive law governing a claim or a defense.  *Id*.  The evidence and all inferences drawn from it must be construed in the light most favorable to the nonmoving party.  *Id*.

The initial burden in a motion for summary judgment is on the moving party.  The moving party satisfies this initial burden by identifying the parts of the materials on file it believes demonstrate an "absence of evidence to support the non-moving

1  party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325

2  (1986).  The burden then shifts to the nonmoving party to defeat

3  summary judgment.  *T.W. Elec.*, 809 F.2d at 630.  The nonmoving

4  party "may not rely on the mere allegations in the pleadings in

5  order to preclude summary judgment," but must set forth by

6  affidavit or other appropriate evidence "specific facts showing

7  there is a genuine issue for trial."  *Id*.  The nonmoving party

8  may not simply state that it will discredit the moving party's

9  evidence at trial; it must produce at least some "significant

10  probative evidence tending to support the complaint."  *Id*.  The

11  question to be resolved is not whether the "evidence unmistakably

12  favors one side or the other, but whether a fair-minded jury

13  could return a verdict for the plaintiff on the evidence

14  presented."  *United States ex rel. Anderson v. N. Telecom, Inc.*,

15  52 F.3d 810, 815 (9th Cir.1995).  This requires more than the

16  "mere existence of a scintilla of evidence in support of the

17  plaintiff's position"; there must be "evidence on which the jury

18  could reasonably find for the plaintiff."  *Id*.  The more

19  implausible the claim or defense asserted by the nonmoving party,

20  the more persuasive its evidence must be to avoid summary

21  judgment."  *Id*.  As explained in *Nissan Fire & Marine Ins. Co. v.*

22  *Fritz Companies*, 210 F.3d 1099, 1102-1103 (9th Cir.2000):

23              The vocabulary used for discussing summary
             judgments is somewhat abstract.  Because
24           either a plaintiff or a defendant can move
             for summary judgment, we customarily refer to
25           the moving and nonmoving party rather than to
             plaintiff and defendant.  Further, because
26           either plaintiff or defendant can have the

1

ultimate burden of persuasion at trial, we
refer to the party with and without the
ultimate burden of persuasion at trial rather
than to plaintiff and defendant.  Finally, we
distinguish among the initial burden of
production and two kinds of ultimate burdens
of persuasion: The initial burden of
production refers to the burden of producing
evidence, or showing the absence of evidence,
on the motion for summary judgment; the
ultimate burden of persuasion can refer
either to the burden of persuasion on the
motion or to the burden of persuasion at
trial.

A moving party without the ultimate burden of
persuasion at trial - usually, but not
always, a defendant - has both the initial
burden of production and the ultimate burden
of persuasion on a motion for summary
judgment ... In order to carry its burden of
production, the moving party must either
produce evidence negating an essential
element of the nonmoving party's claim or
defense or show that the nonmoving party does
not have enough evidence of an essential
element to carry its ultimate burden of
persuasion at trial ... In order to carry its
ultimate burden of persuasion on the motion,
the moving party must persuade the court that
there is no genuine issue of material fact
....

If a moving party fails to carry its initial
burden of production, the nonmoving party has
no obligation to produce anything, even if
the nonmoving party would have the ultimate
burden of persuasion at trial ... In such a
case, the nonmoving party may defeat the
motion for summary judgment without producing
anything ... If, however, a moving party
carries its burden of production, the
nonmoving party must produce evidence to
support its claim or defense ... If the
nonmoving party fails to produce enough
evidence to create a genuine issue of
material fact, the moving party wins the
motion for summary judgment ... But if the
nonmoving party produces enough evidence to
create a genuine issue of material fact, the
nonmoving party defeats the motion.

4

B.   <u>FACTUAL BACKGROUND</u>.

1.   <u>American Express's Statement of Undisputed Facts</u>.

In moving for summary judgment, American Express proffered the following facts as undisputed.  The David Defendants accept these facts as undisputed except where noted and discussed in this Memorandum Decision.

<u>AE UMF 1</u>: American Express Travel Related Services, Inc. is a corporation organized and existing under the laws of the State of New York, having its principal place of business at American Express Tower, World Financial Center, New York, New York 10285.[1]

This fact is undisputed.

<u>AE UMF 2</u>: Defendant David Aezah is a natural person who lives at 9008 Limoges Way, Bakersfield, California 93311.

This fact is undisputed.

<u>AE UMF 3</u>: Defendant Abdo Aezah is a natural person who lives at 2516 El Portal Drive, Bakersfield, California 93309.

This fact is undisputed.

<u>AE UMF 4</u>: David and Abdo are brothers.

This fact is undisputed.

<u>AE UMF 5</u>: Defendant D&A Corporation dba Bakersfield

---

[1]The David Defendants contend that the evidence supporting this fact is inadmissible hearsay but, without waiving the objection, assert that the fact is undisputed.  There are a number of undisputed facts with respect to which the David Defendants make the same objection: UMF Nos. 3, 5, 6, 7, 8, 13, 15, 17, 19, 21, 22, 23, 27, 28, 30, 31, 33, 34, 35, 36, 38, 39, 40, 42, 43, 44, 45, 47, 48, 49, 50, 51, 52, 53, 56, 57, 58, and 59.  Because these facts are otherwise undisputed, the evidentiary objections do not suffice to raise a genuine issue of material fact.

1   Wholesale was a corporation organized and existing under the laws

2   of the State of California with its principal place of business

3   located at 402 California Avenue, Bakersfield, California 93304.

4   Bakersfield Wholesale was operated as a wholesale grocery company

5   that sold candy, soda, cigarettes, and other products to mini

6   marts and other retail grocery outlets.

7      This fact is undisputed.

8      **AE UMF 6**: Bakersfield Wholesale began operations on or about

9   January 3, 2005.

10      The David Defendants object to the supporting evidence as

11   inadmissible hearsay and assert: "Without waiving said

12   objections, DISPUTED.  See Decl. of Marderosian, Ex. A."

13      The evidentiary support for this fact is the Admitted Facts

14   section of the Scheduling Conference Order filed on March 7, 2007

15   (Doc. 243).  The Admitted Facts section of this Order states that

16   the facts set forth "are deemed proven without further

17   proceedings."  Exhibit A to Mr. Marderosian's declaration are

18   copies of corporate documents indicating that Bakersfield

19   Wholesale was incorporated and may have been doing business in

20   late 2003.

21      The David Defendants retained new counsel after the

22   Scheduling Conference Order was filed.  The David Defendants have

23   not moved under Rule 16, Federal Rules of Civil Procedure, to be

24   relieved from the Admitted Facts set forth in the Scheduling

25   Conference Order.  Therefore, this fact is admitted.

26      **AE UMF 7**: Defendant Dave Aezah Investment, Inc. (DAS) is a

1  corporation organized and existing under the laws of the State of
2  California with its principal place of business located at 402
3  California Avenue, Bakersfield, California 93304.  DAI is owned
4  and controlled by David.

5      This fact is undisputed.

6      **AE UMF 8**: Bakersfield Grocery Wholesale is an unincorporated
7  business entity which is owned and operated by David and began
8  operations on or about January 3, 2005.

9      This fact is undisputed.

10     **AE UMF 9**: Bakersfield Wholesale's original owner was Abdo.

11     The David Defendants dispute this fact to the extent that
12 Abdo is described as the "original owner", referring to
13 Paragraphs 2-3 of David's declaration in opposition to the motion
14 for summary judgment:

15          2.  When Abdo and I executed the Declaration
           in regard to my forgiveness of the loan, the
16          term 'business' did not refer to Bakersfield
           Wholesale Foods.  It was an expression we use
17          that was meant to mean Abdo should no longer
           be concerned about the property and that it
18          was now my business, not his.  I have never
           owned any interest in Bakersfield Wholesale
19          Foods.  I did not become an owner of
           Bakersfield Wholesale Foods at any point.
20          That business belonged exclusively to Abdo.
           I did help out on occasion when Abdo needed
21          it but was neither an owner, officer, or
           employee.
22
           3.  I was added as a signatory on one of
23          Bakersfield Wholesale bank accounts; however,
           this was done for convenience purposes only.
24          Abdo wanted me to be able to help him if he
           was busy or out of town.  For some unknown
25          reason, after I was added as a signatory, the
           bank would occasionally send me the bank
26          statements.  This was a mistake on their part

                                    7

> and was not done at my request.  I did not
> tell the bank that I was the owner of
> Bakersfield Wholesale and I was not the
> primary signatory on the account.  Abdo told
> the bank that he was the owner of Bakersfield
> Wholesale Foods so I don't know why the bank
> would send me the bank statements.
> Nevertheless, when I did receive them, I gave
> them to Abdo as they pertained to his
> business, not mine.

The David Defendants also refer to Abdo's deposition transcript but do not provide page and line references.[2]  David's deposition transcript of September 13, 2006 at pages 21-22 and 26 is also referenced but the testimony does not provide evidentiary support for the disputed fact.

   **AE UMF 10**: Bakersfield Wholesale purchased approximately $3.6 million worth of Costco Cigarettes in November and December, 2004.

   The David Defendants object that the evidentiary support for this fact is inadmissible hearsay.

_____

   [2] In *Carmen v. San Francisco Unified School District*, 237 F.3d 1026, 1031 (9th Cir.2001), the Ninth Circuit held:

> [T]he district court may determine whether
> there is a genuine issue of material fact, on
> summary judgment, based on the papers
> submitted on the motion and such other papers
> as may be on file and specifically referred to
> and facts therein set forth in the motion
> papers.  Though the court has discretion in
> appropriate circumstances to consider other
> materials, it need not do so.  The district
> court need not examine the entire file for
> evidence establishing a genuine issue of
> material fact, where the evidence is not set
> forth in the opposing papers with adequate
> references to that it could conveniently be
> found.

8

The evidentiary support is the Admitted Fact section of the Scheduling Conference Order:

> 8.  Bakersfield Wholesale purchased approximately $3.6 million worth of Costco Cigarettes in November and December, 2004, using American Express corporate accounts. Abdo has admitted to making all such purchases on behalf of Bakersfield Wholesale.

The hearsay objection is without merit.

The David Defendants dispute UMF 10 "to the extent that the credit card debt was incurred by Bakersfield Wholesale and Abdo Aezah, Malaka Aezah, and Fahd Aezah." The David Defendants refer to Exhibit B to Mr. Marderosian's declaration. Exhibit B is described as "true and correct copies of the credit applications, the Guarantee of Payment Agreement for Individual Accounts and the American Express credit card statements which show that Abdo Aezah, Malaka Aezah, D & A Corporation, and Fahd Aezah incurred the credit card debt at issue in this matter."

It is not reasonably disputed whether Bakersfield Wholesale made the credit card purchases of the Costco Cigarettes. The Scheduling Conference Order admits this fact from which the David Defendants have not sought relief. The credit cards were issued to Bakersfield Wholesale (actually D & A Corporation dba Bakersfield Wholesale). Based on Exhibit B, Abdo, Malaka and Fahd made charges on the Bakersfield Wholesale credit cards.

AE UMF 11, 12 and 13:

Abdo regularly collects rent from apartment buildings owned by David, then deposits monies into Abdo's own account, with

9

David's approval.

Tenants owing monies to David made checks payable directly to Abdo.

Abdo pays taxes and other expenses for David's buildings out of his own personal checking account.

The David Defendants object that the supporting evidence, which are references to David's deposition and deposition exhibits, are inadmissible hearsay.

Defendants dispute Facts 11, 12 and 13, referring to Paragraph 9(a) of David's declaration:

> ... Abdo ... has collected rent on my behalf when I was unavailable to do so. As a result, many of the tenants know Abdo. Sometimes, they will make their rent checks out to Abdo. When Abdo collects the rent, if the tenant makes the check payable to Abdo, Abdo may deposit the money in his account and give me the cash. This only happens occasionally. However, may [sic] times, even if the check is made out to Abdo, the check is deposited into my account because it is rental income to me alone. I am the only owner of these rental properties. Abdo and I do not have any rental properties together. Sometimes I ask Abdo to make repairs or pay various bills from the rent that he collects on my behalf. The money for the repairs or the other bills still comes directly from money that is owed to me exclusively.

David's testimony, under oath, is unambiguous. Defendants also refer to various parts of David's deposition transcript in disputing these facts.

AE UMFS 11, 12 and 13 are disputed.

**AE UMF 14**: Bakersfield Grocery Wholesale operates from the same address and operates exactly the same business as

1   Bakersfield Wholesale.

2       The David Defendants object that the supporting evidence is

3   inadmissible hearsay.  The supporting evidence is David's

4   response to Interrogatory No. 6 and Paragraphs 66 and 68 of the

5   David Defendants' Answer filed on August 7, 2007 (Doc. 351).  The

6   David Defendants hearsay objections are without merit.

7       This evidence establishes that Bakersfield Grocery Wholesale

8   operates from the same address as Bakersfield Wholesale but does

9   not establish that the two businesses are exactly the same.

10      The David Defendants dispute this fact, referring to

11  Paragraph 9(b) of David's declaration:

12          ... I do not have knowledge of who all of
            Bakersfield Wholesale's customers and
13          suppliers were.  Based on some of the
            documentation I have seen in this case, it
14          would appear that some of my customers and
            suppliers also were customers or suppliers of
15          Bakersfield Wholesale.  However, I believe
            that there are many customers and suppliers
16          of Bakersfield Grocery Wholesale that there
            not mentioned in relation to Bakersfield
17          Wholesale.  I am attaching a list of some of
            my customers and suppliers as Exhibit 'A.'
18          The majority of these customers and suppliers
            have never been mentioned or confirmed as
19          customers or suppliers of Bakersfield
            Wholesale during my deposition.  I do not
20          know if they were also customers and
            suppliers of Bakersfield Wholesale.  Many
21          people on the list were people that I came
            across in my long career n [sic] this
22          industry.  Bakersfield is a small town and
            many convenience store operators know one
23          another.

24  Defendants also refer to portions of David's deposition in

25  disputing Fact 14.

26      AE UMF 14 is disputed.

1    **AE UMF 15**: On August 27, 2004, Abdo delivered a grant deed

2    to David, transferring title to the Warehouse to David.  The

3    transfer was recorded with the Clerk of Kern County, California

4    on September 14, 2004.

5    This fact is undisputed.

6    **AE UMF 16**: On August 13, 2004, David was made a signatory on

7    the accounts of Bakersfield Wholesale.

8    Defendants object that the supporting evidence is

9    inadmissible hearsay.  The supporting evidence is David's

10   deposition testimony and deposition exhibit 28.

11   Defendants dispute Fact 16, referring to Paragraph 9(c) of

12   David's declaration:

13                 ... It is my understanding from the documents
                   that have been produced that Bakersfield
14                 Wholesale had more than one bank account with
                   Wells Fargo.  I was only added as a signatory
15                 on one of them.

16   The evidence is undisputed as to one Bakersfield Wholesale

17   bank account with Wells Fargo, but disputed as to other accounts

18   Bakersfield Wholesale may have had with Well Fargo.

19   **AE UMF 17**: As of August or September 2004, account

20   statements were sent to David's mailing address, rather than to

21   Abdo's mailing address.

22   This fact is undisputed.

23   **AE UMF 18**: In August or September 2004, David began placing

24   orders for Bakersfield Wholesale and signing checks on its

25   behalf.

26   Defendants object that the supporting evidence is

12

1    inadmissible hearsay.  The supporting evidence is David's
2    deposition testimony and copies of checks signed by David
3    attached to Mr. Glauber's affidavit filed previously in this
4    action.

5         Defendants dispute Fact 18 to the extent that David "was not
6    the only individual that placed orders or signed checks."

7         The David Defendants do not dispute that David began placing
8    orders for Bakersfield Wholesale and signing checks, among others
9    who signed, on behalf of Bakersfield Wholesale in August and
10   September 2004.

11        **AE UMF 19**: David and Abdo executed a written "Declaration"
12   dated September 19, 2004, which stated (1) that in exchange for
13   the satisfaction of an alleged $150,000 loan from David to Abdo,
14   Abdo was transferring the Warehouse building located at 402
15   California Avenue to David, and (2) that "[t]he borrower [Abdo]
16   no longer has an interest of any king [kind] in this property or
17   any business within it."

18        **AE UMF 20**: In November and December 2004, David wrote checks
19   drawn on the Bakersfield Wholesale account in order to make
20   mortgage payments on the Warehouse (which he admits owning as of
21   those dates).

22        Defendants object that the supporting evidence, which are
23   copies of checks signed by David attached to Mr. Glauber's
24   affidavit filed previously in this action, David's deposition
25   testimony, and Paragraph 50 of the Answer, are inadmissible
26   hearsay and "vague and ambiguous."  Fact 20 is disputed "to the

1  extent that David only admits to owning the Warehouse and
2  vehemently denies ever owning Bakersfield Wholesale."

3      It is undisputed that David wrote checks drawn on the
4  Bakersfield Wholesale account to make mortgage payments on the
5  Warehouse and it is disputed whether David owned Bakersfield
6  Wholesale.

7      **AE UMF 21**: On December 4, 2004, Bakersfield Wholesale made
8  three payments to American Express which were returned for lack
9  of funds.

10     This fact is undisputed.

11     **AE UMF 22**: American Express terminated Bakersfield
12 Wholesale's American Express accounts and demanded payment in
13 full of the total outstanding balance that was owed thereon.

14     This fact is undisputed.

15     **AE UMF 23**: Despite due demand, no payments on the account
16 were made.

17     This fact is undisputed.

18     **AE UMF 24**: Abdo borrowed $150,000 from David, which Abdo has
19 never repaid.

20     Defendants object that the supporting evidence, the Answer
21 and David's interrogatory responses, are inadmissible hearsay.

22     Defendants dispute Fact 24 "to the extent that the note for
23 $150,000 was forgiven in exchange for the conveyance of the
24 Warehouse and assumption of the mortgage on the Warehouse."

25     AE UMF 24 is disputed.

26     **AE UMF 25**: Bakersfield Grocery Wholesale services the same

14

customers that Bakersfield Wholesale did and makes purchases from the same suppliers.

This fact is disputed.

**AE UMF 26**: David runs Bakersfield Grocery Wholesale with the substantial assistance of his brother Abdo.

Defendants object that the supporting evidence, David's deposition testimony, is inadmissible hearsay.

Defendants dispute Fact 26 on the ground that the term "substantial is vague and ambiguous", referring to other portions of David's deposition testimony.

This fact is disputed.

**AE UMF 27**: In early 2005, David deposited checks from Bakersfield Wholesale's customers into Bakersfield Grocery Wholesale's account.

This fact is undisputed.

**AE UMF 28**: On January 15, 2005, David canceled a proposed bulk sale because of the TRO obtained by American Express in this lawsuit on January 4, 2005, which forbade transfers of assets from Bakersfield Wholesale to third parties.

This fact is undisputed.

**AE UMF 29**: David did not cancel the proposed bulk sale of the inventory until January 15, 2005.

Defendants dispute this fact "to the extent that the sale may have been cancelled prior to January 15, 2005 but notification was not provided until that day." Defendants cite no evidentiary support for this assertion.

1    AE UMF 29 is undisputed.

2    <u>AE UMF 30</u>: On December 6, 2004, David rented a large unit at

3  a storage facility in Bakersfield, California, called Fortress

4  Self-Storage.

5    This fact is undisputed.

6    <u>AE UMF 31</u>: David filled out a 'Customer Identification" form

7  required by Fortress Self-Storage, writing in "Bakersfield

8  Wholesale" as his place of employment.

9    Defendants do not dispute that the Customer Identification

10  Form lists Bakersfield Wholesale as David's place of employment.

11  Defendants dispute that David was employed by Bakersfield

12  Wholesale.  In so disputing, David refers to his deposition

13  testimony on July 9, 2007 at page 544:

14          Q.  You list as your place of employment
            Bakersfield Wholesale.  Why did you list
15          Bakersfield Wholesale there?

16          A.  They were asking for employment so I just
            list that.  It doesn't mean I was working
17          there.

18    AE UMF 31 is undisputed.

19    <u>AE UMF 32</u>: Abdo moved at least $3 million in Costco

20  Cigarettes from Bakersfield Wholesale to Fortress Self-Storage.

21    The evidentiary basis for this fact is the Admitted Facts in

22  the Scheduling Conference Order:

23          16.  A fire broke out on July 4, 2005, at the
            Fortress Self-Storage which damaged several
24          units, including David's rental unit.  As
            part of an insurance claim, David Aezah
25          submitted receipts showing the cost of the
            cigarettes.  The receipts submitted include
26          November-December 2004 receipts for the

1
2
3
4
5

> purchase of cigarettes by Bakersfield
> Wholesale at Costco, using the American
> Express credit card.  Based on these
> receipts, the insurance carrier (Travelers)
> issued a check to David, in his individual
> capacity, in the amount of $341,197.28.  On
> or about January 11, 2006, David deposited
> the check into Bakersfield Grocery
> Wholesale's account at Citibank.

6   Defendants dispute AE UMF 32 claiming the cited evidentiary

7  support does not prove these facts.  Defendants assert that "[i]t

8  is unknown by responding defendant as to how many cigarettes were

9  transferred by Abdo to Fortress."  Defendants refer to David's

10  deposition testimony of July 9, 2007 at page 555 where David

11  testified that he never learned that Abdo was storing cigarettes

12  at Fortress Self-Storage.  Defendants also refer to Abdo's

13  deposition testimony of January 15, 2007 at pages 257-260.

14   Although David may not have known the number of cigarettes,

15  he knew that he had cigarettes stored at Fortress and that the

16  quantity there was in excess of David's cigarettes.

17   **AE UMF 33**: The records at Fortress show that the unit that

18  David was renting had been accessed at least fifteen times

19  between December 6, 2004, and July 4, 2005, the date of a fire at

20  Fortress Self-Storage.

21   This fact is undisputed.

22   **AE UMF 34**: A fire at Fortress Self-Storage on or about July

23  4, 2005, damaged several storage units, including the unit rented

24  by David.  The renter deemed responsible for the fire was insured

25  by Travelers, which engaged an insurance adjuster, Cunningham

26  Lindsey U.S., Inc., to handle the claims.  The representative of

1   Cunningham Lindsey was Robert Bycott, an experienced adjuster who

2   had investigated hundreds of fires, and at least ninety fires in

3   commercial buildings.

4       This fact is undisputed.

5       **AE UMF 35**: After the fire, David arranged to have the

6   remaining cigarettes removed to a container unit near the

7   Warehouse at 402 California Avenue.

8       This fact is undisputed.

9       **AE UMF 36**: In order to establish the value of the cigarettes

10  destroyed at Fortress, David submitted the November-December 2004

11  receipts for the purchase of cigarettes by Bakersfield Wholesale,

12  at Costco, using the American Express credit card, which showed

13  the cost of the cigarettes.

14      This fact is undisputed.

15      **AE UMF 37**: Following the fire at Fortress Self-Storage,

16  David transferred insurance proceeds belonging to Bakersfield

17  Wholesale to Bakersfield Grocery Wholesale.

18      The evidentiary basis for this is Admitted Facts, Paragraph

19  16, of the Scheduling Conference Order.

20      Defendants dispute this fact, referring to Paragraph 9(f) of

21  David's declaration in opposition to this motion:

22          As to plaintiff's undisputed material fact
            no. 37: Travelers Insurance Company issued a
23          check to me for $341,197.28.  I deposited the
            check in my account.  I then gave the money
24          to Abdo because the insurance money was to
            compensate him for the lost cigarettes.
25
26  Defendants also refer to David's July 9, 2007 deposition

18

1  testimony at pages 612, 619-620, and 623-625.

2       This fact is undisputed.

3       **AE UMF 38**: David executed a release of Travelers in the

4  United States and personally delivered it to Bycott on December

5  27, 2006.  Travelers issued a check to David personally in the

6  amount of $341,197.28.

7       This fact is undisputed.

8       **AE UMF 39**: On or about January 11, 2006, David deposited the

9  check into Bakersfield Grocery Wholesale's account at Citibank.

10       This fact is undisputed.

11       **AE UMF 40**: David subsequently transferred such insurance

12  proceeds from Bakersfield Grocery Wholesale to Abdo.

13       This fact is undisputed.

14       **AE UMF 41**: On January 4, 2005, this Court signed a temporary

15  restraining order preventing the defendants (which at that time

16  did not include David) from transferring any real property that

17  might be available to satisfy the debt.

18       Defendants do not dispute this fact.  However, referring to

19  Paragraph 9(j) of David's declaration, Defendants assert: "in

20  that David was not a defendant in the matter, he was not aware of

21  the temporary restraining order." However, there is no paragraph

22  9(j) in David's declaration.

23       This fact is undisputed.

24       **AE UMF 42**: In early January 2005, following the filing of

25  the California Action, Abdo deeded title to his residence to

26  David for no consideration.

19

1   This fact is undisputed.

2   **AE UMF 43**: After American Express moved to hold Abdo in

3   contempt for this fraudulent conveyance, the house was deeded

4   back to Abdo by David.

5   This fact is undisputed.

6   **AE UMF 44**: In January 2005, David took checks which had been

7   made payable to "Bakersfield Wholesale Foods," for goods

8   purchased in 2004 - many of which were issued in 2004, before

9   Bakersfield Grocery Wholesale was formed or licensed - and

10  deposited them directly into the bank account of the new entity,

11  Bakersfield Grocery Wholesale.

12  Defendants do not dispute this fact.  However, they assert:

13  "[T]he monies for each and every check were given back to

14  Bakersfield Wholesale."  Defendant cite Paragraph 9(k) of David's

15  Declaration as support.  However, there is no Paragraph 9(k).

16  This fact is undisputed.

17  **AE UMF 45**: David wrote approximately $350,000.00 in checks

18  on his personal account and on the account of Bakersfield Grocery

19  Wholesale in the fall of 2005 through the spring of 2006 to

20  various individuals who cashed checks in Yemen.

21  This fact is undisputed.

22  **AE UMF 46**: In or about April 2006, the Aezahs began

23  negotiations for the purchase of the "Carver Village Apartments,"

24  a large apartment complex located at 1912 Live Oak Street,

25  Pascagoula, Mississippi (the "Mississippi Property").

26  Defendants dispute Fact 46, relying on Paragraph 9(g) of

20

David's Declaration:

> In April 2006, I began negotiations to
> purchase Carver Village Apartments for my
> acquisition of these apartments.  Any
> participation by Abdo was at my request and
> did not result in or reflect any ownership
> interest for Abdo.

AE UMF 46 is disputed.

AE UMF 47: In 2006, the property was listed for sale through the real estate firm of Cumbest Realty, Inc. ("Cumbest Realty"). Although the investment was made in David's name, Abdo was personally involved in negotiations for the transaction (including price negotiations) and Abdo traveled to Mississippi in order to inspect the property before David purchased it.

This fact is undisputed.

AE UMF 48: In order to pay for the property, on May 9, 2006, Abdo and an employee of Bakersfield Grocery took 6,000 $100 bills, for a total of $600,000, from a safe at 402 California and deposited the cash into the bank account of Bakersfield Grocery Wholesale at Citibank.  Citibank's records confirm the deposit of 6,000 $100 bills on May 9, 2006.  On May 10, 2006, Abdo and the employee deposited another $707,500 in $100 bills into the bank account.

This fact is undisputed.

AE UMF 49: Citibank records show the deposit of more than 13,000 $100 bills by defendants, for a total of more than $1.3 million.

This fact is undisputed.

21

1    **AE UMF 50**: Citibank records show checks written by David

2  Aezah with this money to the real estate firm in Mississippi to

3  purchase the Mississippi Property.

4        This fact is undisputed.

5    **AE UMF 51**: On or about May 17, 2006, David closed on the

6  purchase of the Mississippi Property, using the cash Abdo had

7  deposited into the Bakersfield Grocery Wholesale account.

8        This fact is undisputed.

9    **AE UMF 52**: In August 2006, David learned that it would be

10  difficult to develop the Mississippi Property because the

11  buildings in question had been condemned or were in the process

12  of being condemned for violations of building codes.

13        This fact is undisputed.

14    **AE UMF 53**: Abdo and a handyman then traveled to Mississippi

15  for seven to eight days and consulted with local contractors to

16  determine whether the apartments could be brought into compliance

17  with building codes.

18        This fact is undisputed.

19    **AE UMF 54**: David and Abdo decided not to develop the

20  property, and began investigating the possibility of reselling

21  it.

22        Defendants dispute this fact, relying on Paragraph 9(h) of

23  David's Declaration:

24            I made all decisions about the property in
              Mississippi as I was the sole owner of the
25            property.  Abdo did as I instructed.  He was
              helping me out as I was busy and/or otherwise
26            unavailable.  He did not contribute

1               **financially to the acquisition of the**
2               **property.  I was the sole owner of the**
             **property.**

3      **AE UMF 54 is disputed.**

4      **AE UMF 55: Abdo began to make arrangements to list the**
5  **property for sale through Cumbest Realty.**

6      **Defendants dispute Fact 55, relying on Paragraph 9(h) of**
7  **David's Declaration quoted above re Fact 54.**

8      **AE UMF 55 is disputed.**

9      **AE UMF 56: Ultimately, however, David began negotiations to**
10 **sell the Mississippi Property to the Low Income Family Enrichment**
11 **Foundation (the "Life Foundation") which had previously been**
12 **interested in the property.  The parties negotiated a sale price**
13 **of $1,450,000 and entered into a contract of sale dated July 17,**
14 **2006.**

15     **This fact is undisputed.**

16     **AE UMF 57: On September 19, 2006, American Express, having**
17 **learned about the proposed transaction from bank records produced**
18 **by Citibank, brought an action in the United States District**
19 **Court for the Southern District of Mississippi (the "Mississippi**
20 **Action") in order to enjoin its sale and prevent the loss of**
21 **proceeds of the proposed sale.**

22     **This fact is undisputed.**

23     **AE UMF 58: On November 13, 2006, American Express agreed to**
24 **lift a lis pendens it had obtained and permit the sale of the**
25 **Mississippi Property to proceed, subject to execution by David,**
26 **American Express, and the Life Foundation of an Agreement and**

Escrow Instructions dated November 13, 2006, which was executed by all parties.

This fact is undisputed.

**AE UMF 59**: On February 21, 2007, American Express dismissed the Mississippi Action without prejudice, pursuant to a stipulation signed by counsel for David and American Express, and so ordered by the Court in this action, which provides that the disposition of the proceeds of the sale of the Carver Village Apartments may be determined by this Court.

This fact is undisputed.

2.  **David Defendants' Supplemental Statement of Undisputed and Disputed Facts**.

The David Defendants set forth the following as undisputed material facts:

**DD UMF 1**:  In or about May 2004, Abdo Aezah applied for and was granted a corporate credit card on behalf of Bakersfield Wholesale.

This fact is undisputed.

**DD UMF 2**:  In or about September 2004, Abdo Aezah applied for and was granted a corporate credit card on behalf of D & A Corporation.

This fact is undisputed.

**DD UMF 3**:  Abdo requested three additional American Express credit cards in the name of Abdo Aezah/Bakersfield Wholesale, Malaka Aezah/Bakersfield Wholesale, Fahd Aezah/Bakersfield Wholesale.

1      This fact is undisputed.

2      **DD UMF 4**:  American Express issued another credit card to D

3  & A Corporation.

4      This fact is undisputed.

5      **DD UMF 5**:  None of the American Express cards issued were

6  issued to David Aezah, Bakersfield Grocery Wholesale, or Dave

7  Aezah Investment, Inc.

8      This fact is undisputed.

9      **DD UMF 6**: David did not use any of the American Express

10  cards that were issued.

11      This fact is undisputed.

12      **DD UMF 7**:  By designating Abdo Aezah, Malaka Aezah and Fahd

13  Aezah to receive American Express cards, Bakersfield Wholesale

14  agreed to be bound by the terms and conditions of the Agreement

15  between Corporate Account and American Express and Corporate

16  Cardmember and American Express.

17      This fact is undisputed.

18      **DD UMF 8**: By accepting the corporate card, Abdo Aezah,

19  Malaka Aezah, and Fahd Aezah agreed to be individually

20  responsible for the debt incurred.  David Aezah was not a party

21  to any of these agreements in that a card was not issued to him.

22      This fact is undisputed.

23      **DD UMF 9**: The American Express Agreement with its card

24  holders provides that the individual whose name appears on the

25  card is responsible for all charges.

26      This fact is undisputed.

**DD UMF 10**: American Express dismissed all claims against Fahd Aezah despite a corporate card being issued to him.

This fact is undisputed.

**DD UMF 11**:  David Aezah has over 22 years of experience operating or owning mini marts, liquor stores, and gas stations.

This fact is undisputed.

**DD UMF 12**: Prior to issuing Bakersfield Wholesale the additional credit cards in September 2004, American Express determined that Bakersfield Wholesale and/or Abdo Aezah were credit risks.  The account was initially coded extreme.

This fact is undisputed.

**DD UMF 13**: The collective limit on the credit cards issued by American Express to Bakersfield Wholesale was supposed to be $110,000.

This fact is undisputed.

**DD UMF 14**:  An investigative report was prepared by American Express' Director of Security for the Western Region.  David Aezah's name is not included in the report.  No investigative report was ever prepared by American Express which identified David Aezah as a participant in any alleged fraud.

This fact is undisputed.

**DD UMF 15**: The promissory note that was executed by David and Abdo Aezah to secure a loan from David to Abdo in the amount of $150,000 identifies the warehouse located at 402 California Avenue in Bakersfield, California as the only security for the loan.

1    This fact is undisputed.

2    **DD UMF 16**: There was a mortgage on the warehouse located at

3    402 California Avenue in Bakersfield, California in the amount of

4    $280,000 at the time the promissory note was executed.

5    This fact is undisputed.

6    **DD UMF 17**: Abdo Aezah/Bakersfield Wholesale agreed to pay

7    David Aezah rent to continue to occupy the warehouse after David

8    Aezah became the owner of the warehouse.

9    This fact is undisputed.

10   **DD UMF 18**: Abdo Aezah is the only owner of Bakersfield

11   Wholesale Foods identified on the papers to make David Aezah a

12   signatory on the Bakersfield Wholesale Foods checking account.

13   This fact is undisputed.

14   **DD UMF 19**:  Abdo told Robert Bycott to make the insurance

15   settlement check out to David Aezah and Bakersfield Grocery

16   Wholesale.

17   This fact is undisputed.

18   **DD UMF 20**:  The customer and supplier list of Bakersfield

19   Grocery Wholesale is not identical to the customer and suppliers

20   of Bakersfield Wholesale Foods.

21   This fact is undisputed.

22   **DD UMF 21**: American Express has not identified any

23   individual or business to testify that they acquired cigarettes

24   from David Aezah that were previously acquired at Costco by Abdo

25   Aezah.

26   This fact is undisputed.

27

**DD UMF 22**:  David was not a party to this action at the time the temporary restraining order as to Abdo's property was issued.

This fact is undisputed.

In addition, the David Defendants submit that the following are disputed material facts:

1.  David Aezah has never been an owner of Bakersfield Wholesale Foods.

This fact is disputed.

2.  The David Defendants did not participate in the sale of any Costco Cigarettes.

This fact is disputed.

3.  The Mississippi Property was purchased by David Aezah only.

This fact is disputed.

4.  David had adequate funds to purchase the Mississippi Property and did not receive any money from Abdo Aezah to acquire the property.

This fact is disputed.

5.  The money that was spent in Yemen came from David's various business endeavors and David's wife.  Abdo did not give David any money that was used or cashed in Yemen.

This fact is disputed.

6.  Bakersfield Wholesale Food's inventory was auctioned off or otherwise disposed of.  Bakersfield Grocery Wholesale did not acquire or receive any inventory from Bakersfield Wholesale Foods.

28

1    This fact is disputed.

2        7.  David did not have any real knowledge of what was

3 happening between American Express and Abdo Aezah until he became

4 a defendant in this matter.

5    This fact is disputed.

6    C.  <u>CLAIMS FOR FRAUDULENT TRANSFER</u>.

7        1.  <u>Intentional Fraudulent Transfer</u>.

8    American Express seeks summary judgment on its claims

9 against the David Defendants for fraudulent transfer pursuant to

10 California Civil Code § 3439.04.

11    Section 3439.04 provides in pertinent part:

12        (a) A transfer made or an obligation incurred
          by a debtor is fraudulent as to a creditor,
13        whether the creditor's claim arose before or
          after the transfer was made or the obligation
14        incurred, if the debtor made the transfer or
          incurred the obligation as follows:

15
          (1) With actual intent to hinder, delay, or
16        defraud any creditor of the debtor.

17        (2) Without receiving a reasonably equivalent
          value in exchange for the transfer or
18        obligation, and the debtor either:

19            (A) Was engaged or was about to
          engage in a business or a transaction for
20        which the remaining assets of the debtor were
          unreasonably small in relation to the
21        business or transaction.

22            (B) Intended to incur, or believed
          or reasonably should have believed that he or
23        she would incur, debts beyond his or her
          ability to pay as they became due.

24
          (b) In determining actual intent under
25        paragraph (1) of subdivision (a),
          consideration may be given, among other
26        factors, to any or all of the following:

29

**(1)** Whether the transfer or obligation was to an insider.

**(2)** Whether the debtor retained possession or control of the property transferred after the transfer.

**(3)** Whether the transfer or obligation was disclosed or concealed.

**(4)** Whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

**(5)** Whether the transfer was of substantially all the debtor's assets.

**(6)** Whether the debtor absconded.

**(7)** Whether the debtor removed or concealed assets.

**(8)** Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

**(9)** Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

**(10)** Whether the transfer occurred shortly before or shortly after a substantial debt was incurred.

**(11)** Whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor.

**(c)** The amendment to this section made during the 2004 portion of the 2003-04 Regular Session of the Legislature, set forth in subdivision (b), does not constitute a change in, but is declaratory of, existing law, and is not intended to affect any judicial decisions that have interpreted this chapter.

American Express argues that there is evidence in this

1  action establishing all of the "badges of fraud" set forth in

2  Section 3439.04(a).

3      *In re Beverly*, 374 B.R. 221 (9th Cir.BAP 2007), the Ninth

4  Circuit BAP held in pertinent part:

5          Actually fraudulent transfers are avoidable
           under UFTA by present and future creditors.
6          A transfer is said to be 'actually
           fraudulent' as to a creditor if the debtor
7          made the transfer 'with the actual intent to
           hinder, delay, or defraud any creditor of the
8          debtor.'  Cal.Civ.Code § 3439.04(a)(1).

9          The focus is on the intent of the transferor.
           While intent to defraud is the usual rubric,
10         the intended effect of the transfer need only
           be hindrance of a creditor or delay of a
11         creditor.  Any of the three - intent to
           hinder, intent to delay, or intent to defraud
12         - qualifies a transfer for UFTA avoidance,
           even if adequate consideration is paid by
13         someone other than a good faith transferee
           for reasonably equivalent value ....
14
           Whether there is actual intent to hinder,
15         delay, or defraud under UFTA is a question of
           fact to be determined by a preponderance of
16         the evidence ....

17         Since direct evidence of intent to hinder,
           delay or defraud is uncommon, the
18         determination typically is made inferentially
           from circumstances consistent with the
19         requisite intent ... Thus, UFTA lists eleven
           nonexclusive factors that historically (since
20         the Statute of Elizabeth in 1572) have been
           regarded as circumstantial 'badges of fraud'
21         that are probative of intent.  Cal.Civ.Code §
           3439.04(b).
22
           The UFTA list of 'badges of fraud' provides
23         neither a counting rule, nor a mathematical
           formula.  No minimum number of factors tips
24         the scales toward actual intent.  A trier of
           fact is entitled to find actual intent based
25         on the evidence in the case, even if no
           'badges of fraud' are present.  Conversely,
26         specific evidence may negate an inference of

                              31

> fraud notwithstanding the presence of a
> number of 'badges of fraud.' ....

First, American Express contends, brothers are "indisputably insiders."  American Express cites *BFP v. Resolution Trust Corporation*, 511 U.S. 531, 533 n.5 (1994)(Souter, J., dissenting):[3]

> The Court notes correctly that fraudulent
> conveyance laws were directed first against
> insolvent debtors' passing assets to friends
> or relatives, in order to keep them beyond
> their creditors' reach (the proverbial
> 'Elizabethan deadbeat who sells his sheep to
> his brother for a pittance,' see Baird &
> Jackson, Fraudulent Conveyance Law and Its
> Proper Domain, 38 Vand.L.Rev. 829, 852
> (1985)) ....

American Express refers to evidence that the transfers of the assets of Bakersfield Wholesale to its successor, Bakersfield Grocery, were actively concealed and occurred in direct violation of the Court's January 4, 2005 TRO prohibiting such a transaction; that the transfer of the Costco Cigarettes was, and continues to be, concealed from American Express, which has never received a satisfactory explanation of the location of the Costco Cigarettes or of the proceeds of their sale; that the transfer of Bakersfield Wholesale's assets occurred immediately after it had incurred $3.6 million in debt and continued after Abdo received notice of this lawsuit; that the transfer of the Costco

---

[3]American Express is advised that citations to cases should include the specific page in the case to which reference is made, especially when the quotation is from a footnote in the dissenting opinion.  The Court's limited time for preparation of motions is not well-used when the Court is required to hunt for references in citations.

Cigarettes represented substantially all of Bakersfield Wholesale's assets; that Abdo and David repeatedly perjured themselves and that Abdo inconsistently asserted the Fifth Amendment privilege against self-incrimination in an effort to conceal the location of the Costco Cigarettes and the proceeds from the sale of those cigarettes; that Bakersfield Wholesale received less than reasonably equivalent value for the transfer of the Costco Cigarettes and other assets of Bakersfield Wholesale to David and Bakersfield Grocery; that Bakersfield Wholesale received nothing when David used the assets of Bakersfield Wholesale to purchase the Mississippi Property; and that the transfers to David and Bakersfield Grocery have rendered Abdo and Bakersfield Wholesale insolvent.

This evidence, American Express contends, establishes that it is entitled to summary judgment on its claims of intentional fraudulent transfers under California law.

The David Defendants oppose this aspect of the motion for summary judgment, contending that there have been no fraudulent transfers between Abdo and David. Defendants refer to evidence that Abdo admitted he sold the Costco Cigarettes in their entirety, that David denies selling any of the Costco Cigarettes or accessing the storage unit containing the Costco Cigarettes; that Abdo was the only person having a key to the Fortress Self Storage unit; that, when Abdo lost the key, David had to have the lock cut; that, while Robert Bycott's evidence that David stated that he, David, would access the storage units for the cigarettes

for his own purposes, Bycott's evidence is mistaken and contradicts the testimony and declarations of Abdo and David; that American Express has not identified a witness who purchased cigarettes from Bakersfield Grocery that came from Costco or Bakersfield Wholesale, saw David sell any cigarettes that belong to Bakersfield Wholesale, Costco or American Express, or that David sold the same type of cigarettes through Bakersfield Grocery that were acquired by Abdo from Costco; that there was never a transfer of inventory belonging to Bakersfield Wholesale to any of the David Defendants; that David intended to purchase the remaining inventory of Bakersfield Wholesale but cancelled the prospective sale when he learned of the Court's TRO; and that Abdo admits auctioning off the remaining inventory.  The David Defendants contend that American Express has no evidence of the amount of inventory Abdo had in December 2004 and that American Express's evidence that David must have acquired the Bakersfield Wholesale inventory because he was ready to begin conducting business once he obtained a business license is speculation.  The David Defendants admit that Abdo conveyed his home to David, but assert that David reconveyed the home to Abdo when David learned of the Court's preliminary injunction, further contending that David was not a party to this action at that time and would have no way of knowing about the preliminary injunction.  With regard to the Mississippi Property, the David Defendants refer to evidence that it was purchased with David's own funds; that neither Abdo or Bakersfield Wholesale contributed any monies

34

toward that acquisition; and that defense expert Dick Nordstrom opines that David had adequate funds to acquire the Mississippi property.  The David Defendants refer to evidence that the money spent in Yemen came from David's various business ventures and from his wife; that the money did not come from Abdo or Bakersfield Wholesale; and that defense expert Dick Nordstrom opines that David had adequate funds, exclusive of the Costco Cigarettes proceeds, to spend the amount spent in Yemen.  With regard to Bakersfield Grocery's receipt of insurance proceeds from the damage at the storage facility, the David Defendants refer to evidence that Abdo asked that the check be made out to David because David was the lessor of the storage facility; that David was not entitled to the proceeds and turned the money over to Abdo; and that Abdo spent the entire amount of the insurance proceeds on the acquisition of a new ice cream business.

American Express replies that, although David has made a general denial of his intent to fraudulently convey assets, where the "badges of fraud" are present, a general denial of culpability is unavailing to avoid summary judgment.  American Express cites *In re Beverly*, *supra*, 2007 WL 2200590.  In *In re Beverly*, the Ninth Circuit BAP ruled that "[t]he summary judgment evidence in this appeal contains an extraordinary amount of direct evidence of the requisite intent, as well as circumstantial evidence of 'badges of fraud.'" The Ninth Circuit BAP referred to direct evidence in the debtor's own words to his spouse's counsel and concluded:

1    The evidence demonstrates that the Outland
     litigation was the main reason Beverly
2    structured the MSA [marital settlement
     agreement] so as to transfer his entire
3    interest in the $1 million nonexempt fund.
     If there had been a simple equal division of
4    community assets (as presumed by California
     law when a court makes the division), he
5    would have had about $500,000 of nonexempt
     funds ($50,000 eligible to be rolled over
6    into a new homestead) that he knew would be
     vulnerable to collection of the $424,000
7    Outland judgment.

8    In addition, there was circumstantial evidence supporting five

9    "badges of fraud".  The Ninth Circuit further ruled that

10   Beverly's summary judgment evidence in opposition, which

11   consisted of his contention that a bankruptcy lawyer advised him

12   that his MSA transfers could not be avoided as fraudulent and his

13   contention that the MSA negotiations were not collusive because

14   the divorce was hostile and was resolved through mediation, did

15   not suffice to raise a genuine issue of material fact.  The issue

16   of avoidance is a matter of California law, not bankruptcy law

17   even cursory research would have turned up the California Supreme

18   Court's decision which exposes MSA transfers to UFTA avoidance.

19   As to the MSA negotiations, both spouses had an incentive to

20   thwart collection of the Outland judgment and there was no

21   evidence regarding the extent to which the mediator was apprised

22   of the UFTA issues that would be triggered by the MSA.  The Ninth

23   Circuit ruled that Mrs. Beverly, as the proponent of good faith

24   transferee status, did not demonstrate genuine issues of material

25   fact that would support such a finding, because she was copied on

26   the direct evidence letters from Beverly to his spouse's attorney

36

1  and Mrs. Beverly's attorney recognized the fraudulent aspect of

2  the MSA.   There is nothing in *In re Beverly*, however, that

3  substantiates American Express's contention that a general denial

4  of culpability is unavailing to avoid summary judgment.

5       In its reply brief, American Express also argues that the

6  undisputed evidence shows that David acted with the intent to

7  hinder, delay or defraud American Express.

8       American Express contends that the evidence establishes that

9  David knew what was at the Fortress Self-Storage unit and why it

10  was there.   In his deposition taken on July 9, 2007, David

11  testified in pertinent part:

12          Q.  Have you ever learn [sic] that your
            brother was storing cigarettes at Fortress?
13
            A.  No.
14
            Q.  Did you ever learn that anybody was
15          storing cigarettes at Fortress?

16          A.  No.

17  (David Depo, July 9, 2007, 555:16-21).

18       Abdo testified at his deposition taken on January 13, 2007

19  in pertinent part as follows:

20          Q.  Okay.   Now, did David work with you to
            help you move these cigarettes to Fortress?
21
            A.  No.
22
            Q.  Did David have anything at all to do with
23          Fortress?

24          A.  David, the only thing I asked him, I
            asked him - I tell him, you know, can you
25          give me a favor, now I - my credit - American
            Express messed up my credit, if I rent it -
26          if I need to rent the place out, you know,

1         they may be going to do a credit check, they
    not rent it to me.  But can you rent me a
2         place, I have left over.  I tell him, I got a
    little bit left over, I want to keep them
3         until I settle with American Express and I
    pay them, and you know, then I change it to
4         my name, and if you ever want to use it, I
    let you use it.  If I remember, that's right,
5         because it's been awhile, I'm just guessing.
    The - the - you know, I'm not a hundred
6         percent sure.

7  (Abdo Depo. p. 32:2-19).  David testified at the July 25, 2007

8  hearing in this Court in pertinent part as follows:

9         Q.  Can you remember one way or the other
    that, when you were opening the Fortress
10        facility, whether your brother had told you
    that he wanted to put something in there
11        until he settled with American Express?

12        A.  Yes.

13        Q.  And is that what you remember his telling
    you?
14
    A.  I remember, yes, I think I remember that.
15
    Q.  And isn't it true that the reason he told
16        you he wanted to put that product away until
    he settled is that he was afraid American
17        Express would take it before a settlement?

18        A.  I do not remember if we talked about this
    or not.
19
    Q.  Isn't it true that you understood, at the
20        time, that the reason he wanted to put the
    product in storage until he settled with
21        American Express was to keep it away from
    American Express?
22
    A.  I do not remember that.  It was three
23        years ago.  I'm not exactly quite sure.

24  (July 25, 2007 Transcript, 100:23-101:14).   However, in his

25  Declaration dated June 21, 2007 and filed with the Court on June

26  21, 2007, David averred in Paragraph 13 in pertinent part:

> ... I rented a storage locker and Abdo asked
> if he could put some of his cigarettes in the
> storage locker.  I did not at that point know
> what was really going on with American
> Express and Abdo.  The storage locker was in
> my name and so the check for the property
> that was damaged in the fire was issued in my
> name.  However, I gave all of the money to
> Abdo since it was his property that had been
> destroyed.  I did not keep or use any of that
> money in any way.

American Express argues that David should not be permitted to create an issue of fact by contradicting the averment in the June 21, 2007 affidavit.

In *Foster v. Arenta Assocs., Inc.*, 772 F.2d 1453, 1462 (9th Cir. 1985) and *Radobenko v. Automated Equipment Corp.*, 520 F.2d 540, 544 (9th Cir. 1973), the Ninth Circuit held that a party should not be able to substitute an affidavit alleging helpful facts for earlier deposition testimony harmful to its case in order to avoid summary judgment.  This rule applies to conflicts between affidavits and interrogatory responses as well.  *School Dist. No. IJ, Multnomah County v. ACandS, Inc.*, 5 F.3d 1255, 1264 (9th Cir, 1993).  However, in *Kennedy v. Allied Mut. Ins. Co.* 952 F.2d 262, 266-267 (9th Cir. 1991), the Ninth Circuit held:

> We conclude that the Foster-Radobenko rule
> does not automatically dispose of every case
> in which a contradictory affidavit is
> introduced to explain portions of earlier
> deposition testimony.  Rather, the Radobenko
> court was concerned with 'sham' testimony
> that flatly contradicts earlier testimony in
> an attempt to 'create' an issue of fact and
> avoid summary judgment.  Therefore, before
> applying the Radobenko sanction, the district
> court must make a factual determination that
> the contradiction was actually a 'sham.'

39

Examples of contradictory testimony that does not amount to a "sham" include clarification where the deponent was confused at the deposition and the affidavit explains those aspects of the deposition testimony, lack of access to material facts at the time of the deposition and the affidavit sets forth the newly-discovered evidence. *See Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir.1991).

David's Declaration dated September 10, 2007 and filed in opposition to the motion for summary judgment avers in Paragraph 1:

> 1. ... I am originally from Yemen. I do speak English but I don't speak it that well. I do understand some English but I also get confused and do not always understand it that well especially when I am not given a chance to explain what I mean. I am able to read some English but I do not read it that well.

David unequivocally admitted that Abdo transferred cigarettes to the Fortress storage and is bound by this testimony. He disclaims full knowledge of American Express's proceedings at the time of the transfer. From the record, it does not appear David's testimony that he was not aware of the extent of the legal proceedings against Abdo at the time of the transfer is a sham intended to create an issue of fact to avoid summary judgment.

American Express contends in its reply brief that David kept the inventory at the Fortress Self-Storage unit even after David learned the details of this lawsuit. Although David now claims that he did not know all of the details of the legal dispute

40

1   between American Express and Abdo when the Fortress storage unit

2   was rented on December 6, 2004, American Express contends that

3   David was fully on notice of American Express' claims against

4   Abdo by January 15, 2005.  American Express refers to David's

5   deposition testimony on September 13, 2007 concerning the grant

6   deed dated January 6, 2005:

7           MR. GLAUBER: Q.  And this I'll represent to
            you was the transfer of Abdo's house to
8           yourself.  What were the circumstances
            leading up to your brother Abdo transferring
9           title to his house to you?

10          A.  Well, one day Abdo, he come to me and he
            say, 'I want to transfer my house to your
11          name' and I said, 'That's fine.'  And then he
            told me why, you know, the situation between
12          American Express and all that and I said,
            'Fine.'  And then also after that I find out
13          that I be in trouble doing that. [¶] One week
            later, two weeks later, I can't remember
14          exactly, I called Jan Shine and make
            appointment with her, and I took Abdo, and I
15          re-transfer it back to him.

16          ...

17          Q.  Right.  Do you remember American Express
            had brought in an application to hold your
18          brother in contempt of court and isn't that
            why the title to the house was transferred
19          back to him?

20          A.  Exactly, that way I won't be in trouble.
            But I don't remember exactly how long.  But
21          all I know is I did transfer it back to him
            after I heard that he's — with American
22          Express.

23          Q.  Let's go back to January 6, 2005 ... Your
            brother transferred title to his house on El
24          Portal Road to you, did you pay any money for
            that transfer?

25          A.  No, no.

26

1   Q.  Well, why was it that your brother wanted
    to transfer title to his home to you?
2
3   A.  Well, I don't know what he was going
    through - with American Express.  Maybe he
    think that American Express would take it
4   away from him.  We never run into this
    before, I mean, this kind of idea, this kind
5   of situation like this one before. [¶] But
    all I know is about myself, that I find out
6   that it's not going to be good for me, not
    going to benefit for me, it's bad for me, so
7   I transfer it back to him.  I insist to him,
    I said, 'Hey, take your house back, I don't
8   want to get into trouble with nobody.'

9   (David Depo., September 13, 2006 73:15-75:10).  American Express

10  also refers to the statement in David's opposition brief,

11  referring to David's deposition testimony on September 13, 2006

12  at pages 65-71, that he cancelled the proposed bulk sale of

13  Bakersfield Wholesale's assets to him in early January 2005

14  "because he learned that American Express has [sic] a temporary

15  restraining order in effect preventing any such disposition of

16  assets."[4]  Even though David knew in early January 2005 of the

17  _____

18  [4]Although referred to by the parties as a "temporary
    restraining order", what was actually filed on January 4, 2006
19  (Doc. 6) is an "Order to Show Cause" why a writ of attachment
    should not issue.  The Order to Show Cause further ordered in
    pertinent part:
20
21      ORDERED that pending the hearing and
        determination of this motion, defendants, all
22      persons owing any debt to defendants, and all
        other persons and garnishees, be and hereby
23      are restrained and prohibited from
        transferring or paying any assets of the
24      defendants or any real or personal property in
        which the defendants have an interest, or any
25      debt owed to defendants to the following
        extent:  i) as to defendant Bakersfield
26      Wholesale, to the extent of $3,683,320,97; ii)
        as to defendant Abdo Aezah, to the extent of

42

1  existence of the Court's order preventing Bakersfield Wholesale

2  and Abdo from disposing of assets, at no time did David surrender

3  the inventory at Fortress to the Court or to American Express,

4  and, according to his most recent version of events, gave Abdo

5  continued access to the Bakersfield Wholesale inventory, even

6  after David was named as a party to this lawsuit on or about

7  March 23, 2005.

8      American Express further contends that David has admitted

9  that he used the inventory stored at the Fortress Self-Storage

10 unit in Bakersfield Grocery.  American Express refers to David's

11 deposition testimony on October 9, 2006:

12         MR. MOORE: Q.  And, Mr. Aezah, this is a
           check drawn to you personally in the amount
13         of $341,000 and change from Travelers
           Indemnity.  Why did you receive this check
14         from them?

15         A.  This from when I used to have a storage,
           has product in it.  So it burn up because of
16         next door neighbor, he caused the problems,
           and these people, they reimburse me for it.

17
           Q.  All right.  So are you saying you owned a
18         storage facility?

19         A.  I didn't own it.  I rent it.

20         Q.  You rented a storage facility?

21         A.  Yes.

22         Q.  And where was that storage facility
           located, what's the address?
23
           A.  In Bakersfield.
24

25  _____

           $351,384.38 ....
26

43

1        Q.  And at what street address?

2        A.  I don't know.

3        Q.  You had $300,000 worth of property at a
         place you don't know where it is?
4
         A.  No, I can't remember.  It's not like that
5        I know it by heart.

6        Q.  What part of town is it in?

7        ...

8        A.  I think southwest.

9        Q.  And when was the fire?

10       A.  I don't remember when the fire was.

11       Q.  Well, was it 2003, was it 2004?

12       A.  In 2005, I think it is.

13       Q.  And is this property that you owned
         individually?
14
         A.  Yes.
15
         Q.  And did you own it through Bakersfield
16       Grocery or just directly.

17       A.  I didn't get it.

18       Q.  Was this somehow connected with the
         inventory for Bakersfield Grocery?  What did
19       you have stored there?

20       A.  Yeah, in case I have product, extra
         product, somebody just put them in there.
21
(David Depo., October 9, 2006, 312:18-314:7).  In his Declaration
22
dated September 10, 2007 and filed in opposition to the motion
23
for summary judgment, David avers in Paragraphs 9(e) and (f) in
24
pertinent part as follows:
25
         e. ... I do not have any first hand knowledge
26       as to the value of the cigarettes that were

44

1             stored in Fortress Storage or where they came
            from.  I secured the storage facility because
2             Abdo asked me to.  He had not provided me
            much information about what was really going
3             on with American Express.  I rented the
            storage unit and gave him the key.  As a
4             result of this lawsuit, I have learned that a
            significant amount of cigarettes were sold to
5             A N J Mini Mart.  I do not know how many
            cigarettes were sold by Abdo prior to
6             December 6, 2006.  I do not know the exact
            value of the cigarettes that were stored or
7             what Abdo did with all of the cigarettes.

8             f. ... Travelers Insurance Company issued a
            check to me for $341,197.28.  I deposited the
9             check in my account.  I then gave the money
            to Abdo because the insurance money was to
10            compensate him for the lost cigarettes.

11 This testimony is highly significant, because American Express

12 had not yet learned of David's involvement with Fortress, and was

13 examining him concerning the insurance check alone. David

14 contended unequivocally that the insurance payment was for

15 "extra" cigarette inventory that he had been storing for use by

16 *Bakersfield Grocery Wholesale*, his successor business. David Tr.

17 312-14.

18     American Express again argues that David should not be

19 permitted to manufacture an issue of fact by contradicting his

20 previous testimony.  The issue presented is whether David's most

21 recent declaration is a sham intended to create an issue of fact

22 to withstand summary judgment.  There is no contention made by

23 David that his English language skills caused him to be confused

24 with this testimony or that he discovered additional evidence –

25 his later testimony is diametrically opposed to his early

26 description that he accepted transfer of Abdo's and Bakersfield

1  Wholesale's cigarettes.  Although the issue is close, it is

2  concluded that David's testimony is not a sham intended to create

3  an issue of fact to avoid summary judgment.  Ultimately the right

4  to jury trial on the issue of credibility should endure.

5      American Express contends that David admitted using the

6  inventory during his discussions with the insurance adjustor,

7  Robert Bycott.  American Express refers to Bycott's deposition

8  testimony of January 16, 2007:

9          Q.  All right.  And what did he say to you
           and what did you say to him, as best you can
10         recall?

11         A.  On the initial visit?

12         Q.  Yes.  And after you exhaust your
           recollection, I'll let you look at your
13         notes.  And I realize this is not a memory
           test, but I'm just trying to see what you can
14         remember.

15         A.  As far - as far as I recall, and what -
           what would seem reasonable, based on a first
16         - first meeting, is he discussed the damage
           to his - his cigarettes at the storage
17         facility due to the fire, and - and I recall
           that it was - he said it was causing him some
18         hardship, because he lost quite a bit of
           product, and - and he wanted to try to be -
19         remedy it as soon as possible in order not to
           lose income, I guess, or -
20
           Q.  Did he explain to you why it was causing
21         hardship?

22         A.  I - from what I recall, I think, you
           know, he'd have clients - from what I recall,
23         is he would rotate stock from the storage
           facility to his business on California on an
24         as-needed basis.  He didn't have an inventory
           to draw from there, so his clients coming in
25         to acquire or purchase the cigarettes, he
           wasn't able to - or he was having difficulty
26         in providing their - what they needed.

                              46

1  (Bycott Depo., January 16, 2007, 33:13-34:16).

2      In his Declaration dated September 10, 2007 filed in

3  opposition to the motion for summary judgment, David avers:

4              4.  I did not participate in the sale or
               disposition of any of the cigarettes acquired
5              by Abdo from Costco with American Express
               credit cards.  I know that Robert Bycott
6              indicated that I told him that I would access
               the storage facility so that I could sell the
7              cigarettes, however, that was a mistake.  It
               seems to me that the actions described by Mr.
8              Bycott in his file are referencing Abdo.  I
               did not say or do the things he identified as
9              they pertained to accessing the storage
               facility or selling the cigarettes contained
10             therein that came from Costco.

11  David refers to Bycott's January 16, 2007 deposition testimony:

12             Q.  Okay.  All right.  When David was in
               Yemen, and your notes don't indicate the
13             first date he went there, but I'll represent
               that you actually skipped over the date, I
14             don't know if you saw that or not, but you
               have one entry in your work log that you knew
15             that he was out of the country on October
               12th.
16
               A.  Okay.
17
               Q.  And I believe he got back near the end of
18             December, correct?

19             A.  I believe so.

20             Q.  During that time period, did you attempt
               to contact David in Yemen?  Did you pass a
21             message along?

22             A.  No, I - I - I never tried to call him in
               Yemen.
23
               Q.  And did you pass a message to Abdo
24             saying, hey, I need to talk to David, could
               you have him call me?
25
               A.  I recall meeting with David before he
26             left, he indicated he was going to be going

47

1    to Yemen and asked that I direct any calls
     while he was out to his - to Abdul [sic], -
2
3    Q.  Okay.

4    A.  - which I did.  I don't recall ever
     trying to call him, or I just ran everything
5    through Abdul [sic] to relay to David.

6    ...

7    Q.  Turning to Exhibit 99.  Do you recognize
     this document?  I believe you've already
8    testified to it.

9    A.  Yes.

10   ...

11   Q.  This letter is actually addressed to both
     David and Abdul [sic].  Do you remember
12   informing them, or writing that David must
     execute the Release despite Abdul [sic]
13   having the Power of Attorney?

14   A.  Yes.

15   Q.  Okay.  After you executed that letter,
     informing them that David needed to sign it
16   and that Abdul [sic] could not act on his
     behalf, did you attempt to contact David
17   after that point?

18   A.  No, I believe the purpose of that letter
     was to put it in writing, because David was
19   out of the country.

20   Q.  Okay.  Did you request that Abdul [sic]
     have David contact you after you informed him
21   that he could not use this Power of Attorney?

22   A.  Not that I recall.

23   Q.  Okay.

24   A.  That's why I'm requesting that David sign
     it.

25   Q.  Turning to Exhibit 89, page two ... Do
     you remember if the receipts that were
26   provided by Costco referred to the exact

                              48

1          cigarettes that were lost?

2          A.   No, I believe that they were presented by
           David to show his acquisition price that he
3          pays for them.

4          Q.   Okay.  So, the cigarettes lost did not
           necessarily reflect the cigarettes in the
5          receipts?

6          A.   Right.  As far as I recall.

7          Q.   Okay.  Did anyone, at any time, either
           David or Abdul [sic], say that they were co-
8          owners of Bakersfield Grocery Wholesale?

9          A.   I don't recall ever being told that.

10         ...

11         Q.   Okay.  Did David Aezah ever tell you
           specifically to put the name Bakersfield
12         Grocery Wholesale on the check?

13         A.   I don't recall.

14         Q.   Okay.  On the 29th [of November] - did we
           - I think we already covered that Abdul was
15         the one who said it.

16         ...

17         A.   Yes.

18         Q.   Okay.  And you did not speak to David on
           that date?
19
           A.   No.
20
   (Bycott Depo., January 16, 2007, 102:20-108:13).
21
        David argues that Bycott's testimony should be disregarded
22
   in resolving this motion because his testimony relied on his
23
   written notes.
24
        However, as American Express notes, Bycott's deposition
25
   testimony was made without refreshing his recollection by
26

                                49

1  reviewing his notes.

2      American Express argues that Bycott's testimony concerning

3  the statements made to him by David concerning David's ownership

4  and use of the product stored at the Fortress cannot be

5  undermined by the speculation that Bycott had confused David with

6  Abdo during this initial meeting over the insurance claim.

7  Bycott had no contact with Abdo until several months into the

8  negotiations, in October 2005, when David was out of the country.

9  Bycott testified at his January 16, 2007 deposition:

10          Q.  Okay.  Did David Aezah ever mention his
            brother, Abdo or Abdul Aezah?
11
            A.  Yes.
12
            Q.  Did he ever say that he was in business
13          with his brother?

14          A.  I don't recall that.

15          Q.  What did he say about his brother?

16          A.  The only thing I recall is that he -
            David, at one point during the claim, it
17          seemed to me that towards the end of the
            claim, had gone to Yemen, and there was a
18          document we needed him to sign, a Proof of
            Loss, to get it finalized, and he asked me to
19          deal with his brother.

20          Q.  And did you ever meet his brother face-
            to-face?
21
            A.  I believe so.
22
            Q.  And can you tell the difference between
23          David Aezah and his brother, Abdo, at the
            time?
24
            A.  Yeah, I was able to tell a difference.  I
25          mean, I couldn't describe them right now, but
            I don't - I don't recall them standing out as
26          being twins or anything.

1          MR. MORRISON: Just to clarify, we're talking
           about being face-to-face, you were able to
2          tell the difference between both of them?

3          MR. MOORE: Yes. Yes.

4          Q.  And were your dealings in July of 2004
           with David, rather than Abdo?

5
           A.  I believe so.

6
(Bycott Depo., January 16, 2007, 48:15-49:18).    American Express
7
also refers to David's deposition testimony on July 9, 2007:
8
           Q.  Did you tell ... the insurance
9          investigator [that you purchased cigarettes
           from Costco and put them in Fortress]?
10
           A.  I do not remember.
11
           Q.  Did you tell the insurance investigator
12         that when you needed more cigarettes you got
           them from the Fortress facility?
13
           A.  I don't recall.
14
           ...
15
           Q.  All right.  I'd like to show you a
16         document that was previously marked as
           Defendants' [sic] Exhibit 88.  I represent
17         that this is a report that Mr. Bycott made to
           St. Paul Traveler's on or about July 27,
18         2005.  That was his testimony.  I'd like you
           to turn to Page 4, and I'd like you to read
19         through Page 4 and the top of Page 5 until
           you get to a discussion of the next Claimant.
20         Just read it to yourself.

21         ...

22         A.  Okay.

23         Q.  All right.  Now, does this help you
           remember telling anything to Mr. Bycott?
24
           ...
25
           A.  No, it does not help me.
26

                              51

(David Depo., July 9, 2007, 565:10-18, 576:1-578:12). American Express notes that David now denies under penalty of perjury that he made any such statements to Mr. Bycott as opposed to not remembering if he did during his deposition. American Express argues that, under the sham affidavit doctrine, David should not be permitted to change his testimony in order to avoid summary judgment.

This may be true, however, a jury should make this credibility determination.

The motion for summary judgment as to the fraudulent transfer of the Costo-acquired cigarettes is DENIED.

2. <u>Constructive Fraudulent Transfers</u>.

American Express seeks summary judgment on its claim that Abdo and David were engaged in "constructive" fraudulent transfers.

Section 3439.04(a)(2) provides that a transfer is fraudulent if the debtor made the transfer or incurred the obligation:

> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor either:
>
> (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.
>
> (B) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

California Civil Code § 3439.05 provides:

1
2
3
4
5

> A transfer made or an obligation incurred by
> a debtor is fraudulent as to a creditor whose
> claim arose before the transfer was made or
> the obligation was incurred if the debtor
> made the transfer or incurred the obligation
> without receiving a reasonably equivalent
> value in exchange for the transfer or
> obligation and the debtor was insolvent at
> that time or the debtor became insolvent as a
> result of the transfer or obligation.

6
7

American Express argues that summary judgment on this claim

8
9
10

is appropriate because of evidence that Abdo and David transferred all of Bakersfield Wholesale's assets to Bakersfield Grocery and David, without reasonably equivalent value which rendered Bakersfield Wholesale insolvent.

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

American Express refers to evidence that, in November and December 2004, Bakersfield Wholesale charged $3.6 million to its American Express cards for the purchase of Costco Cigarettes and that, after American Express commenced this lawsuit against Abdo and Bakersfield Wholesale on December 21, 2004, David created a successor business, Bakersfield Grocery, and took possession of all inventory, accounts receivable and goodwill, without providing Bakersfield Wholesale any consideration.  American Express refers to evidence that David and Abdo transferred at least $3 million in Costco Cigarettes from Bakersfield Wholesale to Fortress Self-Storage, at a time when American Express contends that Bakersfield Wholesale owed $3.6 million to American Express and would be rendered insolvent by the transfer; that David subsequently drew down on the Costco Cigarettes stored at Fortress Self-Storage on an "as needed" basis for sale at

53

Bakersfield Grocery; that, following the fire at Fortress Self-Storage, David transferred insurance proceeds belonging to Bakersfield Wholesale (and at a time when Bakersfield Wholesale was insolvent) to Bakersfield Grocery and subsequently transferred the insurance proceeds from Bakersfield Grocery to Abdo.  American Express further contends that Abdo and David purchased the Mississippi Property in David's name with $1.3 million in cash proceeds from the Costco Cigarettes belonging to Bakersfield Wholesale and laundered through Bakersfield Grocery; and that David transferred an additional $350.000 in cash proceeds from sales of Costco Cigarettes to parties in Yemen.

The David Defendants contend that genuine issues of material fact preclude summary judgment for American Express on the constructive fraudulent conveyances claim.  They refer to their evidence that David did not know that Abdo had incurred any debt with American Express until several months after the fact; that David never used any of the American Express cards; that David did not sell the Costco Cigarettes acquired with the American Express cards; that David gave Abdo the insurance proceeds owed to Abdo and proceeds from accounts receivable; that David did not acquire any of Bakersfield Wholesale's inventory or property; that Abdo's house was reconveyed from David to Abdo when David learned to the potential ramifications of that transfer; and that David claims that the monies for the acquisition of the Mississippi Property and transfers to Yemen came from his own sources.

54

In its reply brief, American Express asserts that the undisputed facts of what transpired during the month of December 2004 alone mandate summary judgment against David on the claim of constructive fraudulent conveyance.  American Express contends that it is undisputed that in November and December 2004, Abdo, who had the authority to use the Bakersfield Wholesale credit cards, used them to purchase $3.6 million of cigarettes from Costco; that, immediately thereafter, Bakersfield Wholesale defaulted on the credit card accounts because of a series of bounced checks; that Bakersfield Wholesale refused to pay the $3.6 million owed to American Express despite due demand; that Abdo (with or without the assistance of David) arranged to physically remove the Costco Cigarettes from the Bakersfield Wholesale warehouse ("Warehouse"), and that, at that time, Bakersfield Wholesale was insolvent because of its debt to American Express; that, on December 6, 2004, David rented a storage facility at Fortress Self-Storage, to which the Costco Cigarettes were then transported; and that the value of the Costco Cigarettes which were stored at Fortress Self-Storage was $3 million.

These undisputed facts, American Express contends, satisfy the statutory requirements quoted above: "The transfer to Fortress occurred at a time when Bakersfield Wholesale was insolvent.  David has never contended that he provided Bakersfield Wholesale with any consideration for any of the cigarettes which were stored at the Fortress unit."   American

1  **Express cites California Civil Code § 3439.07(a)(1):**

2           **In an action for relief against a transfer or
            obligation under this chapter, a creditor,
3           subject to the limitations in Section
            3439.08, may obtain:**
4
            **(1) Avoidance of the transfer or obligation
5           to the extent necessary to satisfy the
            creditor's claim.**
6
   **American Express also cites Section 3439.08(b)(1):**
7
            **Except as otherwise provided in this section,
8           to the extent a transfer is voidable in an
            action by a creditor under paragraph (1) of
9           subdivision (a) of Section 3439.07, the
            creditor may recover judgment for the value
10          of the asset transferred, as adjusted under
            subdivision (c), or the amount necessary to
11          satisfy the creditor's claim, whichever is
            less.  The judgment may be entered against
12          the following:**

13          **(1) The first transferee of the asset or the
            person for whose benefit the transfer was
14          made.**

15 **American Express contends that David, who leased the Fortress**

16 **Self-Storage space to which the Costco Cigarettes were**

17 **transferred, was the "first transferee" of those cigarettes and**

18 **is liable to American Express for their $3 million value.  With**

19 **regard to David's argument that there was no transfer from**

20 **Bakersfield Wholesale to the Fortress unit because David**

21 **permitted Abdo access to the Costco Cigarettes stored there,**

22 **American Express refers to the definition of "transfer" set forth**

23 **in California Civil Code § 3439.01(i):**

24          **'Transfer' means every mode, direct or
            indirect, absolute or conditional, voluntary
25          or involuntary, of disposing of or parting
            with an asset or an interest in an asset, and
26          includes payment of money, release, lease,**

                                56

1          and creation of a lien or other encumbrance.

2   American Express contends:

3          [T]he fact that the transfer might have been
           'conditional,' and made with the expectation
4          that David would ultimately provide his
           brother Abdo access to the inventory, does
5          not provide David with a safe haven to avoid
           liability.  It is undisputed that David had
6          personal control over the Costco Cigarettes.
           He could have opened the facility in the name
7          of Bakersfield Wholesale, but chose not to do
           so, putting the unit at Fortress in his own
8          name.  Although David contends that he gave
           his brother a key to the unit, it was David
9          who controlled the unit: he admits that when
           his brother lost the key, it was only David
10         who could regain access to the facility.  The
           fact that Abdo might have been permitted to
11         remove the Costco Cigarettes from the unit
           does not provide a defense to a fraudulent
12         conveyance action.

13  In so arguing, American Express cites the "badge of fraud" set

14  forth in Section 3439.04(b)(2)("Whether the debtor retained

15  possession or control of the property transferred after the

16  transfer").  American Express refers to the evidence that, when

17  the remainder of the inventory was destroyed by fire in July

18  2005, David made the insurance claim and David received the

19  insurance proceeds from the insurance company by check made out

20  to David personally.  American Express notes that David did not

21  turn over the proceeds to Bakersfield Wholesale or its creditor,

22  American Express, but to Abdo personally.  American Express

23  contends that David did not hold the Bakersfield Wholesale

24  inventory in trust for Bakersfield Wholesale:

25         Instead, he either used the inventory for his
           own business (which is what he told an
26         insurance investigator after the fire at

                                57

1          Fortress) or he gave his brother <u>carte</u>
           <u>blanche</u> to keep the inventory out of the
2          reach of Bakersfield Wholesale's creditors.

3   From this, American Express asserts that David, as the first

4   transferee of the Costco Cigarettes, is liable for their $3

5   million value as a matter of law.

6        American Express argues that David's attempt to avoid

7   liability by contending that he received the inventory at the

8   Fortress unit without knowing the exact nature or extent of

9   American Express's claims against Bakersfield Wholesale can not

10  withstand summary judgment.   American Express asserts that "good

11  faith" is not a defense to "first transferee" liability under

12  Section 3439.08(b)(1), but is only available to a "subsequent

13  transferee" under Section 3439.08(b)(2) who obtains the asset for

14  consideration and in good faith.   Section 3439.08(b) provides:

15          Except as otherwise provided in this section,
            to the extent a transfer is voidable in an
16          action by a creditor under paragraph (1) of
            subdivision (a) of Section 3439.07, the
17          creditor may recover judgment for the value
            of the asset transferred, as adjusted under
18          subdivision (c), or the amount necessary to
            satisfy the creditor's claim, whichever is
19          less.   The judgment may be entered against
            the following:
20
            (1) The first transferee of the asset or a
21          person for whose benefit the transfer was
            made.
22
            (2) Any subsequent transferee other than a
23          good faith transferee who took for value or
            from any subsequent transferee.
24

25       American Express cites an unpublished decision from the

26  Sixth Circuit Court of Appeals, *Tareco Properties, Inc. v.*

1    *Morriss,* 2006 WL 2457064 (6th Cir.2006).

2      *Tareco Properties* involved Tennessee's Uniform Fraudulent

3 Transfer Act (UFTA). Tenn.Code.Ann. § 66-3-308(a)(1) provides

4 that a creditor, in an action to recover a fraudulent transfer,

5 may obtain "[a]voidance of the transfer or obligation to the

6 extent necessary to satisfy the creditor's claim." To the extent

7 such a transfer is voidable, the creditor may obtain a judgment

8 against "[t]he first transferee of the asset or the person for

9 whose benefit the transfer was made." Tenn.Code.Ann. § 66-3-

10 309(b)(1). The Sixth Circuit held:

11           Because Steve Morriss fraudulently conveyed
          money into the Amy Morriss account, and

12           because Amy Morriss Lowry, as owner of the
          account, was the 'first transferee,' Amy

13           Morriss Lowry is liable for the transferred
          money.

14

15           The defendants' argument - that Amy Morriss
          Lowry should not have been held liable

16           because the district court found that she
          'lacked the requisite intent to be a co-

17           conspirator' - is without merit. There is
          nothing in the Uniform Act requiring

18           fraudulent intent; the statute is silent as
          to scienter. *Cf. Bowlin v. Comm'r*, 273 F.2d

19           610, 611 (6th Cir.1960)(holding without
          discussing intent, that a wife who received

20           cash from her insolvent husband was a
          transferee and thus liable under a previous

21           Tennessee fraudulent conveyance statute).
          Moreover, courts interpreting identical

22           statutes from other jurisdictions have held
          that there is no intent requirement for

23           transferee liability. *See, e.g., Warfield v.*
          *Byron*, 436 F.3d 551, 557-58 (5th

24           Cir.2006)(holding that Washington's Uniform
          Fraudulent Transfer Act 'permits entry of

25           judgment even without proof that the
          transferee knowingly accepted property and

26           intended to assist the debtor in evading the
          creditor'). The district court therefore

1

2

**properly found Amy Morriss Lowry liable as a transferee despite its finding that she did not intend to participate in a fraudulent conveyance.**

3

4    Here, the extent to which David became a transferee is

5  unclear.  He allowed the Bakersfield Wholesale assets to be

6  housed at his Fortress storage locker and apparently co-mingled

7  those assets with his own cigarette inventory.  The remaining

8  stored cigarettes were destroyed by fire.  David received

9  insurance proceeds on the remaining stored cigarettes and

10 transferred the proceeds to Abdo after he knew of American

11 Express's lawsuit against Abdo.

12    Because the extent to which David became a transferee is

13 disputed and because the facts underlying American Express's

14 claim of constructive fraudulent transfer are disputed, the

15 motion for summary judgment on this ground is DENIED.

16         3.   <u>Conspiracy to Fraudulently Transfer</u>.

17    American Express moves for summary judgment on its claim

18 that David is liable as a co-conspirator for Abdo's fraudulent

19 conveyances.

20    California recognizes conspiracy to commit fraudulent

21 transfers.  *See Taylor v. S & M Lamp Co.*, 190 Cal.App.2d 700, 706

22 (1961)("[A] debtor and those who conspire with him to conceal his

23 assets for the purpose of defrauding creditors are guilty of

24 committing a tort and each is liable in damages"); *Qwest*

25 *Communications Corp. v. Weisz*, 278 F.Supp.2d 1188, 1192

26 (S.D.Cal.2003).  As explained in *Applied Equipment Cor. v. Litton*

1   *Saudi Arabia Ltd.*, 7 Cal.4th 503, 510-511 (1994):

2           Conspiracy is not a cause of action, but a
        legal doctrine that imposes liability on
3       persons who, although not actually committing
        a tort themselves, share with the immediate
4       tortfeasors a common plan or design in its
        perpetration ... By participation in a civil
5       conspiracy, a coconspirator effectively
        adopts as his or her own the torts of other
6       coconspirators within the ambit of the
        conspiracy ... In this way, a coconspirator
7       incurs tort liability co-equal with the
        immediate tortfeasors.

8
        Standing alone, a conspiracy does no harm and
9       engenders no tort liability.  It must be
        activated by the commission of an actual
10      tort.  '"A civil conspiracy, however
        atrocious, does not give rise to a cause of
11      action unless a civil wrong has been
        committed resulting in damage."' ... 'A bare
12      agreement among two or more persons to harm a
        third person cannot injure the latter unless
13      and until acts are actually performed
        pursuant to the agreement.  Therefore, it is
14      the acts done and not the conspiracy to do
        them which should be regarded as the essence
15      of the civil action.' ....

16      "The elements of civil conspiracy are the formation and

17  operation of the conspiracy and damage resulting to the

18  plaintiff."  *Monastra v. Konica Business Machines, U.S.A., Inc.*,

19  43 Cal.App.4th 1628 1644-1645 (1996).

20      An element of a civil conspiracy is an agreement between the

21  alleged conspirators to commit a tortious act.  As explained in

22  *Kidron v. Movie Acquisition Corp.*, 40 Cal.App.4th 1571, 1582

23  (1995):

24          Accordingly, '[t]he basis of a civil
        conspiracy is the formation of a group of two
25      or more persons who have agreed to a common
        plan or design to commit a tortious act.'
26      ....

> However, actual knowledge of the planned
> tort, without more, is insufficient to serve
> as the basis for a conspiracy claim.
> Knowledge of the planned tort must be
> combined with intent to aid in its
> commission.  'The sine qua non of a
> conspiratorial agreement is the knowledge on
> the part of the alleged conspirators of its
> unlawful objective and their intent to aid in
> achieving that objective.' ... 'This rule
> derives from the principle that a person is
> generally under no duty to take affirmative
> action to aid or protect others.' ....
>
> While knowledge and intent 'may be inferred
> from the nature of the acts done, the
> relation of the parties, the interest of the
> alleged conspirators, and other
> circumstances' ..., '"[c]onspiracies cannot
> be established by suspicions.  There must be
> some evidence.  Mere association does not
> make a conspiracy.  There must be evidence of
> some participation ro interest in the
> commission of the offense.' ... An inference
> must flow logically from other facts
> established in the action.

Defendants argue that summary judgment for American Express must be denied because of evidence that David was not informed of what was happening between Abdo and American Express until David was served as a defendant in this action.  Moreover, conspiracy is only established where an alleged co-conspirator has the requisite intent to achieve an unlawful purpose.  Intent raises an issue of fact.

In reply, American Express argues that the evidence establishes David's knowledge:

> [B]y December 6, 2005, the date of the
> Fortress rental, David knew that Abdo wanted
> to keep inventory from Bakersfield Wholesale
> in storage, and to keep it away from American
> Express, at least until the parties
> "settled." Even if (as David contends), he

did not know the "details" concerning
American Express' claim, he knew from the
very beginning that his brother was shutting
Bakersfield Wholesale down, had a dispute
with a creditor, American Express, and was
trying to keep inventory away from it.
Moreover, by his own admission, David was
fully on notice of American Express' claims
by January 15, 2005, by which time he learned
that American Express has a temporary
restraining order preventing any disposition
of Bakersfield Wholesale assets. Of course,
on March 23, 2005, when he was named as a
party to this lawsuit, David was fully
knowledgeable about each and every detail of
American Express' claims.

Throughout this entire period of time, David
provided substantial assistance to his
brother in secreting the assets, by: (1)
continuing to maintain the Fortress storage
unit in his name and provide his brother
unfettered access to it; (2) by pursuing an
insurance claim, beginning in July 2005, in
his own name, for the $340,000 of Bakersfield
Wholesale inventory destroyed by fire; and
(3) accepting a check from Travelers for the
funds, depositing the funds into the
Bakersfield Grocery Wholesale account, and
turning over the cash to his brother. Under
California law, this knowing and continuing
participation in his brother's wrongful
conduct makes him jointly liable with his
brother for the fraudulent transfers, in
their entirety.

American Express cites *De Vries v. Brumback*, 53 Cal.2d 643, 648-
650 (1960):

It is the settled rule that 'to render a
person civilly liable for injuries resulting
from a conspiracy of which he was a member,
it is not necessary that he should have
joined the conspiracy at the time of its
inception; every one who enters into such a
common design is in law a party to every act
previously or subsequently done by any of the
others in pursuance of it.' ... Having been
found to have joined and actively
participated in the continuing conspiracy to

63

> convert, appellant became liable for the previous acts of his coconspirators under the rules relating to civil liability, and the fact that some of the missing goods may never have come into his possession would not absolve him from liability.
>
> ...
>
> There is a clear distinction in the law of conspiracy as applied to criminal as differentiated from civil cases ... The gist of the crime of conspiracy is the *agreement* to commit the unlawful act ..., while the gist of the tort is the *damage* resulting to the plaintiff from an overt act or acts done pursuant to the common design ... In tort, 'the major significance of the conspiracy lies in the fact that it renders each participant in the wrongful act responsible as a joint tortfeasor for all damages ensuing from the wrong, irrespective of whether or not he was a direct actor and regardless of the degree of activity.' ....
>
> Here the findings establish that appellant, within a few hours after the robbery, joined the continuing conspiracy to convert and with full knowledge of the prior acts of his coconspirators, actively participated in the overall purpose to convert all of the stolen property to their use and benefit.  As such active participant, appellant was a joint tortfeasor liable for the entire damage done in pursuance of the common design.  In such circumstances, the question of whether or not all or any part of the unrecovered stolen property ever came into appellant's personal possession is immaterial.

The David Defendants contend that there is no evidence that David owed any duty to American Express.  In *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, *supra*, 7 Cal.4th at 511, the California Supreme Court explained:

> By its nature, tort liability arising from conspiracy presupposes that the coconspirator is legally capable of committing the tort,

64

1          i.e., that he or she owes a duty to plaintiff
           recognized by law and is potentially subject
2          to liability for breach of that duty.

3   *Chavers v. Gatke Corp.*, 107 Cal.App.4th 606, 614 (2003), holds:

4          As we read *Applied Equipment* and the
           antecedent authorities on which it builds, in
5          California a civil conspiracy to commit
           tortious acts can, as a matter of law, *only*
6          be formed by parties who are already under a
           duty to the plaintiff, the breach of which
7          will support a cause of action against them -
           individually and not as conspirators-in-tort
8          ... Restated, in cases where the plaintiff
           alleges the existence of a civil conspiracy
9          among the defendants to commit tortious acts,
           the source of substantive liability arises
10         out of a preexisting legal duty and its
           breach; liability can *not* arise out of
11         participation in the conspiracy alone.
           Moreover, according to these authorities, it
12         makes no difference in the analysis whether
           the underlying duty is imposed by statute (as
13         in *Doctor's Co.*) or by the common law (as in
           *Applied Equipment*).  A duty, however,
14         independent of the conspiracy itself, must
           exist in order for substantive liability to
15         attach.

16  *See also Ferris v. Gatke Corp.*, 107 Cal.App.4th 1211, 1225

17  (2003).

18       However, as American Express notes, the David Defendants

19  cite no case involving fraudulent transfers.  In *Qwest*

20  *Communications Corp., supra*, 278 F.Supp.2d at 1192-1193, the

21  Southern District held:

22         [I]t does not follow that a non-transferee
           cannot engage in a conspiracy to violate the
23         UFTA.  Although conspiracy is a theory of
           liability rather than an independent tort.
24         the chief function of the theory is to extend
           liability beyond the principals who actually
25         committed the tort.  The sole caveat is that
           the coconspirator must be '*legally capable* of
26         committing the tort, *i.e.,* that he or she

owes a duty to plaintiff recognized by law and is *potentially* subject to liability for breach of that duty." *Applied Equip. Corp.*, 7 Cal.4th at 511 ... (emphasis added).  No doubt, Jonathan Weisz was legally capable of committing a fraudulent conveyance in violation of the UFTA.  As president of the debtor corporation, New Media, Weisz had a duty not to commit a fraud upon the creditor, Qwest.  If he had transferred the subject funds to his own bank account (thereby becoming the transferee), there is no doubt that would be a proper defendant in this action.  If, as alleged, he conspired to transfer the funds to his father's control, then he can be held to account on a conspiracy theory.  *See Taylor v. S & M Lamp Co.*, 190 Cal.App.2d 700, 706 ... (1961)('[A] debtor and those who conspire with him to conceal his assets for the purpose of defrauding creditors are guilty of committing a tort and each is liable for damages.').

The David Defendants' contention that they owed no duty to American Express is without merit.

David refers to evidence that he was not an owner of Bakersfield Wholesale or responsible for incurring any of the debt owed by Abdo to American Express.  In addition, the David Defendants refer to evidence disputing American Express's evidence of fraudulent conveyances.  *See discussion supra*. Finally, the David Defendants argue that summary judgment on this claim must be denied because of evidence that harm to American Express was caused solely by Abdo.

However, even if David's version of the facts is accepted and Abdo alone benefitted from the fraudulent transfers, David is not absolved of liability because, if a conspirator, he is liable for all damages foreseeably caused by the fraudulent transfers.

1    **Because the issue of David's intent cannot be decided as a**

2    **matter of law, summary judgment on conspiracy must be DENIED.**

3        **D.   Successor Liability.**

4        **American Express moves for summary judgment on its claims**

5    **against the David Defendants based on successor liability.**

6        **In *Ray v. Alad Corp.*, 19 Cal.3d 22, 28 (1977), the**

7    **California Supreme Court discussed imposition of successor**

8    **liability, holding in pertinent part:**

9                **Our discussion of the law starts with the**
               **rule ordinarily applied to the determination**
10             **of whether a corporation purchasing the**
               **principal assets of another corporation**
11             **assumes the other's liabilities.  As**
               **typically formulated the rule states that the**
12             **purchaser does not assume the seller's**
               **liabilities unless (1) there is an express or**
13             **implied agreement of assumption, (2) the**
               **transaction amounts to a consolidation or**
14             **merger of the two corporations, (3) the**
               **purchasing corporation is a mere continuation**
15             **of the seller, or (4) the transfer of assets**
               **to the purchaser is for the fraudulent**
16             **purpose of escaping liability for the**
               **seller's debts.**

17   **At issue here are exceptions 3 and 4.  "Eliminating the**

18   **exceptions requires disproving at least one element of each**

19   **exception or showing that at least one element cannot be**

20   **established."  *Fisher v. Allis-Chalmers Corp. Prod. Liab. Trust*,**

21   **95 Cal.App.4th 1182, 1188 (2002).**

22       **Under California law, a corporation acquiring the assets of**

23   **another corporation is the latter's mere continuation only upon a**

24   **showing that "(1) no adequate consideration was given for the**

25   **predecessor corporation's assets and made available for meeting**

26

67

the claims of its unsecured creditors," or "(2) one or more persons were officers, directors, or stockholders of both corporations."  *Ray v. Alad Corp.*, *supra*, 19 Cal.3d at 29.

American Express argues that it has submitted "irrefutable evidence" that Bakersfield Grocery and DAI are a continuation of Bakersfield Wholesale.  American Express refers to evidence that Bakersfield Grocery operates from the same address and operates the same business as Bakersfield Wholesale; that Bakersfield Grocery services the same customers and makes purchases from the same suppliers; that David runs Bakersfield Grocery with the substantial assistance of Abdo; that Abdo operated Bakersfield Wholesale with the substantial assistance of David; that Bakersfield Wholesale transferred all of its assets to Bakersfield Grocery for no consideration; that David deposited checks from Bakersfield Wholesale's customers into Bakersfield Grocery's business account; that David sold the Costco Cigarettes purchased by Bakersfield Wholesale through Bakersfield Grocery; and that David used Bakersfield Grocery business accounts to launder money for the purchase of the Mississippi Property. American Express refers to David's interrogatory response that DAI has taken over the assets of Bakersfield Grocery for no consideration.  American Express further argues that these transfers were clearly intended to avoid American Express's collection of its debt from Bakersfield Wholesale:

> As Bakersfield Wholesale closed, David opened
> Bakersfield Grocery Wholesale, just as
> American Express was preparing to obtain a

judgment against Abdo and Bakersfield
Wholesale.  There was no reason for the
company to re-open under a slightly different
name, except that American Express was
actively pursuing Abdo and Bakersfield
Wholesale.

The David Defendants argue that summary judgment on this claim is inappropriate.  Although conceding that both businesses operated from the same address, Defendants refer to evidence that David acquired the property from Abdo when Abdo was unable to repay a $150,000 loan from David and to evidence that David assumed a $288,000 mortgage on the property.  Defendants argue that the transaction was at arms length and for a fair consideration.  Defendants admit that Bakersfield Grocery deposited a "small number" of checks payable to Bakersfield Wholesale but that "these checks were deposited and then the full amount of cash was distributed to the owner of Bakersfield Wholesale, unless some amount was owed to Bakersfield Grocery or its sole owner" and contend that Bakersfield Grocery did not retain any monies belonging to Bakersfield Wholesale.  Defendants further dispute American Express's evidence that Bakersfield Wholesale transferred all of its inventory to Bakersfield Grocery, referring to evidence that the proposed bulk sale was cancelled when David learned of the Court's Order; that Abdo sold the remaining inventory at auction and to various third parties; that Abdo denies selling inventory to David and David denies buying any inventory.  Defendants concede that Bakersfield Wholesale and Bakersfield Grocery have "some" similar customers

1   and suppliers and sold similar items.  Defendants refer to

2   evidence that Abdo did not provide David with customer or

3   supplier lists or identify for David what David should sell; that

4   David had extensive experience in the mini mart industry; and

5   that some overlap in customers and suppliers is expected given

6   the small size of the Bakersfield mini mart industry.

7        Defendants further argue that summary judgment is unfounded

8   because American Express cannot demonstrate common officers,

9   directors or stockholders of the two companies:

10              Abdo ... owned Bakersfield Wholesale Foods.
                David would occasionally help Abdo out
11              because they are brothers.  Abdo ... was the
                sole officer, director, and shareholder.
12              When David started Bakersfield Grocery
                Wholesale, he was the sole officer, director,
13              and stockholder.  Abdo ... did not own any
                portion of Bakersfield Grocery Wholesale.
14              The fact that Abdo would help out at
                Bakersfield Grocery Wholesale does not make
15              him an owner or employee.  The David
                Defendants were not able to find any case law
16              (and plaintiff has not identified any) to
                support any assertion that by helping out at
17              a brother's business, that would make the
                brothers co-owners of a business, which is in
18              essence what American Express is asking the
                Court to find.
19

20        American Express replies that, because Bakersfield Grocery

21   was never incorporated, David's assertion that he was the sole

22   officer, director and shareholder of Bakersfield Grocery is

23   "absurd."  American Express cites *Nash-De Camp Co. v. Nakata

24   Farms, Inc.*, 2006 WL 539569 (2006).  There Five Star Partners

25   LLC, Five Star Depot Ltd. and Hanuye Nakata were found to be

26   successors to Nakata Farms because "[t]hey carried on the same

business and substantially the same people operated and managed
the Five Star businesses as operated Nakata Farms." American
Express argues:

>             David has run Bakersfield Grocery Wholesale
>             with substantial assistance of his brother
>             Abdo.  Abdo in turn once operated Bakersfield
>             Wholesale with the substantial assistance of
>             his brother David.  Thus, there is a
>             substantial overlap in management, which
>             fully justifies the imposition of successor
>             liability.

With regard to successor liability based on fraudulent
conveyances, Defendants dispute that such conveyances occurred.
These disputes over intent and identity of the conduct of
business of Bakersfield Wholesale and Bakersfield Grocery cannot
be resolved as credibility is in issue as to Abdo and David.

Summary judgment on successor liability is DENIED.

E.  <u>Alter Ego Liability</u>.

American Express seeks summary judgment on its claim for
alter ego liability.

As explained in *Roman Catholic Archbishop v. Superior Court*,
15 Cal.App.3d 405, 411 (1971):

>             The terminology '*alter ego*' or 'piercing the
>             corporate veil' refers to situations where
>             there has been an abuse of corporate
>             privilege, because of which the equitable
>             owner of a corporation will be held liable
>             for the actions of the corporation ... The
>             requirements for applying the 'alter ego'
>             principle are thus stated: '"[I]t must be
>             made to appear that the corporation is not
>             only *influenced and governed* by that person
>             [or other entity], but that there is such a
>             *unity of interest and ownership* that the
>             individuality, or separateness, of such
>             person and corporation has ceased, and the

71

1      facts are such that an adherence to the
       fiction of the separate existence of the
2      corporation would, under the particular
       circumstances, sanction a *fraud or promote*
3      *injustice.'* ... Among the factors to be
       considered in applying the doctrine are the
4      commingling of funds and other assets of the
       two entities, the holding out by one entity
5      that it is liable for the debts of another,
       identical equitable ownership in the two
6      entities, use of the same offices and
       employees, and use of one as a mere shell or
7      conduit for the affairs of the other ....

8      American Express argues that the facts show that David was

9   the real owner of Bakersfield Wholesale when the American Express

10  debt was incurred, even though the stock was in Abdo's name; that

11  Abdo, David and Bakersfield Wholesale were alter egos of each

12  other; and that Bakersfield Wholesale and its successor entity,

13  Bakersfield Grocery, are shell entities that are insufficiently

14  capitalized, fail to observe corporate formalities, are used for

15  fraudulent purposes, and are so totally dominated and controlled

16  by Abdo and David as to have no separate and independent

17  existence of their own.

18      One of the requirements for alter ego liability is that

19  "there be such unity of interest and ownership that the separate

20  personalities of the corporation and the individual no longer

21  exist". *Mid-Century Ins. Co. v. Gardner*, 9 Cal.App.4th 1205,

22  1212 (1992). A threshold question is whether the alleged alter

23  ego had an ownership interest in the corporation. If there is no

24  ownership interest, there is no alter ego liability. *Riddle v.*

25  *Leuschner*, 51 Cal.2d 574, 580 (1959); *see also SEC v. Hickey*, 322

26  F.3d 1123, 1128 (9th Cir.2003)("Ownership is a prerequisite to

                                    72

alter ego liability, and not a mere 'factor' or 'guideline.'"); *Firstmark Capital Corp. v. Hempel Financial Corp.*, 859 F.2d 92, 94 (9th Cir.1988)("Ownership of an interest in the corporation is an essential part of the element of unity of ownership and interest.  If an individual's ownership is not established, the corporation's obligations cannot be imposed on him or her.").

The David Defendants argue that summary judgment on this claim should be denied because David was never an owner of Bakersfield Wholesale.  David argues that American Express is attempting to proceed against him because Abdo is judgment proof, that American Express has not demonstrated that he had any ownership interest in Bakersfield Wholesale and has merely alleged facts from which it may be inferred that David "essentially acted as a periodic manager or employee of Bakersfield Wholesale."  David cites *Riddle v. Leuschner*, *supra*, 51 Cal.2d 574, 580:

> It is undisputed that he held none of the stock, and there is no evidence that he had any interest as an owner in the business operated by either of the two corporations or that he had a right to share in any of the profits they might make.  Instead, he received a monthly salary.  Under all the circumstances, he is to be regarded as having been a managing employee of the two companies, and his control over their affairs must be treated as that which would be exercised by a managing agent rather than that of a shareholder or owner.

American Express responds that David's motion is based on the contention that Abdo is the nominal owner of 100% of the corporate shares of Bakersfield Wholesale.  However, American

Express contends, in order to be held liable as an alter ego, the defendant need only have an *equitable* ownership in the relevant entity.   *See Minton v. Cavaney*, 56 Cal.2d 576, 580 (1961):

> The evidence is ... undisputed that Cavaney was not only the secretary and treasurer of the corporation but was also a director.   The evidence that Cavaney was to receive one-third of the shares to be issued supports an inference that he was an equitable owner (see *Riddle v. Leuschner, supra*, 51 Cal.2d 574, 580), and the evidence that for a time the records of the corporation were kept in Cavaney's office supports an inference that he actively participated in the conduct of the business.   The trial court was not required to believe his statement that he was only a 'temporary' director and officer for 'accommodation.'

*See also Roman Catholic Archbishop v. Superior Court*, *supra*, 15 Cal.App.3d at 411 ("The terminology 'alter ego' or 'piercing the corporate veil' refers to situations where there has been an abuse of corporate privilege, because of which the equitable owner of a corporation will be held liable for the actions of the corporation."); *Sonora Diamond Corp. v. Superior Court*, 83 Cal.App.4th 523, 538 (2000)("Under the alter ego doctrine ... the courts will ignore the corporate entity and deem the corporations acts to be those of the persons or organizations actually controlling the corporation, in most instances the equitable owners."); *Tri-State Equipment v. United States*, 1997 WL 375264 (E.D.Cal.1997)("[E]quitable ownership has been inferred, despite the individual's lack of actual or substantial ownership of shares, provided other indicia of control are present.").

The David Defendants argue that the language in the

Declaration dated September 19, 2004 which stated that in exchange for the satisfaction of a $150,000 loan from David to Abdo, Abdo was transferring the Warehouse to David, and that "[t]he borrower [Abdo] no longer has an interest of any king [kind] in this property or any business within it" is vague and ambiguous and subject to multiple interpretations.   David avers in his Declaration in opposition to this motion for summary judgment:

> 2.   When Abdo and I executed the Declaration in regard to my forgiveness of the loan, the term 'business' did not refer to Bakersfield Wholesale Foods.  It was an expression we use that was meant to mean that Abdo should no longer be concerned about the property and that it was now my business, not his.  I have never owned any interest in Bakersfield Wholesale Foods.  I did not become an owner of Bakersfield Wholesale Foods at any point. That business belonged exclusively to Abdo. I did help out on occasion when Abdo needed it but was neither an owner, officer, or employee.

Defendants argue that the language in the Declaration is "vague and ambiguous" and "subject to multiple interpretations".
Defendants contend:

> Under the general principles of contract law, it is necessary to examine the intent of the parties that executed the agreement.  Based on the deposition testimony of David and Abdo, it is clear that it was <u>not</u> the intention of either Abdo or David to convey any ownership interest in Bakersfield Wholesale Foods.

As explained in *Falkowski v. Imation Corp.*, 132 Cal.App.4th 499, 505-506 (2005):

> When faced with a dispute over the meaning of

75

a contractual provision, the court must first determine whether the provision is ambiguous, i.e., whether, on its face, the language of the provision is capable of different, yet reasonable interpretations ... If an ambiguity is found, the court must determine which of the plausible meanings the parties actually intended ... When the parties offer no extrinsic evidence concerning the meaning of the contractual language, or when the extrinsic evidence offered is not in conflict, ascertaining the intended meaning is solely the duty of the court ....

In determining which of the plausible meanings was intended, we are required to deduce the parties' intent from the language of the contract alone, if possible ... Accordingly, at least in the first instance, contractual interpretation turns on 'what was intended by what was said - not what a party intended to say.' ... In evaluating the contractual language, however, we also '"tak[e] into account all the facts, circumstances and conditions surrounding the execution of the contract."' ....

American Express has not established the seminal requirement that David had *any* actual or constructive ownership interest in the shares of Bakersfield Wholesale.  Evidence as to other aspects of corporate or business operations are inconclusive. Alter ego liability cannot be determined as a matter of law.  The motion for summary judgment on this claim is DENIED.

G.   Affirmative Defenses.

American Express moves for summary judgment on each of the affirmative defenses to liability pleaded in the Answer. American Express contends that each affirmative defense "is wholly defective for its failure to include factual allegations" and that "[a]s a matter of law, none of them raise a genuine

76

issue of material fact sufficient to defeat a motion for summary judgment, and each of them should be dismissed as a matter of law."

To the extent that American Express seeks summary judgment because the Affirmative Defenses do not *plead* specific facts, summary judgment is DENIED.  The issue on summary judgment is whether Defendants can support the affirmative defenses with evidence.

### 1.   First Affirmative Defense.

Summary judgment is GRANTED with regard to the First Affirmative Defense of failure to state a claim upon which relief can be granted.  It is a pleading defense.  Because Defendants' motion to dismiss the Third Amended Complaint for failure to state a claim was denied, this Affirmative Defense is without merit.

### 2.   Second, Sixth and Twelfth Affirmative Defenses.

The Second Affirmative Defense is captioned "Acts of Other Persons" and alleges that "the damages alleged in the complaint [sic] were caused in whole or in part by other persons including but not limited to the plaintiff and/or third parties."  The Sixth Affirmative Defense is captioned "Apportionment of Fault/Comparative Fault" and alleges:

> [A]t the time and place of the events described in the complaint [sic], persons and entities as yet unknown to the David Defendants were careless, negligent, in breach of contract, in breach of fiduciary duty, in breach of warranty, express or implied, strictly liable and/or otherwise

77

legally at fault in and about the matters and
things alleged in the complaint [sic] which
comparative negligence, breach of contract,
breach of fiduciary duty, breach of warranty,
strict liability and/or other legal fault
proximately caused or contributed to the
injuries and damages complained of, if any
there were or are, and that liability, if any
should be apportioned among David and said
persons and entities based upon their
respective percentages of comparative fault.

The Twelfth Affirmative Defense alleges that "Plaintiff assumed

the risk of its damages herein."

American Express contends that the David Defendants

suggested during the course of depositions that American Express

was negligent in erroneously permitting Bakersfield Wholesale to

exceed its credit limits and that this should relieve the David

Defendants of any liability for fraudulent conveyances.  American

Express argues that it is entitled to summary judgment with

respect to this claim because "[i]t is well established under

California law that the principles of comparative fault are not

applicable to reduce the liability of a party guilty of

intentional misconduct, like the fraudulent transfer of assets

and conspiracy to fraudulently transfer assets at issue in this

lawsuit."

In *Cardoza v. Dar Side, Inc.*, 2005 WL 605448 (2005), the

California Court of Appeals held at * 14:

Statutorily, the law provides that a
tortfeasor who has intentionally injured a
person is not entitled to contribution from
any other tortfeasors.  (Code Civ. Proc. §
875, subd. (d).)  A number of cases have held
that a defendant who commits an intentional
tort against the plaintiff is not entitled to

78

1          a reduction of the judgment based on the
           plaintiff's contributory negligence.  (See
2          *Allen v. Sundean* (1982) 137 Cal.App.3d 216,
           226-227; *Godfrey v. Steinpress* (1982) 128
3          Cal.App.3d 154, 176.)

4   See also *Kologe v. Boyd*, 2004 WL 2669272 (2004) at * 11 n.9:[5]

5          As stated in *Carroll v. Gava, supra*, 98
           Cal.App.3d 892, '[w]hatever [the] trend
6          [toward comparative fault analysis] may be
           [citation], the concept has no place in the
7          context of ordinary business transactions.
           The modern law of misrepresentation evolved
8          from the "action on the case of deceit" in
           business transactions. [Citations.] Business
9          ethics justify reliance upon the accuracy of
           information imparted in buying and selling,
10         and the risk of falsity is on the one who
           makes a representation. [Citation.] This
11         straightforward approach provides an
           essential predictability to parties in the
12         multitude of everyday exchanges; application
           of comparative fault principles, designed to
13         mitigate the often catastrophic consequences
           of personal injury, would only create
14         unnecessary confusion and complexity in such
           transactions.'  (*Id*. at p.897.).

15
    The doctrine of comparative fault does not apply to American
16
    Express's claims of successor liability or alter ego.   In
17
    *Considine Co. v. Shadle, Hunt & Hagar*, 187 Cal.App.3d 760, 770-
18
    771 (1986), the Court held:
19
           In light of the deference we must afford the
20         reasonable expectations of contracting
           parties, we believe that where the alleged
21         breach of an express promise gives rise to a
           claim for implied indemnity, principles of
22         contract law should control.   Thus, where one
           party has promised to perform a particular
23         act, upon breach the injured promisee should
           not face a comparative negligence defense.
24         (See *Bear Creek Planning Com. v. Title Ins. &
           Trust Co.* (1985) 164 Cal.App.3d 1227, 1239
25

26         _____

           [5]Miscited by American Express as 2004 WL 26692792.

                              79

> ... Rather, the only limitation on indemnity
> should be the traditional contract rule which
> completely bars indemnity to those whose
> active participation in the injury has gone
> beyond simple negligence. (*Id.* at p. 1241).
> Thus, in cases such as *Nomellini* and *Bear
> Creek*, where the indemnitor was charged with
> breach of an express promise, indemnity could
> be barred, but only upon a showing of
> participation beyond the mere failure to
> perform the duty imposed by law.

> However, when indemnity is based, not upon
> breach of a promise, but upon breach of a
> duty of care, the principles of comparative
> fault set forth in *Li v. Yellow Cab Co.* ....

*See also C.I. Engineers & Constructors, Inc. v. Johnson ...,* 140 Cal.App.3d 1011, 1017 (1983): "Here, the legal obligation of the indemnifying subcontractor, if any, is predicated upon express contract indemnity and not upon the application of the comparative fault doctrine which springs from common law tort principles."

As American Express contends, the David Defendants have not and cannot point to any case or statute holding that a debtor's exceeding a credit limit imposed by the lender is a defense to the debt. American Express cites, *inter alia, Edwards v. Modoc County Bank,* 135 Cal.App. 550, 554 (1933)("The fact that a bank might loan beyond its statutory limit does not absolve the debtor or raise any presumptions against the truth of the testimony given"). Indemnity is not sought by any party in this case. American Express seeks to establish direct liability against the David Defendants.

In *Lipson v. Superior Court*, 31 Cal.3d 362, 376 n.8 (1982),

80

the California Supreme Court explained:

> In this state, the defense of assumption of
> risk arises when the plaintiff voluntarily
> undertakes to encounter a specific known risk
> by defendant's conduct.  (*Grey v. Fibreboard
> Paper Products Co.* (1966) 65 Cal.2d 240, 245
> ...; see also 4 Witkin, Summary of Cal. Law
> (8th ed.1974) Torts, § 722, pp. 3011-3012.)
> Assumption of risk normally operates as a
> complete defense to a plaintiff's claim of
> strict liability.  However, when a
> plaintiff's voluntary encounter with a known
> risk is also unreasonable, his conduct is in
> reality a form of contributory negligence.
> (*Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804,
> 824 ....)  To the extent that the assumption
> of risk doctrine overlaps with contributory
> negligence, the former has been abolished as
> a separate and complete defense.  The burden
> of plaintiff's loss is divided between the
> parties in proportion to the percentage of
> fault attributable to each of them.  (*Daly v.
> General Motors Corp.* (1978) 20 Cal.3d 725,
> 742 ....)

These authorities establish that the affirmative defenses of comparative fault, apportionment of fault and assumption of the risk do not provide a defense to American Express's claims of fraudulent transfer, conspiracy to fraudulently transfer, alter ego or successor liability.

Defendants do not respond specifically to the legal authority cited by American Express.  They contend, however, that damages sustained by American Express were caused solely by the actions of third parties, including American Express and Abdo. Noting that Abdo personally guaranteed the loan, the David Defendants argue that, because American Express has determined Abdo to be judgment proof, American Express is attempting to collect the entire amount of the debt from the David Defendants

81

1 and that "[t]here is no basis for the imposition of liability on

2 the David Defendants in light of the actions taken by the other

3 parties."  In addition, the David Defendants assert, Fahd Aezah

4 is personally liable as a card holder for the debt incurred on

5 the credit card issued to him but that, for some reason, American

6 Express dismissed Fahd Aezah as a defendant in this action.

7     As American Express contends, parties can be jointly and

8 severally liable.  Further, the David Defendants do not contend

9 that Fahd Aezah is an indispensable party to this litigation.

10     Summary judgment for American Express on the Second, Sixth

11 and Twelfth Affirmative Defenses is GRANTED.

12          3.   <u>Third and Fifth Affirmative Defenses</u>.

13     The Third Affirmative Defense, captioned "Set Off", alleges

14 that, to the extent the David Defendants are liable for American

15 Express's damages, the David Defendants "are entitled to set off

16 those damages against any amounts owed by Plaintiff or other

17 parties to him."

18     Based on the concession by the David Defendants at the

19 hearing that they have no facts to support set-off, summary

20 judgment for American Express on the Third Affirmative Defense is

21 GRANTED.

22      The Fifth Affirmative Defense, captioned "Failure to

23 Mitigate Damages", alleges that American Express, "with the

24 exercise of reasonable diligence and effort, could have mitigated

25 the damages, if any, alleged in the complaint [sic]."

26     The doctrine of mitigation of damages is set forth in *Valle*

1   *de Oro Bank v. Gamboa*, 26 Cal.App.4th 1686, 1691 (1994):

2           The doctrine of mitigation of damages holds
            that '[a] plaintiff who suffers damage as a
3           result of either a breach of contract or a
            tort has a duty to take reasonable steps to
4           mitigate those damages and will not be able
            to recover for any losses which could have
5           been thus avoided.' ... A plaintiff may not
            recover for damages avoidable through
6           ordinary care and reasonable exertion ... The
            duty to mitigate damages does not require an
7           injured party to do what is unreasonable or
            impracticable ... 'The rule of mitigation of
8           damages has not application where its effect
            would be to require the innocent party to
9           sacrifice and surrender important and
            valuable rights.' ....

10
            Typically, the rule of mitigation of damages
11          comes into play when the event producing
            injury or damage has already occurred and it
12          then has become the obligation of the injured
            or damaged party to avoid continuing or
13          enhancing damages through reasonable efforts.
            For example, a landowner should avoid the
14          certain loss of trees and crops by reasonably
            irrigating the land while a dispute over the
15          contract price of water is resolved ... An
            owner's recovery for deprivation of use of a
16          damaged vehicle is limited to the time
            reasonably required for making the necessary
17          repairs ... One has an obligation to avoid an
            unwarranted enhancement of damages 'through
18          passive indifference or stubborn insistence
            upon a conceived legal right ....' ...
19          Indeed, BAJI Nos. 14.67 (Damages-Personal
            Injury-Duty to Mitigate) and 14.68 (Damages-
20          Personal Property-Duty to Mitigate) impose
            the duty to mitigate upon 'a person who has
21          been injured,' or 'whose property has been
            damaged ....'

22  In *Millikan v. American Spectrum Real Estate Services California,*

23  *Inc.,* 117 Cal.App.4th 1094, 1105 (2004), cited by American

24  Express, the Court of Appeals explains:

25          'The burden of proving that losses could have
26          been avoided by reasonable effort and expense

                                83

> must always be borne by the party who has
> broken the contract ... Inasmuch as the law
> denies recovery for losses that can be
> avoided by reasonable effort and expense,
> justice requires that the risks incident to
> such effort should be carried by the party
> whose wrongful conduct makes them necessary
> ... Therefore, special losses that a party
> incurs in a reasonable effort to avoid losses
> resulting from a breach are recoverable as
> damages.' ....

American Express contends that there is no evidence in the record that American Express owes any of the David Defendants any money or that American Express failed to mitigate its damages.

Referring to "Defenses Based on Mitigation", the David Defendants assert that American Express concedes that the collective credit limit for the cards issued to Bakersfield Wholesale was supposed to be $110,000 and that internal glitches allowed Abdo in incur $3.5 million in excess of that credit limit, and that Abdo was considered a high credit risk. The David Defendants argue: "American Express failed to mitigate its damages in this case by failing to properly monitor their cards and have adequate measures in place to limit the damages."

The David Defendants were given leave to file a supplemental brief providing legal authority in support of their mitigation defense.

The David Defendants cite *Thrifty-Tel Inc. v. Bezenek,* 46 Cal.App.4th 1559 (1996). In *Thrifty-Tel*, Thrifty-Tec, a telephone long distance carrier, sued the Bezenek's, parents of sons who used computer technology to crack Thrifty-Tel's access and authorization codes and made long distance telephone calls

without paying for them, for fraud and conversion and prevailed. On appeal, the Court of Appeals ruled in pertinent part:

> At least four months before Thrifty-Tel sued, it knew the hacking occurred in the Bezenek home.  But plaintiff neither notified the Bezeneks nor attempted to prevent a recurrence.  Myron Bezenek's testimony that he would have stopped it immediately had he been advised of his children's activities was, not surprisingly, unrebutted. Accordingly, the Bezeneks complain plaintiff failed to mitigate its damages and insist they should not be liable for any losses suffered in the February 1992 escapade.  We agree.
>
> A plaintiff has a duty to mitigate damages and cannot recover losses it could have avoided through reasonable efforts.  (*Shaffer v. Debbas* (1993) 17 Cal.App.4th 33, 41 ....) Citing *Service v. Trombetta* (1963) 212 Cal.App.2d 313, 320 ..., Thrifty-Tel's only response is that mitigation does not '"require a complex series of doubtful acts and expenditures."' Picking up the telephone to reach out and touch the Bezeneks or sending them a letter was complex, doubtful, or expensive?  Based on Myron Bezenek's unchallenged testimony, we must presume that simple expedient would have avoided the second hacking episode.  Accordingly, Thrifty-Tel is not entitled to recover damages for the February 1992 event.

46 Cal.App.4th at 1568-1569.

The David Defendants argue that American Express, like Thrifty-Tel, could have used reasonable efforts to limit the amount of damages/amount that was charged by Abdo on the credit cards, contending that American Express had knowledge that the credit limits were being exceeded but did nothing to limit or stop the incurrence of the debt.

American Express argues that a lender has no duty to

85

mitigate damages when it is owed a debt.  American Express refers to *Valle de Oro Bank v. Gamboa*, *supra*, 26 Cal.App.4th 1686.

In *Valle de Oro Bank*, the Bank brought an action for damages for the balance due on a promissory note executed by Gamboa in consideration for a loan to purchase a motor home (also referred to as the vehicle).  The motor home was destroyed by fire when the unpaid balance on the loan exceeded the insurance coverage obtained by Gamboa on the motor home.  On appeal, the issue was whether the trial court erred in allowing the jury to consider the doctrine of mitigation of damages against the Bank by virtue of the Bank's failure to procure comprehensive insurance coverage on the motor home.  The Court of Appeals held it was error to allow the jury to consider and apply the doctrine of mitigation of damages, holding:

> The issue of mitigation of damages in this case arises in a unique context.  Although no reported California case has dealt with application of the doctrine of mitigation of damages to a lender's action to collect on a contractual obligation for the repayment of a loan where the collateral to a loan was destroyed and the lender did not exercise a contractual option to insure against the loss, case law analysis discloses the doctrine is used sparingly in the contract or commercial context.
>
> In *Seaboard Music Co. v. Germano,* ... 24 Cal.3d 618, the lessor of a jukebox and pool table sued a tavern owner for damage for failure to make lease payments.  The argument the lessor was required to mitigate damages by releasing the equipment it received back was rejected by the court.  The court reasoned one who is engaged in the business of leasing equipment is not required to sacrifice additional leases it might

negotiate so that repossessed equipment may
be released.  As the *Seaboard* court
articulated, '... the rule of mitigation of
damages has no application where its effect
would be to require the innocent party to
sacrifice and surrender important and
valuable rights.'  (*Id.* at p. 623.)

In *Capaldi v. Levy* (1969) 1 Cal.App.3d 274
..., defendant contracted to purchase all the
corporate stock of a company.  Defendant made
a down payment, took possession of the
corporate property, but thereafter refused to
pay the balance of the purchase price and
abandoned the property.  The *Capaldi* court
rejected defendant's argument the sellers
were required to mitigate damages: 'Appellant
contends that it was the duty of the sellers
to mitigate damages from and after the time
when he repudiated the purchase agreement and
abandoned the property.  The sellers,
however, having fully performed their
obligations under the written agreement and
escrow instructions, had no further duty with
respect to the operation of the corporation,
the books, records and assets of which had
been delivered to appellant.  It is obvious
that the doctrine requiring mitigation of
damages has no application to the facts of
this case.'  (*Id.* at p. 282.)

In *Vitagraph, Inc. v. Liberty Theatres Co.*
(1925) 197 Cal. 694 ..., a distributor of
photoplays sued to recover damages resulting
from defendant's failure to pay the agreed
film rental value.  While upholding the trial
court's ruling defendant had failed to prove
facts in mitigation of damages, the court
noted: 'No case has been called to our
attention wherein this rule as to the duty to
minimize the damages has been applied to a
situation in which the defendant's breach of
duty consisted solely of the failure or
refusal to pay a liquidated sum of money when
due, and it may perhaps be doubted that the
rule is applicable to such a case.  It would
seem that the situation of the respondent is
in this respect analogous to that of a lessor
whose lessee has repudiated the lease and
given notice that he will not perform it.  It
is held in such case that the lessor may

87

elect to stand upon his contract and may
recover the full rent for the term, when it
becomes due, in accordance with the terms of
the contract, or he may elect to treat the
contract as abandoned and relet the premises
to another tenant, in which event he can
recover as damages only the difference
between the rent he was to receive and the
rent actually received from the subsequent
tenant ....'  (*Id.* at pp. 698-699.)

Other California cases have dealt with the
issue of whether there exists under certain
circumstances a general or common law duty to
procure insurance coverage.  In *Morales v.
Fansler* (1989) 209 Cal.App.3d 1581 ..., it
was held a lessor had no duty to an injured
third party to ensure a tenant's compliance
with a lease provision requiring $500,000 in
liability coverage.  Similarly, in *Sutake v.
Orange County Federal Credit Union* (1986)
..., the lender and legal owner financing the
purchase of an automobile owed no duty to an
injured motorist to procure liability
insurance on the vehicle where the registered
owner/driver had failed to do so.  (Accord,
*Altman v. Morris Plan Co.* (1976) 58
Cal.App.3d 951, 956-959 ...; *Skerlec v. Wells
Fargo Bank* (1971) 18 Cal.App.3d 1003, 1006
....)

By contrast, where a lender orally agrees or
represents it will maintain its practice of
procuring insurance for the financed vehicles
of its long-time customer, an action for
breach of the agreement can be maintained for
fire damage to a vehicle for which no
insurance coverage was in fact provided.
(*Sawyer v. Bank of America* (1978) ... In this
case, of course, there was no evidence of any
such practice or representation ....

Perhaps no California case better captures
the spirit of the equities which exist in
favor of the Bank in this case than *Ash v.
Soo Sing Lung* (1918) 177 Cal. 356 ... In *Ash*,
the defendant agreed to purchase, harvest,
and market a crop of peaches on the
plaintiff's property.  The defendant failed
to tie up tree limbs as he was obligated to
do and the plaintiff sustained damage to his

88

trees as a result.  Because the plaintiff
discovered some tree damage but did not avert
further damage by tying the trees himself,
the trial court instructed the jury on
mitigation of damages.  The jury's verdict
was in favor of the defendant.  The Supreme
Court reversed judgment for defendant and
held: 'Conceding that the rule contended for
by the defendant requiring one threatened
with injury to his property through the
breach of an obligation respecting the same
undertaken by another, to do all in his power
to prevent or minimize the loss to himself
impending upon such breach, to be a correct
statement of the law, it must be apparent
that the foregoing instruction went far
beyond the boundaries of this rule; for in
effect it charged the jury that the plaintiff
could recover no damages from the defendant
for injuries arising from the latter's breach
of his obligation if the plaintiff could have
done himself what the defendant ought to have
done, but failed to do under the terms of his
contract.  A rule of law thus broadly stated
would place a premium upon the defendant's
breach of his agreement, and results in
entirely transferring to the plaintiff's
shoulders the burden of the defendant's
violated obligation.'  (*Id.* at pp. 361-362.)

In this case, the trial court erred in
allowing the doctrine of mitigation of
damages to defeat the Bank's right to recover
the unpaid balance on the note executed by
Gamboa.  Use of the doctrine in this case did
not provide a shield against the unwarranted
piling up of damages, but rather constituted
a sword against the Bank's contractual right
to recover damages resulting from Gamboa's
admitted breach of contract.  The Bank had
fully performed under the contract by
disbursing loan proceeds of $79,000 to
Gamboa.  The contractual obligation to secure
comprehensive insurance on the vehicle was
Gamboa's, not that of the Bank.  When Gamboa
allowed his insurance coverage to lapse and
when he thereafter arranged for renewal of
coverage for less than the amount of the loan
balance, no damage-producing event had yet
occurred.  The vehicle which collateralized
the loan still existed and Gamboa continued

89

1   to make scheduled loan payments.  Simply put,
    there was no damage for the Bank to mitigate,
2   and it was still the Bank's contractual
    *option*, not *obligation*, to secure its own
3   insurance coverage.

4   Under the circumstances of this case, it was
    error to allow the jury to consider and apply
5   the doctrine of mitigation of damages.  The
    Bank was entitled to recover the unpaid
6   balance of the promissory note executed by
    Gamboa together with interest.

7
26 Cal.App.4th at 1691-1694.
8

9       American Express argues that *Thrifty-Tel* has no application

10  to a debt to a corporate borrower in a liquidated amount, which

11  forms the basis of American Express' contract claims.  Further,

    American Express contends that mitigation of damages has no
12
    application to the claims against the David Defendants for
13
    fraudulent transfer or conspiracy to fraudulently transfer:
14

15          ... American Express has shown that David
            actively participated in transfers of
16          Bakersfield Wholesale property <u>after</u> the
            entire $3.7 million in debt owed by
17          Bakersfield Wholesale had been incurred.
            Thus, the damage caused by David (that is,
18          the transfer, on or after December 6, 2007,
            of $3 million in inventory from Bakersfield
19          Wholesale to the Fortress storage unit, as
            well as subsequent transfers) could not have
20          been prevented by any action of American
            Express: American Express did not even learn
21          of such transfers to Fortress until after
            this lawsuit was initiated.

22          To hold otherwise would be to permit the
            David Defendants to assert a comparative
23          negligence defense, permitting them to assert
            that their intentional wrongdoing should be
24          weighed against American Express' purported
            negligence in permitting Bakersfield
25          Wholesale to incur the $3.7 million debt in
            the first place.  As the Court properly
26          observed during the summary judgment

                          90

1
2

        argument, the State of California does not
permit an intentional tortfeasor to assert a
claim of comparative negligence.

3      American Express replies that Defendants' position is not a

4  proper application of the mitigation of damages doctrine.

5  American Express cites *Pacific Can Co. v. Hewes*, 95 F.2d 42, 46

6  (9th Cir.1938): "The duty resting on appellee to minimize his

7  damages, would not operate until he knew, that he was suffering

8  damages, by breach of the contract by appellant."  American

9  Express also cites *White v. Atlantic Richfield Co.,* 945 F.2d

10  1130, 1133-1134 (9th Cir.1991):

11
12
13
14
15
16
17
18

       ... A nondefaulting party must act reasonably
under the circumstances so as 'not to
unnecessarily enlarge damages caused by
default.' ... We think White's refusal to
take back the lease was, under the
circumstances, reasonable.  White only
learned of ARCO's breach in October, 1986,
well after the price of oil had fallen.  By
that time, the lease was worth considerably
less than in November of 1985, when Arco
failed to notify White of its decision not to
make the delay rental payment.  The Whites
should not be expected to absorb the loss
caused by Arco's breach.

19      Even if American Express was remiss in permitting

20  Bakersfield Wholesale to incur the debt, the doctrine of

21  mitigation of damages has no application in this case.  The debt

22  was incurred rapidly, even if by mistake.  American Express's own

23  alleged negligence in failing to police credit extended to Abdo

24  and his relatives, other than David, cannot be an offset if

25  American Express prevails against David.

26      American Express's motion for summary judgment as to the

Third and Fifth Affirmative Defenses is GRANTED.  No evidence has been submitted by the David Defendants that American Express's duty to the David Defendants was breached, exacerbating the damages.

### 4.  Fourth, Ninth and Tenth Affirmative Defenses.

The Fourth Affirmative Defense, captioned "Estoppel", alleges that American Express "is estopped from asserting the claims alleged in the complaint [sic] by virtue of its own acts, conduct, or omissions."  The Ninth Affirmative Defense, captioned "Waiver", alleges "that as a result of the acts, conduct, and omissions of Plaintiff, the latter has waived its right to assert each purported claim for relief in the complaint [sic]."  The Tenth Affirmative Defense, captioned "Unjust Enrichment", alleges "that as a result of the acts, conduct, and omission of Plaintiff, the latter has waived its right to assert each purported claim for relief in the complaint [sic]."[6]

American Express argues that it is entitled to summary judgment on these affirmative defenses because Defendants do not set forth any facts to support them.  In so arguing, American Express cites *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal.4th 1, 31 (1995):

> Case law is clear that '"[w]aiver is the intentional relinquishment of a known right after knowledge of the facts." ... The burden ... is on the party claiming a waiver of a right to prove it by clear and convincing

---

[6]The Tenth Affirmative Defense appears to be a typographical error.

92

1

2

3

4

> evidence that does not leave the matter to
> speculation, and "doubtful cases will be
> decided against a waiver." ... The waiver may
> be either express, based on the words of the
> waiving party, or implied, based on conduct
> indicating an intent to relinquish the right
> ....

5

6

7

Although American Express cites no case authority for the estoppel affirmative defense, the Court's research indicates that equitable estoppel has four elements that must be proved:

8

9

10

11

12

13

> "'Four elements must ordinarily be proved to
> establish and equitable estoppel: (1) The
> party to be estopped must know the facts; (2)
> he must intend that his conduct shall be
> acted upon, or must so act that the party
> asserting the estoppel had the right to
> believe that it was so intended; (3) the
> party asserting the estoppel must be ignorant
> of the true state of facts; and (4) he must
> rely upon the conduct to his injury.'"

14

*Spray, Gould & Bowers v. Associated Internat. Ins. Co.*, 71 Cal.App. 4th 1260, 1268 (1999).

15

16

17

18

Defendants did not respond to this section of the motion for summary judgment and presented no evidence or facts at the hearing from which a genuine of issue of material fact relevant to these affirmative defenses could be inferred.

19

20

21

Summary judgment for American Express as to the Fourth, Ninth and Tenth Affirmative Defenses is GRANTED.

22

5.   <u>Second, Sixth and Seventh Affirmative Defenses</u>.

23

24

25

26

The Second Affirmative Defense, captioned "Acts of Other Persons", alleges that the damages "were caused in whole or part by other persons including but not limited to the plaintiff and/or third parties." The Sixth Affirmative Defense captioned

93

1  "Apportionment of Fault/Comparative Fault" is quoted *supra*.  The

2  Seventh Affirmative Defense, captioned "Equitable

3  Indemnification", alleges that "should Plaintiff recover damages

4  from him [sic], he is entitled to indemnification, either in

5  whole or in part, from all persons or entities whose negligence

6  and/or fault proximately contributed to Plaintiff's damages, if

7  any."  No third parties have been joined as defendants.

8       American Express moves for summary judgment on these

9  affirmative defenses, contending that "[p]otential claims against

10 unidentified third-parties, whom the David Defendants have not

11 even attempted to implead into this litigation, cannot defeat

12 American Express' right to summary judgment ...."

13      The David Defendants oppose this aspect of the motion,

14 contending:

15            Abdo ... was responsible for the sale of the
              cigarettes to A N J mini mart.  The amount of
16            cigarettes that were sold the A N J may be as
              high as $2,000,000 based on Abdo's ...
17            deposition testimony or as low as $600,000
              based on the fraudulent checks that were
18            received by Bakersfield Wholesale Foods.
              David was not a party to those transactions.
19            David was not an owner of Bakersfield
              Wholesale.  David should not be culpable for
20            the transactions with A N J.  American
              Express has as little to do with the sale of
21            cigarettes to A N J as David ... did.
              American Express should pursue A N J for
22            recovery of their property in this regard
              rather than trying to impose this burden
23            completely on David ... who had nothing to do
              with the acquisition of the credit card debt
24            or the sale of the Costco cigarettes.

25      As American Express contends, however, "parties may be

26 jointly and severally liable, and the David Defendants do not

                              94

1  contend that any of the missing parties are indispensable parties

2  to this lawsuit."

3      Summary judgment for American Express on the Second, Sixth

4  and Seventh Affirmative Defenses is GRANTED.

5          6.  Eighth and Eleventh Affirmative Defenses.

6      The Eighth Affirmative Defense, captioned "Laches", alleges

7  that, "by virtue of Plaintiff's unreasonable delay in commencing

8  this action, which delay has caused prejudice to the David

9  Defendants, the complaint [sic] and each purported claim for

10 relief asserted therein are barred by the doctrine of laches."

11 The Eleventh Affirmative Defense, captioned "Statute of

12 Limitations", alleges that the TAC is barred by the applicable

13 statute of limitations.

14     In *Miller v. Eisenhower Medical Center*, 27 Cal.3d 614, 624

15 (1980), the California Supreme Court, citing *Conti v. Board of*

16 *Civil Service Commissioners*, 1 Cal.3d 351 (1969), explained:

17          [T]he affirmative defense of laches requires
             unreasonable delay in bringing suit 'plus
18          either acquiescence in the act about which
             the plaintiff complains or prejudice to the
19          defendant resulting from the delay.' ...
             Prejudice is never presumed; rather it must
20          be affirmatively demonstrated by the
             defendant in order to sustain his burdens of
21          proof and the production of evidence on the
             issue ... Generally speaking, the existence
22          of laches is a question of fact to be
             determined by the trial court in light of all
23          of the applicable circumstances, and in the
             absence of manifest injustice or a lack of
24          substantial support in the evidence its
             determination will be sustained.
25
        American Express contends that there is "absolutely no
26

                                 95

evidence that American Express delayed the assertion of claims in
this action, or that the David Defendants have been prejudiced by
any such delay."   No evidence of delay prejudicing the David
Defendants has been shown.   All Defendants' predecessor counsel
endeavored to delay progress of this lawsuit.

American Express contends that it is entitled to summary
judgment on the statute of limitations affirmative defense.   This
action was commenced on December 21, 2004.   The First Amended
Complaint naming David as a defendant was filed on March 22,
2005.   The Third Amended Complaint naming Bakersfield Wholesale
Grocery and DAI as defendants was filed on February 23, 2007.
American Express notes that the lawsuit is based on conduct that
occurred in December 2004 and continued throughout the course of
the litigation, which American Express contends is well within
the applicable statutes of limitations.   The statute of
limitation on a written contract is four years; for fraud, three
years from the time of discovery; and for breach of oral
contract, two years.

The David Defendants did not respond to this section of the
motion for summary judgment and conceded at the hearing that
there was no evidence to support these affirmative defenses.

Summary judgment for American Express on the Eighth and
Eleventh Affirmative Defenses is GRANTED.

7.   <u>Thirteenth, Fourteenth and Seventeenth Affirmative
Defenses</u>.

The Thirteenth Affirmative Defense, captioned "Good

Faith/Reasonably Equivalent Value", alleges that the David Defendants "took certain fixtures of Bakersfield Wholesale in good faith and for a reasonably equivalent value."  The Fourteenth Affirmative Defense, captioned "Preference", alleges that "Abdo Aezah paid him, and/or transferred certain fixtures of Bakersfield Wholesale to him in lawful preference over Plaintiff, for adequate consideration."  The Seventeenth Affirmative Defense, captioned "Cumulative Liability Limited", alleges that the David Defendants' "cumulative liability herein is limited pursuant to the value of certain fixtures transferred by Bakersfield Wholesale to him."

At the hearing Defendants conceded summary judgment for American Express on these affirmative defenses.

Summary judgment for American Express on the Thirteenth, Fourteenth and Seventeenth Affirmative Defenses is GRANTED.

### 8.   Fifteenth and Sixteenth Affirmative Defenses.

The Fifteenth Affirmative Defense alleges that "certain fixtures of Bakersfield Wholesale conveyed to him are exempted pursuant to Civil Code § 3440.1.  The Sixteenth Affirmative Defense alleges that the sale of certain fixtures of Bakersfield Wholesale are excluded under Commercial Code §§ 6103(c) and 6107.

These statutory provisions pertain to bulk sales.  The evidence establishes that the attempted bulk sale under the California Code by Abdo to David was reversed.  Defendants conceded at oral argument that this defense is not applicable.

Summary judgment for American Express on the Fifteenth and

1  Sixteenth Affirmative Defenses is GRANTED.

2          9.  **Eighteenth Affirmative Defense**.

3      The Eighteenth Affirmative Defense reserves the right to

4  assert additional affirmative defenses.  None has been asserted.

5      The pleadings and discovery in this action are closed.

6  Summary judgment for American Express on this affirmative defense

7  is GRANTED.

8                          **CONCLUSION**

9      For the reasons stated above:

10     1.  American Express's motion for summary judgment IS

11 GRANTED IN PART AND DENIED IN PART:

12         a.  Summary judgment is DENIED as to American Express's

13 claims for intentional fraudulent transfer, constructive

14 fraudulent transfer, conspiracy to fraudulently transfer,

15 successor liability, and alter ego liability.

16         b.  Summary judgment is GRANTED as to the David

17 Defendants' affirmative defenses.

18     2.  Counsel for American Express shall prepare and lodge a

19 form of order that the rulings set forth in this Memorandum

20 Decision within five (5) days following the date of service of

21 this decision.

22     IT IS SO ORDERED.

23 Dated:   __October 29, 2007__           _____/s/ Oliver W. Wanger_____
                                          UNITED STATES DISTRICT JUDGE
24

25

26